# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

RECEIVED

**KPL, infant son**
   **a.k.a. KPM;**

2006 OCT 17 P 4: 47

**represented, at this time,**

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

**Karl Rudolph Lentz, Natural Father,**
**Plaintiff, Pro se**

2:06CV942-MEF

   vs.

**ALABAMA STATE BOARD OF HUMAN RESOURCES, and**
**GOVERNOR BOB RILEY, Chairman, in his official capacity to Execute and**
**individual capacities;**

**ALABAMA DEPARTMENT OF HUMAN RESOURCES, and**
**PAGE WALLEY,  Acting Director, in his official capacity as Administrator and**
**individual capacities;**

**ALABAMA SUPREME COURT, and CHIEF JUSTICE NABERS , in his  official**
**Judiciary capacities;**

**STATE OF ALABAMA OFFICE OF THE ATTORNEY GENERAL, and**
**STATE ATTORNEY GENERAL, TROY KING, in his official Judiciary and**
**Prosecuting capacities;**

**STATE OF ALABAMA OFFICE OF THE ATTORNEY GENERAL, and**
**ASSISTANT STATE ATTORNEY GENERAL, SANDRA JOHNSON and, in her**
**official and individual capacities;**

**STATE OF ALABAMA OFFICE OF THE ATTORNEY GENERAL, and**
**ASSISTANT STATE ATTORNEY GENERAL, JONATHON S. SCHLENKER, in**
**his official and individual capacities;**

**ALABAMA SUPREME COURT, and VERY HONORABLE JUDGE WILLIAM**
**HEREFORD, ST. CLAIRE COUNTY, in his official and individual capacities;**

ALABAMA  TENTH CIRCUIT COURT a.k.a. JEFFERSON COUNTY
COURTHOUSE, and CHIEF JUDGE VOWELL, in his official and individual
capacities;

ALABAMA  TENTH CIRCUIT COURT FAMILY DIVISION a.k.a.. JEFFERSON
COUNTY FAMILY COURT, and CHIEF JUDGE SANDRA STORM, in her
official and individual capacities;

JEFFERSON COUNTY PUBLIC DEFENDERS OFFICE OF THE FAMILY
COURT and CHIEF JUDGE SANDRA STORM, retired, in her official and
individual capacities;

ALABAMA  TENTH CIRCUIT COURT FAMILY DIVISION a.k.a.. JEFFERSON
COUNTY FAMILY COURT, and CHIEF JUDGE BRIAN HUFF, in his official and
individual capacities ;

JEFFERSON COUNTY PUBLIC DEFENDERS OFFICE OF THE FAMILY
COURT, and CHIEF JUDGE BRIAN HUFF, in his official and individual
capacities ;

ATTORNEY, BRIAN HUFF, as an associate in the Law Firm of
BOYD, FERNAMBUCQ, VINCENT & DUNN, P.C., in his professional capacity;

ATTORNEY,  BRIAN HUFF, in his individual capacity;

ALABAMA  TENTH CIRCUIT COURT FAMILY DIVISION a.k.a.. JEFFERSON
COUNTY FAMILY COURT, and REFEREE JUDGE ANDRE SPARKS, in his
limited official and individual capacities;

ALABAMA  TENTH CIRCUIT COURT FAMILY DIVISION a.k.a.. JEFFERSON
COUNTY FAMILY COURT, and JUDGE BAHAKEL  in his/her official and
individual capacities;

ALABAMA  TENTH CIRCUIT COURT FAMILY DIVISION a.k.a.. JEFFERSON
COUNTY FAMILY COURT, and JUDGE BARCLAY, in his/her official and
individual capacities;

JEFFERSON COUNTY PUBLIC DEFENDERS OFFICE OF THE FAMILY
COURT and, DOUGLAS A DELLACCIO JR. in his official and individual
capacities;

JEFFERSON COUNTY PUBLIC DEFENDERS OFFICE OF THE FAMILY
COURT and, MARY KAYE LAUMER, in her official and individual capacities;

LEGAL AID SOCIETY OF JEFFERSON COUNTY, FAMILY COURT OF
JEFFERSON COUNTY  and, SANDRA EUGENE GREGORY, in her official and
individual capacities;

LEGAL AID SOCIETY OF JEFFERSON COUNTY, FAMILY COURT OF
JEFFERSON COUNTY appointed  GUARDIAN AD LITEM  JULIE MARKS, in
her official and individual capacities;

LEGAL AID SOCIETY OF JEFFERSON COUNTY, FAMILY COURT OF
JEFFERSON COUNTY GUARDIAN AD LITEM OFFICE and, CELIA LAPIDUS
NADLER, in her official and individual capacities;

JEFFERSON COUNTY DEPARTMENT OF HUMAN RESOURCES, and
TRISH  MUSCOLINO,  Interim Director, JCDHR, in her official and individual
capacity;

ANGELA TANVEER, Assistant Director / Child Welfare, JCDHR, in her official and
individual capacity;

KIM MASHEGO,  Assistant Director / Child Welfare, JCDHR, in her official and
individual capacity;

BARBARA GALLOWAY, Assistant Director / Child Welfare, JCDHR, in her
official and individual capacity;

TENISHA FELTON , original Intake Supervisor, JCDHR, Supervisor, in her
official and individual capacity;

DEIRDRE MARCH, original Intake Caseworker, JCDHR, in her official and
individual capacity;

LISA BROWN, Caseworker, JCDHR, in her official and individual capacity;

ANITA SCOTT-SMITH, a JCDHR, Supervisor, in her official and individual capacity;

KAREN BAZINET, Caseworker, JCDHR, in her official and individual capacity;

TRACIE CURRY, Caseworker, JCDHR, in her official and individual capacity;

TERRY BEASLEY, Caseworker, JCDHR, in her official and individual capacity;

BETH SCHAEFER, - STATE HEADQUARTERS OF ALABAMA DEPARTMENT OF HUMAN RESOURCES - Montgomery, AL. in her official and individual capacity;

DR. GUFFY, attending Pediatric Physician, UAB Hospital in Birmingham, Alabama, in his official capacity;

MARGARET MANGINA, adoptive mother of Mary Kary Mangina, maternal grandmother of KPL.

Sarah Faull, Caseworker, JCDHR, in her official and individual capacity;

BRIEF OF PLAINTIFF
KPL, infant son
and
Karl Rudolph Lentz

RELIEF FROM THE UNITED STATES DISTRICT
COURT FOR THE MIDDLE DISTRICT OF ALABAMA

KIDNAPING AND FAILURE TO TRAIN

Karl R. Lentz
710 Augusta Farms Rd
Waynesboro, VA 22980
678.665.0593
kldirectv@yahoo.com

## STATEMENT REGARDING ORAL ARGUMENT

The issues presented herein are novel and of tremendous importance. Therefore, the Plaintiff believes that oral argument would be of benefit to the Court.

## TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT.................................................................

TABLE OF CONTENTS............................................................................................

TABLE OF AUTHORITIES.......................................................................................

STATUTES

    US CODES.................................................................................................

    ALABAMA CODES of 1975.........................................................................

    ALABAMA ADMINISTRATIVE CODE BOOK..................................................

    RULES.......................................................................................................

    CONSTITUTIONAL PROVISIONS..................................................................

    ALABAMA CONSTITUTION OF 1901...........................................................

    OTHER AUTHORITIES.................................................................................

STATEMENT OF JURISDICTION..............................................................................

    DISTRICT COURT JURISDICTION...............................................................

    11th CIRCUIT COURT JURISDICTION.........................................................

U.S. CODES DEFINITIONS......................................................................................

COMPLAINT.........................................................................................................

PARTIES...............................................................................................................

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW..........................................

STATEMENT OF THE CASE

    A. Background Facts...................................................................................

    B. Statement of the Facts............................................................................

STANDARD OF REVIEW.........................................................................................

SUMMARY OF THE ARGUMENT..............................................................................

IMPACT STATEMENT.............................................................................................

CONCLUSION - REMEDY.......................................................................................

CERTIFICATE OF SERVICE.....................................................................................

CERTIFICATE OF COMPLIANCE.............................................................................

## TABLE OF AUTHORITIES

### CASES and JUDGEMENTS

Monroe v. Pape, 365 U.S. 167, 81 S. Ct. 473, (1961)

Monell v. New York City Department of Social Services, 436 U.S. 658, 98 S ...

City of Oklahoma City v. Tuttle, 471 U.S. 808, 105 S.Ct. 2427 (1985),

City of Canton v. Harris, 489 U.S. 378, 109 S. Ct. 1197 (1989).

Tennessee v. Garner, 471 U.S. 1, 105 S. Ct. 1694, 85 L.Ed.2d 1 (1985)

Vineyard v. County of Murray, 990 F.2d 1207 (11th Cir.), cert. denied 510 U.S. 1024 (1993)

Sewell v. Town of Lake Hamilton, 117 F.3d 488 (11th Cir. 1997), cert. denied 118 S.Ct. 852 (1998)

# __STATUTES__

## __U.S. Codes__

42 USC 21-1(2) § 1985 (2) (3)
42 USC 21-1  § 1983
42 USC 21-1 (a) § 1988
18 USC 18-1-13   § 242
18 USC 18-1-13   § 241
42 USC 21-1 § 1986

## __ALABAMA CODES of 1975__

36-25-17(a)
36-25-17(b)

Code 1907, § 4299; Code 1923, § 8050; Code 1940,T.7, §109.
6 -5-102

Code 1923, § § 7353,7354; Code 1940, T.7, § §111,112.
6-5-104 (a)
6-5-104(b)(1)
6-5-104 (b)(2)
6-5-104(b)(3)
6-5-104(b)(4)

Code 1923, § § 7353,7354; Code 1940, T.7, § §111,112, continued
6-5-182
6-5-100/103
6-5-102
36-25-17

## __ALABAMA ADMINISTRATIVE CODE BOOK, DEPARTMENT OF HUMAN RESOURCES, SOCIAL SERVICES DIVISION__

660-3-11-.03(3)
660-3-11-.03(b)(1)
660-5-34-.02
660-5-34-.03(2)
660-5-34-.04
660-5-34-.04 (4)
660-5-34-.04 (5)(a)
660-5-34-.04(5)(b)
660-5-34-.05(a)

660-5-47-.04(a)
660-5-47-.04(8)
660-5-47-.06
660-5-50-.04
660-5-50-.06(c)
660-5-50-.06(d)
660-5-50-.06(e)
660-5-50-.06(1)
660-5-50-.06(e)
660-5-50-.09

## RULES

Fed.R.Civ.P.2

Fed.R.Civ.P.3

Fed.R.Civ.P.60(b)(3)(6)

Fed.R.Civ.P.39

## CONSTITUTIONAL PROVISIONS

U.S. Const. Amend.  IV                          *passim*

U.S. Const. Amend.  V                           *passim*

U.S. Const. Amend.  VI                          *passim*

U.S. Const. Amend.  VII                         *passim*

U.S. Const. Amend.  VIII                        *passim*

U.S. Const. Amend.  X                           *passim*

## ALABAMA CONSTITUTION OF 1901;

SECTION 1.  Equality and rights of me.

SECTION 2.  People source of power

SECTION 5.  Unreasonable search and seizure; search warrants.

SECTION 6 .  Rights of persons in criminal prosecutions generally; self-incrimination; due process
            of law; right to speedy trial; change of venue.

SECTION 10.  Right to prosecute civil cause

SECTION 13.  Courts to be open; remedies for all injuries; impartiality of justice

SECTION 15.  Excessive fines; cruel or unusual punishment.

SECTION 21.  Suspension of laws.

SECTION 36.  Constitution of Declaration of Rights.

SECTION 75.  Change of venue in civil and criminal cases.

SECTION 113.  **Supreme executive power vested in governor**

**SECTION 121. Governor may require reports from officers of executive department and officers and managers of state institutions; false reports or failure to file reports constitutes impeachable offense.**

**SECTION 140. Jurisdiction of supreme court generally; power of supreme court to issue certain remedial and original writs**

## OTHER AUTHORITIES

THE ALABAMA ADMINISTRATIVE CODE BOOK, DEPARTMENT OF HUMAN

RESOURCES, SOCIAL SERVICES DIVISION.

R.C. CONSENT DECREE OF 1991

ALABAMA CODE OF 1975

ALABAMA CONSTITUTION OF 1901

FEDERAL RULES OF CIVIL PROCEDURE

ALABAMA COURT RULES AND PROCEDURE - STATE-2000

U.S. Constitution of 1788.

## STATEMENT OF JURISDICITON

### A. DISTRICT COURT JURISDICTION

      The United States District Court for the Middle District of Alabama has jurisdiction to

review this constitutional challenge to the violations of our "Civil Rights" by the Alabama Courts.

Through the actions of conspiracy of its acting judicial agents and by the DHR and its executive and

administrative agents under Article III, section 2 U.S. Constitution of 1788 and,  42 USC 1983;

28 U.S.C. 1367(a) and authority under 28 USC  2201.

      This lawsuit is a constitutional challenge to the State of Alabama's belief in denying us

of our civil rights. DHR is justifying their actions relying on the Alabama Code of 1975; TITLE 26-14-7

empowering  them the right to intervene to remove (thru due process) by  a report of child abuse or

neglect . The Agents of DHR, have sworn to never allow us to have our children in our custody while

they alive or employed as agents for the state department of human resources, out of sheer hatred,

effectively KIDNAPING my / our families children , stripping the children of the birth rights inherently

in numerated by The Creator. the custody of our children.  Our complain therefore, is based upon the

inability to adhere to TITLE 26-14-7.1 (a)(b)(c)(d)(e)(f)(g)(h)(i)(j)(k)

allowing us due process, to be heard in a court of law through the premise of basic procedural,

court standards within the United States as well as,42 USC 1983 violations against those

enforcing the challenged statutes against the Movant.


**B    11ᵀᴴ CIRCUIT COURT JURISDICTION**

This Court has jurisdiction to hear this lawsuit from

28 U.S.C. 85 § 1343.

   We are compelled, to pray, to seek a  resolution in THE UNITED STATES DISTRICT
COURT FOR THE MIDDLE DISTRICT OF ALABAMA, for THE DEPARTMENT OF
HUMAN RESOURCES OF ALABAMA , and the JCDHR, division in Birmingham by
violation of our Civil Rights
42 U.S.C. 21 § 1983

We must proceed to ask for relief by proceeding with this lawsuit to be filed THE UNITED
STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA,  pursuant to
Fed.R.Civ.P.3 for the action to be commenced we must.

We are seeking relief from a family court order who by detaining our children thru malicious
 intrinsic fraud, through violations of our civil rights, misrepresentation of our court-
appointed attorney's and through the misconduct of the JCDHR and its agents.
 Furthermore, through violations perpetrated by the JCDHR and its agents knowingly and
with malice  violated,  **ALABAMA CODE OF 1975**

### 26-14-7.1 (1)(4)(6)(7)(a)(b)(c)(d)(e)(f)(G)(h)(i)(j)(k)(8)
PLAINTIFF WAS DENIED THE FOLLOWING DUE PROCESS RIGHTS ;
(1).  inform alleged of his rights
(4). Ten (10) day notices
(6). To know the time and date of hearings/trials
(7)(a). The right to an attorney
(b). The right to present evidence, oral testimony, and witnesses.
( c). The right to have written knowledge of what is to be said in all hearings/trails
(d). The right to review "alleged" statements - self implication/incrimination
(e). The right to possess all written material prior to hearing/trial
(f). The right to evidence t least 5 days prior to hearing/trial
(g). The right to a written policy codes and rights
(h). The right to cross examine witnesses
(i). The right to subpoena witnesses who are to testify
(j). The right to all written records judge has
(k). The right to an impartial judge.
(8). A judge to compel to attend for "both" sides

United States Code

TITLE 18—CRIMES AND CRIMINAL PROCEDURE;

TITLE 42 – THE PUBLIC HEALTH AND WELFARE ;

TITLE 28--JUDICIARY AND JUDICIAL PROCEDURE ;

# TITLE 18, PART I, CHAPTER 13  § 241 ;
**"Conspiracy against rights ".**

# TITLE 18, PART I, CHAPTER 13  § 242 ;
"Deprivation of rights under color  of law"..

# TITLE 18, PART I, CHAPTER 13  § 247 ;
"Obstruction of persons in the free exercise of religious beliefs".

# TITLE 18, PART I, CHAPTER 13 § 641 ;.
" Public money, property or records"

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or

Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—

Shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate, combining amounts from all the counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both.

The word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.

LENTZ____of____

## TITLE 18, PART I, CHAPTER 13 § 666 ;.
Theft or bribery concerning programs receiving Federal funds
(a) Whoever, if the circumstance described in subsection (b) of this section exists—

(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—

(A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that—

(i) is valued at $5,000 or more, and

(ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; or

(B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more; or

(2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;

shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.
(c) This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.
(d) As used in this section—
(1) the term "agent" means a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative;

(2) the term "government agency" means a subdivision of the executive, legislative, judicial, or other branch of government, including a department, independent establishment, commission, administration, authority, board, and bureau, and a corporation or other legal entity established, and subject to control, by a government or governments for the execution of a governmental or intergovernmental program;

(3) the term "local" means of or pertaining to a political subdivision within a State;

(4) the term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States; and

(5) the term "in any one-year period" means a continuous period that commences no earlier than twelve months before the commission of the offense or that ends no later than twelve months after the commission of the offense. Such period may include time both before and after the commission of the offense.

# TITLE 42, CHAPTER 21, SUBCHAPTER I § 1983 ;

**"Civil action for deprivation of rights"**

.

# TITLE 42, CHAPTER 21, SUBCHAPTER I § 1986 ;

Action for neglect to prevent ;

**" Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action**

# TITLE 42, CHAPTER 21, SUBCHAPTER I § 1985 :

**"Conspiracy to interfere with civil rights".**

**(2) Obstructing justice; intimidating party, witness, or juror**

**(3) Depriving persons of rights or privileges.**

# TITLE 42, CHAPTER 21, SUBCHAPTER I § 1986

**"Proceedings in vindication of civil rights".**

**(a) Applicability of statutory and common law**

# TITLE 28  PART V  CHAPTER 115‑ § 1746 ;

**EVIDENCE; DOCUMENTARY**

**(1).Unsworn declarations under penalty of perjury**

**Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a**

deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

# ALABAMA CODES OF 1975

## "TITLE 6 – CIVIL PRACTICE
## TITLE 13A – CRIMINAL CODE
## TITLE 36 – PUBLIC OFFICERS and EMPLOYEES ";

### TITLE 6 – CIVIL PRACTICE  CHAPTER 5 - ACTIONS

### Article 8 Fraud, Misrepresentation, and Deceit

## TITLE 6 , CHAPTER 5 § 100 - "FRAUD"

**Fraud - Right of action generally.**

Fraud by one, accompanied with damage to the party defrauded, in all cases gives a right of action.

*(Code 1907, §2468; Code 1923, §5676; Code 1940, T. 7, §107.)*

## TITLE 6 , CHAPTER 5 § 101 - " Fraud" -

**Misrepresentations of material facts.**

Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud.

*(Code 1907, §4298; Code 1923, §8049; Code 1940, T. 7, §108.)*

## TITLE 6 , CHAPTER 5 § 102 - " Fraud"

**Suppression of material facts.**

Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case.

*(Code 1907, §4299; Code 1923, §8050; Code 1940, T. 7, §109.)*

## TITLE 6 , CHAPTER 5 § 103 – " Fraud"
### Deceit - Right of action generally.

Willful misrepresentation of a material fact made to induce another to act, and upon which he does act to his injury, will give a right of action. Mere concealment of such a fact, unless done in such a manner as to deceive and mislead, will not support an action. In all cases of deceit, knowledge of a falsehood constitutes an essential element. A fraudulent or reckless representation of facts as true, which the party may not know to be false, if intended to deceive, is equivalent to a knowledge of the falsehood.

*(Code 1907, §2469; Code 1923, §5677; Code 1940, T. 7, §110.)*

## TITLE 6 , CHAPTER 5 § 104 – " Fraud"
### Deceit - Fraudulent deceit ;

(a) One who willfully deceives another with intent to induce him to alter his position to his injury or risk is liable for any damage which he thereby suffers.

(b) A deceit within the meaning of this section is either:

(1) The suggestion as a fact of that which is not true by one who does not believe it to be true;

(2) The assertion as a fact of that which is not true by one who has no reasonable ground for believing it to be true;

(3) The suppression of a fact by one who is bound to disclose it or who gives information of other facts which are likely to mislead for want of communication of that fact; or

(4) A promise made without any intention of performing it.

*(Code 1923, §§7353, 7354; Code 1940, T. 7, §§111, 112.)*

## TITLE 6 , CHAPTER 5 § 104 - "Libel or slander"

### Burden of proof.

In an action for libel or slander, the plaintiff must prove, unless it shall be admitted by the defendant, the facts showing that the alleged defamatory matter was published or spoken of the plaintiff.

*(Code 1923, §7357; Code 1940, T. 7, §910.)*

TITLE 13A - CRIMINAL CODE,
CHAPTER 2 – PRINCIPLES OF CRIMINAL LIABILITY
ARTICLE 1 CULPABILITY

## TITLE 13A , CHAPTER 5 § 103
## Section 13A-2-1

### Definitions - Generally.

**The following definitions apply to this Criminal Code:**

**(1) ACT. A bodily movement, and such term includes possession of property.**

**(2) VOLUNTARY ACT. An act performed consciously as a result of effort or determination, and such term includes the possession of property if the actor was aware of his physical possession or control thereof for a sufficient time to have been able to terminate it.**

**(3) OMISSION. A failure to perform an act as to which a duty of performance is imposed by law.**

**(4) CONDUCT. An act or omission and its accompanying mental state.**

**(5) TO ACT. Either to perform an act or to omit to perform an act.**

**(6) CULPABLE MENTAL STATE. Such term means "intentionally" or "knowingly" or "recklessly" or with "criminal negligence," as these terms are defined in Section 13A-2-2.**

*(Acts 1977, No. 607, p. 812, §301.)*

## Section 13A-2-2

**1. Definitions - Definitions of culpable mental state.**

**The following definitions apply to this Criminal Code:**

**(1) INTENTIONALLY. A person acts intentionally with respect to a result or to conduct described by a statute defining an offense, when his purpose is to cause that result or to engage in that conduct.**

**(2) KNOWINGLY. A person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of that nature or that the circumstance exists.**

**(3) RECKLESSLY. A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof**

constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates a risk but is unaware thereof solely by reason of voluntary intoxication, as defined in subdivision (e)(2) of Section 13A-3-2, acts recklessly with respect thereto.

**(4) CRIMINAL NEGLIGENCE. A person acts with criminal negligence with respect to a result or to a circumstance which is defined by statute as an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation. A court or jury may consider statutes or ordinances regulating the defendant's conduct as bearing upon the question of criminal negligence.**

*Acts 1977, No. 607,p.812 § 305*

## TITLE 36 - PUBLIC OFFICERS AND EMPLOYEES

## CHAPTER 25 - CODE OF ETHICS FOR PUBLIC OFFICIALS, EMPLOYEES, ETC.

# TITLE SECTION 36- 25-1 ;  "DEFINITIONS"

**(1) BUSINESS. Any corporation, partnership, proprietorship, firm, enterprise, franchise, association, organization, self-employed individual, or any other legal entity.**

**(13) GOVERNMENTAL CORPORATIONS AND AUTHORITIES. Public or private corporations and authorities, including but not limited to, hospitals or other health care corporations, established pursuant to state law by state, county or municipal governments for the purpose of carrying out a specific governmental function. Notwithstanding the foregoing, all employees, including contract employees, of hospitals or other health care corporations and authorities are exempt from the provisions of this chapter.** *(Acts 1973, No. 1056, p. 1699, &amp;sect;2; Acts 1975, No. 130, p. 603, &amp;sect;1; Acts 1979, No. 79-698, p. 1241, § 1; Acts 1982, No. 82-429, p. 677, § 1; Acts 1986, No. 86-321, p. 475, &amp;sect;1; Acts 1995, No. 95-194, p. 269, &amp;sect;1; Acts 1997, No. 97-651, p. 1217, &amp;sect;1.)*

# TITLE SECTION 36- 25-17 ;

**"Reports of violations; cooperation of agency heads".**

**(a) Every governmental agency head shall within 10 days file reports with the commission on any matters that come to his or her attention in his or her official capacity which constitute a violation of this chapter.**

**(b) Governmental agency heads shall cooperate in every possible manner in connection with any investigation or hearing, public or private, which may be conducted by the commission.**

*(Acts 1973, No. 1056, p. 1699, &sect;16; Acts 1975, No. 130, p. 603, &sect;1; Acts 1995, No. 95-194, p. 269, &sect;1.)*

**TITLE SECTION 36- 25-4 - "State Ethics Commission - Duties; complaint; investigation; rights of respondent concerning hearing; collection of fees; result once violation found".**

**SECTIONS ; (a) (1) (2) (3) (4) (5) (6) (7) (8) (9) (10)) (11)  (b) (c) (d) (e)     "(e) The commission shall provide discovery to the respondent pursuant to the Alabama Rules of Criminal Procedure as promulgated by the Alabama Supreme Court"**

*(Acts 1973, No. 1056, p. 1699, &sect;18; Acts 1975, No. 130, p. 603, &sect;1; Acts 1979, No. 79-460, p. 814, §1; Acts 1995, No. 95-194, p. 269, &sect;1.)*

# Constitution of Alabama of 1901;

SECTION 1

1.      **Equality and rights of men.**

**That all men are equally free and independent; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness**

SECTION 2

1.      **People source of power.**

**That all political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit; and that, therefore, they have at all times an inalienable and indefeasible right to change their form of government in such manner as they may deem expedient**

SECTION 5

1.      **Unreasonable search and seizure; search warrants.**

**That the people shall be secure in their persons, houses, papers, and possessions from unreasonable seizure or searches, and that no warrants shall issue to search any place or to seize any person or thing without probable cause, supported by oath or affirmation**

SECTION 6

1.      **Rights of persons in criminal prosecutions generally; self-incrimination; due process of law; right to speedy, public trial; change of venue.**

**That in all criminal prosecutions, the accused has a right to be heard by himself and counsel, or either; to demand the nature and cause of the accusation; and to have a copy thereof; to be confronted by the witnesses against him; to have compulsory process for obtaining witnesses in his favor; to testify in all cases, in his own behalf, if he elects so to do; and, in all prosecutions by indictment, a speedy, public trial, by an impartial jury of the county or district in which the offense was committed; and he shall not be compelled to give evidence against himself, nor be deprived of life, liberty, or property, except by due process of law; but the legislature may, by a general law, provide for a change of venue at the instance of the defendant in all prosecutions by indictment, and such change of venue, on application of the defendant, may be heard and**

he shall not be compelled to give evidence against himself, nor be deprived of

determined without the personal presence of the defendant so applying therefor; provided, that at the time of the application for the change of venue, the defendant is imprisoned in jail or some legal place of confinement.

## SECTION 10

### Right to prosecute civil cause.

That no person shall be barred from prosecuting or defending before any tribunal in this state, by himself or counsel, any civil cause to which he is a party.

## SECTION 13

### Courts to be open; remedies for all injuries; impartiality of justice.

That all courts shall be open; and that every person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law; and right and justice shall be administered without sale, denial, or delay.

## SECTION 15

### Excessive fines; cruel or unusual punishment.

That excessive fines shall not be imposed, nor cruel or unusual punishment inflicted.

## SECTION 2.

### Suspension of laws.

That no power of suspending laws shall be exercised except by the legislature.

## SECTION 36

### Construction of Declaration of Rights.

That this enumeration of certain rights shall not impair or deny others retained by the people; and, to guard against any encroachments on the rights herein retained, we declare that everything in this Declaration of Rights is excepted out of the general powers of government, and shall forever remain inviolate.

# COMPLAINT

## Injunction and Jurisdiction

1.    This is a complaint for relief under 42 U.S.C. § 1983, with the pendant state claims, against certain current and past officials, SOCIAL WORKERS of the DEPARTMENT OF HUMAN RESOURCES; JUDGES in the ALABAMA COURT SYSTEM, and the LAWYERS of THE OFFICE OF THE STATE ATTORNEY GENERAL; the ADMINISTRATIVE Agencies, EXECUTIVE Agencies, and the JUDICIARY BRANCH systems within the borders of The State known as ALABAMA, in The United States of America, who are regulated by Federal, State and Local Administrative Codes, Statutory Codes and Regulations, from which they derive their Authority and Control.

(A)    **For Declaratory and Injunctive Relief.**
That these DEFENDANTS, who in acting on behalf of their government sponsored program and in conspiracy with each other, Under the Color of Law, through their official and individual capacities, within the State of ALABAMA, failed to uphold their sworn duty to abide by the legal parameters and moral duties encapsulated within the <u>ALABAMA ADMINISTRATIVE CODE BOOK, DEPARTMENT OF HUMAN RESOURCES, SOCIAL SERVICES DIVISION</u> and the spirit of the <u>R.C. CONSENT DECREE of 1991</u> and violated Mr. Lentz' protected due process rights by a pattern and practice of criminally editing, falsifying and manipulating court reports and depriving him of any meaningful remedy.

(B)    **For Damages.**
Defendants, in conspiracy with each other, deprived Mr. Lentz of due process and equal protection of the law in the Alabama State Courts for five (5) years, resulting in the "kidnaping" of his children, KPL, KSL and KNL. Under Color of State Law.

( C )    **For Pendant State Claim.**
Defendants, by their actions, intentionally interfered with
Mr. Lentz' parent-child relationship, by their fraudulent and
deceitful actions in clandestine  Dependency Hearings
resulting in the kidnaping of his children KPL, KSL and
KNL..

(2)    Jurisdiction of the pendant state claim is pursuant to 28 USC
1367, as it is founded on essentially the same factual
foundation.

(3)    The STATE OF ALABAMA, by virtue of Section 6,
Subsection 2, of the Constitution of ALABAMA 1901, in
Article 1 of the Declaration of Rights, has made itself
accountable for suit in Federal Court, precluding immunity
under the Eleventh Amendment of the United States
Constitution.

(4)    That these DEFENDANTS, through their unconstrained
misuse of the ADMINISTRATIVE, EXECUTIVE,
JUDICIAL and MEDICAL "positions" they embody,
directly resulted in malicious fraud, intrinsic fraud,
embezzlement and kidnaping without due process.

(5)    We pray that this Honorable Court recognizes the
utmost urgency of this request for an Immediate
Injunction to prohibit the Jefferson County Department
of Human Resources and the Jefferson County
Family Court to continue to deny this Family of our due
process and civil rights.

(6)    We pray that this Honorable Court will move with the
utmost diligence and speed and, grant injunctive relief
and seek an immediate action to impede further
irreparable damage and estrangement due to the
fraudulent and deceitful actions of the DEFENDANTS
and immediately reunite the CHILDREN to their Natural
Father.

## PARTIES

(1)    Governor Bob Riley, as CHAIRMAN for the Department of Human Resources knows:

> (a) All STATES accepting federal money under the *Americans with Disabilities Act of 1974,* that he is required to abide by certain "principles" or "standards" or "codes" and "ethics";

> (b) By accepting federal money and the rules regulating the receipt of such funds, the STATE waivers their 11th Amendment right to immunity as a Defendant in a lawsuit(s) as a result of their non-compliance to laws, rules, regulations and/ or guidelines.

(2)    Governor Bob Riley and his Staff in Montgomery have been contacted and have had the opportunity to become familiar with the procedural transgressions taking place in Jefferson County.

> (a) That through his action and  inaction, and that of his Staff, Governor Bob Riley permitted the violations of our due process and civil rights in collusion with the Jefferson County Department of Human Resources and the Jefferson County Family Court.

> (b) Through his actions and inaction(s), and that of his Staff, he has opened the door to litigation addressing these violations in a civil lawsuit (violations of due process and civil rights) and possible criminal prosecution or convictions (kidnaping, intrinsic fraud and embezzlement).

(3)    The *Americans with Disabilities Act of 1975* clearly stipulates that in order
to qualify as a "Social Service Agency" within the borders of the United States, ALABAMA "must" with the utmost discretion, separate families.

> (a) The bond between mother/ father to her/his child is an Inherent Right: that "these are but the holiest of bonds";

      (b) The Department of Human Resources, Social Services Division of ALABAMA should proceed with the utmost discretion and caution
in *considering* the separation of parent/child.

(4)    That, in his official and individual capacities, Governor Bob Riley and his Staff have received numerous written, mailed, e-mailed and oral requests for his intervention in his capacity as the Chairman of the Department of Human Resources .

(5)    The Department of Human Resources in the State of ALABAMA has already
been found to have acted, individually and collectively, to have violated the civil rights and due process under the color of law of its citizenry.

      (a)    The result of this wrongdoing led to the placement of this AGENCY
on federal probation;

      (b)    A "guideline", a standard of conduct, was established herein referred to the R.C. Consent Decree, which was  to be meticulously adhered to maintain their status as a SOCIAL SERVICE AGENCY and to be entitled to receive federal funding.

(6)    We pray that this Honorable Court will deny any application or petition from the Department of Human Resources in ALABAMA to be released from Federal Probation.

      (a)    That the temptation of unbridled federal funding, coupled with possibility of exponentially increasing the STATE's GENERAL FUND, and personal and/or political gain necessitates a Federal Monitor
to ensure against fraud and abuse of power.

## PARTIES

(1)     Page Walley, as the acting DIRECTOR for the Department of Human Resources knows:

> (a) All STATES accepting federal money under the *Americans with Disabilities Act of 1974,* that he is required to abide by certain "principles" or "standards" or "codes" and "ethics";

> (b) By accepting federal money and the rules regulating the receipt of such funds, the STATE waivers their 11th Amendment right to immunity as a Defendant in a lawsuit(s) as a result of their non-compliance to laws, rules, regulations and/or guidelines.

(2)     Page Walley, acting Administrative Director of the Department of Human Resources and his Staff in the State Office in Montgomery have been contacted and have had the opportunity to become familiar with the procedural transgressions taking place in Jefferson County.

> (a) That through his action and inaction, and that of his Staff, Page Walley permitted the violations of our due process and civil rights in collusion with the Jefferson County Department of Human Resources and the Jefferson County Family Court.

> (b) Through his actions and inaction(s), and that of his Staff, he has opened the door to litigation addressing these violations in a civil lawsuit (violations of due process and civil rights) and possible criminal prosecution or convictions (kidnaping, intrinsic fraud and embezzlement).

(3)     The *Americans with Disabilities Act of 1975* clearly stipulates that in order to qualify as a "Social Service Agency" within the borders of the United States, ALABAMA "must" with the utmost discretion, separate families.

> (a) The bond between mother/ father to her/his child is an Inherent Right: that "these are but the holiest of bonds";

(b) The Department of Human Resources, Social Services Division of ALABAMA should proceed with the utmost discretion and caution in *considering* the separation of parent/child.

(4)     That, in his official and individual capacities, acting DIRECTOR Page Walley and his Staff have received numerous written, mailed, e-mailed and oral requests for his intervention in his capacity as Director .

(5)     The Department of Human Resources in the State of ALABAMA has already been found to have acted, individually and collectively, to have violated the civil rights and due process under the color of law of its citizenry.

   (a)     The result of this wrongdoing led to the placement of this AGENCYon federal probation;

   (b)     A "guideline", a standard of conduct, was established herein referred to the R.C. Consent Decree, which was  to be meticulously adhered to maintain their status as a SOCIAL SERVICE AGENCY and to be entitled to receive federal funding.

(6)     We pray that this Honorable Court will deny any application or petition from the Department of Human Resources in ALABAMA to be released from Federal Probation.

   (a)     That the temptation of unbridled federal funding, coupled with possibility of exponentially increasing the STATE's GENERAL FUND, and personal and/or political gain necessitates a Federal Monitor to ensure against fraud and abuse of power.

# **PARTIES**

(3)     HON. CHIEF JUSTICE NABERS, as Presiding Judge for the ALABAMA
         SUPREME COURT, that as a result of improper training and supervision of his
         STAFF, permitted the blatant disregard of the due process rights of the Plaintiffs;
         by the courts, judges and clerks of courts.

(4)     HON. TROY KING, as the Head of the STATE OF ALABAMA OFFICE OF
         THE ATTORNEY GENERAL, that as a result of improper training and
         supervision of his STAFF, permitted the blatant disregard of the due process rights
         of the Plaintiffs and aggressively prevented the reunification of Plaintiff's Family;

(5)     SANDRA JOHNSON, as the ASSISTANT ATTORNEY GENERAL, stated
         during an ISP that "*...as long as I am involved in this case, these children will
         NEVER be returned to your families custody...*" The "opinion" and unjustified
         "bias" of SANDRA JOHNSON directly resulted in the continuation of the
         violations of the RC CONSENT DECREE and the ALABAMA
         ADMINISTRATIVE CODE BOOK, DEPARTMENT OF HUMAN
         RESOURCES, SOCIAL SERVICES DIVISION and the ALABAMA CODE of
         1975 against the NATURAL FATHER and offspring;

(6)     JONATHON S SCHLENKER, STATE PROSECUTOR, actively prevented the
         commencement of a TPR trial within the 12-18 month time allotment permitted by
         LAW, and through intensive back ground checks over a period of FIVE YEARS
         was still unable to prosecute the NATURAL FATHER;

(7)     HON. JUDGE HEREFORD, appointed by the SUPREME COURT
         should have accused himself when he realized that at a preliminary TPR hearing
         the state prosecutor handed over the DHR's court report to the judge;

                    (a). After a severe protest by the father stating"We have waited 5 years for
                    a "untainted "judge to hear this case , and you sir, have just been tainted by
                    the prosecutors by accepting their court report during this preliminary
                    hearing, when it clearly states, we the defendants, are allowed access to
                    "the court report" five (5) days prior to a hearing/trial, and if our version
                    differs with that of the DHR's ,we the defendants are entitled and or
                    allowed to submit an "amended version" to the court report" which I, in
                    vain, attempted, begged, and pleaded for him to "take" our amendments to
                    the court report, as well as those by the DHR and The State Prosecutor.
                    I attempted to inform the Judge, (maybe he was not trained to know that he
                    is to accept the defendants "story of the events they would like to have
                    addressed by the judge/court as well as the state prosecutors

"story/concerns", that although we were not given the court report 5 days prior to hearing, (fortunately or unfortunately, for us, we ASSUMED, what they The DHR, and State prosecutor were going to do/say/state in their version of events, how they were going to "tell" the Judge in their biased opinions how and what they felt must be done in this our trial, watching this transpire in front of the whole courtroom, in front of all the attorneys, family members, and court staff, to me was outrageous , behavior, if they wanted to have only one-side of the story heard , yet again by another judge, why did not the Judge and State prosecutor, just" slip the report into the judges hands when noone was looking, no they ( I was told), that this one-sided event(s) occur all the time for the defendants, defended by the public defenders office are not competent enough in law , that the average defendant is unaware that the practice/acceptance of one-sided evidence in a courtroom, is not only immoral, but illegal as well, we're going to enter into the court report, ( I assume they never witnessed a defendant such as myself , who knew the proper filing to a judge/court procedure), that his, Judge Herefords response was, " *in this courtroom we'll have the say, what I read and what I don't read, who's papers I will accept and whose I will not"* It goes without saying just"whose" paper work he accepted, and those he had not !

(b) This family has been denied their access to a Judge to be heard; DUE PROCESS for five (5) years, where the time limit is set for 12 months, and in extreme TPR cases 18 months

   (1)   When in just the first few days we were informed the Judge requested and was delivered all (5) years worth of CPS  case files, and all case files held by the clerk of courts office, which we the defendants still have not received either the CPS files or 2 of the 3 case files the clerk of court holds to this day after numerous motions granted by judges for their release ,most recently in APRIL 2006 by JUDGE VOWELL, so that we may defend ourselves years (5) years into this and still not be allowed to defend ourselves.

( c ).did not question the conduct or motives of the court-appointed attorney's upon realizing that:

(1) the NATURAL PARENTS reaction when informed they had just won a "great victory", (what victory? We still are not allowed the proper amount of visits to be able to bond) prior to us even entering into the room this was all decided without our attorneys *"OOPS"* my  mistake of forgetting to write on the motion a remedy/relief.) of *a* dismissal of the case.

(a).*ALL* proceedings that were to take place on 14th of

AUGUST 2006, at 9 am, when we were summoned to appear, all was decided *before* 9am , without out knowledge of ( and it should have been painfully clear to the judge, or at least obviously clear, to the just , that there must be a TREMENDOUS lack of communication going on between ,the public defenders, and their clientele. That, whatever the motion that was submitted by our defense attorneys even  said/requested on our behalf, to allow a discussion of the case to occur prior to the 9AM commencement of the trial, prior to the arrival of the parents/defendants, That a motion for case to be dismissed by 'our' attorneys, without :.

> (1) no remedy for relief addressed , which, all we were seeking is the immediate return of OUR children to us, the natural parents ;
>
> (2)upon noticing parents outrage of no remedy being addressed , did not question, the public defense attorneys or admonish them, the public defenders, for their clients reaction to their case being dismissed with no mention of the return remedy for the "motion to dismiss".Should have sent up a signal that something is *terribly not right here today!*

(d). The NATURAL PARENTS had not authorized their attorney's to agree to anything without consulting them first, by their reactions, angst and bewilderment of, was a clear sign that they were unaware of ANY of the proceedings;

(e).Should have been obvious that the NATURAL PARENTS were unaware that MARY KAY LAUMER had not only submitted a MOTION TO DISMISS , the case in its entirety - not just TPR, but failed to gain one, yes, even just one concession,  so at first glance it would conceived as some sort of *"GREAT VICTORY!!"*QUOTED BY OUR DEFENSE ATTORNEY, Ms. Laumeer.

(8)   HON. JUDGE VOWELL, PRESIDING HEAD OF THE ALABAMA TENTH CIRCUIT COURT, in his capacity as overseer of this County's court system, and as SUPERVISOR of the PUBLIC DEFENDERS, for the failure to effectively train and supervise court-appointed attorney's activities;

(9)   JUDGE SANDRA STORM, for threatening then-attorney Brian Huff to withdraw the change of venue of this case or risk being disbarred; and FORBID ANY CONTACT WITH THE NATURAL PARENTS with their infant son, KPL, for TWO YEARS;

(10)  CHIEF JUDGE BRIAN HUFF, for permitting the Court-appointed attorneys

under his supervision to continue to work against the best interest of his/her client(s), for not allowing the NATURAL FATHER to enter into evidence documentation in his behalf, to allow the continuing suppression of NATURAL FATHER's due process rights;

(11)    BRIAN HUFF, lawyer for NATURAL FATHER, for not aggressively seeking to protect his client's due process rights, for suggesting that the "NATURAL FATHER" just "*walk away and have kids with someone else...*", for personally and politically benefitting from usurping the due process and civil rights of the NATURAL FATHER;

(12)    REFEREE JUDGE ANDRE SPARKS, upon entering the courtroom remarked without ever meeting and/or speaking with the NATURAL PARENTS that he "*....never met such a cruel, twisted, perverted, sordid person...:*" and proceeded to hand down a judgment without advising the NATURAL PARENTS:
> (A) Why they were there;
> (B) That they were ENTITLED to legal counsel;
> (C) Failed to mention that the day's proceedings would be ex parte;
> (D) DENIED the NATURAL PARENTS the opportunity to SPEAK or enter any evidence or testimony on their behalf;
> (E) Made the decision for the NATURAL PARENTS to 'appear' "PRO SE"
> (F) Denied the NATURAL PARENTS any access to the records and/or transcripts of the Hearing;

(13)    JUDGE BAHAKEL, for rendering decisions WITHOUT
> (A) physically seeing DEFENDANTS;
> (B) advising the NATURAL PARENTS of their DUE PROCESS RIGHTS;
> (C) Defendant's attorneys being present;
> (D) failed to note that the DEFENDANTS were NEVER present during trials/hearings/reviews.
> (E) For allowing Deirdre March, Lisa Brown and Tenisha Felton undue influence to the Judge's Chambers and prejudicing his/her opinion and causing the due process rights of the NATURAL PARENTS to be deemed unworthy of consideration;

(14)    JUDGE BARCLAY, for rendering decisions WITHOUT
> (A) physically seeing DEFENDANTS;
> (B) advising the NATURAL PARENTS of their DUE PROCESS RIGHTS;
> (C) Defendant's attorneys being present;
> (D) failed to note that the DEFENDANTS were NEVER present during trials/hearings/reviews.
> (E) For allowing Deirdre March, Lisa Brown and Tenisha Felton undue influence to the Judge's Chambers and prejudicing his/her opinion and causing the due process rights of the NATURAL

(A) introducing himself as "OUR" attorney;
(B) by advising us to sign a "VOLUNTARY AGREEMENT" as
    a *"...sign of good faith, that you are willing to work with DHR"* ,
(C) That signing the "VOLUNTARY AGREEMENT" would be the
    *"...only way to get your son back...."*
(D) That, at *"any time"* we could request custody and legally, DHR
    *"...would be required by LAW to return your son..."*
(E) REFUSED to inform of any/all proceedings and its implications,
(F) REFUSED to discuss case with us,
(G) REFUSED to accept phone calls from us,
(H) REFUSED to return ANY calls,
(I) REFUSED to meet with us and prepare us for Hearings/Reviews.
In essence, the behavior of Douglas Dellaccio, Jr. throughout his service to the
NATURAL PARENTS was unprofessional and unethical.

(16)    MARY KAYE LAUMER, failed to act in the best interest of her client by:
    (A) failing to advise NATURAL MOTHER of her due process rights,
    (B) failing to aggressively DEFEND the NATURAL MOTHER
        against the malicious and fraudulent allegations of
        Deirdre March, Lisa Brown, Tenisha Felton and other agents
        of the JCDHR throughout this ordeal,
    (C) for constantly and consistently refusing to file motions in behalf of the
        NATURAL MOTHER (ie: release of court reports and any/all
        information being used against her),
(D) for constantly and continuously refusing to petition the Court for daily,
    routine visits in accordance with the RC CONSENT DECREE and the
    <u>ALABAMA ADMINISTRATIVE CODE BOOK, DEPARTMENT OF</u>
    <u>HUMAN RESOURCES, SOCIAL SERVICES DIVISION,</u>
(E) for FAILURE to follow through on requests for INTERROGATORIES,
(F) for FAILURE to present evidence and testimony on behalf on the
    NATURAL MOTHER,
(G) for FAILURE to properly advise NATURAL MOTHER of the
    DEPENDENCY HEARINGS and their implications.
(H) CONTEMPT OF COURT for REFUSING to relinquish
    evidence, documentation, narratives that are being used against the NATURAL
    PARENTS;


Although her mortification of Brian Huff's mysterious ascension to his current
position as the Presiding Judge of the Family Court may have dissuaded a lesser
person, Mary Kay Laumer remains a staunch advocate of the JCDHR and its

methodical illicit acquisition of Federal Funds by ignoring the civil and due process rights of her client.

(17)   BETH SCHAEFFER, CELIA NADLER, TRISH MUSCOLINO, ANGELA TANVEER, BARBARA GALLOWAY as Supervisors and/or Directors for failing to:

(A) train their STAFF properly;

(B) to stress the importance of adhering to the guidelines set forth by the RC CONSENT DECREE;

(C) in failing to address concerns brought to their attention by the NATURAL PARENTS, PATERNAL GRANDMOTHER and PATERNAL AUNT, such as:

    (1) denial of frequent visits in accordance with the RC CONSENT DECREE;

    (2) KPL's failure to thrive;

    (3) the environment of the visitation room at the JCDHR building;

    (4) repeated requests to access KPL's IEP reports;

    (5) KPL arriving at visits without his glasses, leaving him virtually blind;

    (6) frequent missed visits of KPL, KSL and KNL;

        which is devastating because the NATURAL PARENTS only are permitted one visit per month for two hours, a direct violation of the RC CONSENT DECREE of 1991 and the ALABAMA ADMINISTRATIVE CODE BOOK.

    (7) denial to have the children baptized in accordance with their Roman Catholic heritage;

    (8) FAILURE to address the name changes by the foster care providers; We have provided video documentation to the above mentioned Supervisors/Directors.

    (9) CONTEMPT OF COURT for REFUSING to relinquish evidence, documentation, narratives that are being used against the NATURAL PARENTS;

    (10) Refusing to inform the NATURAL PARENTS of medical procedures and treatments received by KPL, KSL and KNL.

(18)   SANDRA GREGORY, GUARDIAN AD LITEM for not ensuring that, in the best interest of the children, that they develop and maintain strong, healthy bonds with their NATURAL PARENTS and each other as provided by the RC CONSENT DECREE of 1991 and the ALABAMA ADMINISTRATIVE CODE BOOK .

      We are not trying to "say"or judge what a person does for "recreational enjoyment" with her interactions of fellow mal contents/associates, who may just happen to be, drug dealers, gun runners, or convicted felons, the company she chooses to keep, for her being a free U.S. citizen , is her "right". For whom, or

what, she chooses to do at 9am in the morning, after just dropping her child off to school, and knowing for the rest of the day her child will be taken care of is to be commended, by at least making sure her child is safe, before she decided to delve into an , our opinion a very questionable elicit affair" with known drug dealers, gun runners, or convicted felons who she chooses to be with at 9 am, in the morning, what ever she needs to do in her life, in her pursuit of happiness, should not be impeded, to  find fulfilment, we will defend her "rights" to do as she pleases, in a motel room , behind closed doors, as long as those activities have no impact on others,.... this is where we have this moral, ethical, legal, DILEMMA,

(a). As our children's court appointed attorney, was she ever under the influence of narcotics of a criminal nature, that by the use of these "drugs" was her ability to render justice influenced or affected? Was she able to "think" clearly? Was, when she was at meetings, hearings, and trials representing the best interests of our children, as well as other families children was she really "all" there, in her mental capacity to be "all" there, do delegate her official duties to these children she represented?

It is now laughable, (but at the time was quite, tragic and traumatic, for all concerned for her well being and safety, her friends ,families, coworkers and the concerned public as well ),for the ability for the local police, state police, and federal FBI, and the implementation of the "Amber Alert" system to work so well. and, for the media CNN, in particular to get the word out, for all involved in the search for Ms. Gregory, to pull together their resources, so quickly and effectively is impressive for this was not just a "local"event but a National, even an International news story as well. We are suggesting that after recent these events that unfolded, that for the Jefferson County Family Court, to think about looking a little more throughly, into Ms. Gregory's, extremely questionable, "lifestyle" activities she enjoys to partake in either after work, or before work . This "lifestyle", (for this is the woman everyone "thought" was kidnaped and being taken/forced into a hotel room against her will, while it was an actual consensual "endeavor"). For us the defendants to have to live up to her "standards" of "proper conduct" is laughable, just how many other Sandra Eugene Gregory "types" does DHR employ? Just what is their screening process, and who often do their employees mandate to take drug tests , to ensure "proper" state of mind, can at the very least, to be maintained. For this woman never had told the court or in our personal contestations or in meetings discussing  the issue of placement, and reunification  with family for our children, she NEVER  had one decent opinion of her view of the father , that when looking his way, to outwardly show utter disgust , for even having to be in the same space, room, building, or planet such a vile animal, that some how someone was "allowing" me the right to breath air, that she felt she was entitled too, she effectively  attempted in every mannerisms imaginable, to persuade the Judge, other DHR workers, other attorneys , defense attorneys as well as state attorney generals, for she was the LAW that represented

our children, to elicit her disdain to the court on DHR 's behalf, but now after this
"motel mid-day rendevous", it is now apparent to us, her total disorientation
during our encounters with, Ms. Gregory her "look" of misorientation, this needs
to be seriously addressed and all her other cases as well where it was her job to tell
the court the TRUTH, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Who knows how
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. *many other Cases*
*have been affected by her "Self-Induced", Drug- Afflicted*
*LifeStyle"?*

(19)  KIM MASHEGO, ANITA SCOTT-SMITH, KAREN BAZINET and TERRY
     BEASLEY for :
         (1) denial of frequent visits in accordance with the RC CONSENT
         DECREE;
         (2) KPL's failure to thrive;
         (3) the environment of the visitation room at the JCDHR building;
         (4) repeated requests to access KPL's IEP reports;
         (5) KPL arriving at visits without his glasses, leaving him virtually blind;
         (6) frequent missed visits of KPL, KSL and KNL;
                which is devastating because the NATURAL PARENTS only
                are permitted one visit per month for two hours, a direct violation
                of the RC CONSENT DECREE of 1991 and the ALABAMA
                ADMINISTRATIVE CODE BOOK.
         (7) denial to have the children baptized in accordance with their
                Roman Catholic heritage;
         (8) FAILURE to address the name changes by the foster care providers;
                We have provided video documentation to the above mentioned
                Supervisors/Directors.
         (9) CONTEMPT OF COURT for REFUSING to relinquish
                evidence, documentation, narratives that are being used against
                the NATURAL PARENTS;
         (10) Refusing to inform the NATURAL PARENTS of medical procedures
                and treatments received by KPL, KSL and KNL.


(20)  DEIRDRE MARCH, TENISHA FELTON, and TRACIE CURRY for their:
     (A) racist attitudes towards the NATURAL FATHER who happens to be an older,
     white/caucasian man, their judgements on a man they never spoke to or met, to
     consorting with each other, thereby causing him depravation of his civil brights, yes
     quite ironic !


     (B) Based upon their training, relied upon "PROFILING" techniques
     and *assumed* that based solely on his appearance, that the
     NATURAL FATHER "...*must be a violent, abusive man that drinks, smokes and
     does drugs cause he has longhair, looks like a biker and does not act like us*

*because he is a yankee..."*

(C)DENIED the NATURAL PARENTS of any contact with KPL for two
 years because just *"...hearing his name, made my skin crawl..."*
 *[Deirdre March]*

(D) manipulated information gathered at ISP's to create documents that
made it "appear" that the NATURAL PARENTS were in agreeance with all
procedures and recommendations;

(E) had undue influence over the Court's ear and effectively prejudiced
 the Court against the NATURAL PARENTS sight unseen;

(F) continue to disseminate false information regarding the NATURAL
 FATHER's "alleged" abusive behavior which was discredited in a
 Deposition in May 2003;

(G) continually FAIL to mention to the COURT, that it is ILLEGAL
 to prohibit visitation between parents and their children;

(H) FAIL to address concerns the NATURAL PARENTS, the PATERNAL
 GRANDMOTHER , and the PATERNAL AUNT regarding:
        (1) denial of frequent visits in accordance with the RC CONSENT DECREE;

        (2) KPL's failure to thrive;

        (3) the environment of the visitation room at the JCDHR building;

        (4) denied repeated requests to access KPL's IEP reports;

        (5) KPL arriving at visits without his glasses, leaving him virtually blind;

        (6) frequent missed visits of KPL, KSL and KNL;
        which is devastating because the NATURAL PARENTS only          are
        permitted one visit per month for two hours, a direct violation
         of the RC CONSENT DECREE of 1991 and the ALABAMA
        ADMINISTRATIVE CODE BOOK.

        (7) denial to have the children baptized in accordance with their
         Roman Catholic heritage;
        (8) FAILURE to address the name changes by the foster care providers;
                        We have provided video documentation to the above mentioned
                        Supervisors/Directors.
        (9) CONTEMPT OF COURT for REFUSING to relinquish

evidence, documentation, narratives that are being used against the
NATURAL PARENTS;

(10) Refusing to inform the NATURAL PARENTS of medical procedures
and treatments received by KPL, KSL and KNL.

(21) LISA BROWN, for becoming personally involved with OUR children and
deliberately manipulating and falsifying court reports, and:

    (1) denial of frequent visits in accordance with the RC CONSENT DECREE;

    (2) CONTEMPT OF COURT for PURPOSELY delaying the paternity test
that was ordered in DEC 2001 and managed to MANIPULATE the system
and blatantly disregard the DUE PROCESS rights not only of the Natural
Father, but that of KPL, who *has a family that is willing, able and ready* to
welcome him into the FAMILY; (**JCDHR *FINALLY* produced KPL in**
~~NOV 2003~~)*May, 2004. For six months after birth we were
allowed minimal visitation and we
were denied any contact with KPL*

    (3)KPL's failure to thrive;

    (3) the environment of the visitation room at the JCDHR building; *from May 2003*

    (4) denied repeated requests to access KPL's IEP reports; *until May 2004.*

    (5) KPL arriving at visits without his glasses, leaving him virtually blind;

    (6) frequent missed visits of KPL, KSL and KNL;

        which is devastating because the NATURAL PARENTS only
are permitted one visit per month for two hours, a direct violation
of the RC CONSENT DECREE of 1991 and the ALABAMA
ADMINISTRATIVE CODE BOOK.

    (7) denial to have the children baptized in accordance with their
Roman Catholic heritage;

    (8) FAILURE to address the name changes by the foster care providers;
We have provided video documentation to the above mentioned
Supervisors/Directors.

    (9) CONTEMPT OF COURT for REFUSING to relinquish
evidence, documentation, narratives that are being used against
the NATURAL PARENTS;

    (10) Refusing to inform the NATURAL PARENTS of medical procedures
and treatments received by KPL, KSL and KNL.

(22)  DR GUFFY, for giving false testimony which directly resulted in the loss of custody
of KPL.

(23)  MARGARET MANGINA, for:

       (A) conspiring with MARY KAY MANGINA to abscond with KPL with the sole purpose for acquiring a sibling for BM, MARY KAY MANGINA's four-year old daughter, and a healthy child support check;

       (B) for persuading MARY KAY MANGINA to file false police reports;

       (C)for attempting to file false police reports with the City of Homewood.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

(1)    Whether the Jefferson County Family Court erred by prohibiting the Plaintiff's due process rights under 26-14-7.1?

(2)    Through the manipulation and falsifying of court reports, did the STATE of ALABAMA illegally receive Federal funding?

(3)    Whether the DHR abused its discretion when it prevented the Natural Parents from baptizing their children according to their Roman Catholic beliefs, and stated that the children were "...*in good Baptist homes and* [a Roman Catholic] *baptism wouldn't be necessary"* ?

(4)    Whether the legal counsel and/or court-appointed attorney's provided by the Jefferson County Family Court system adhered to a code of standard and ethics to reasonably defend his/her client(s)?

(5)    Whether the Social Workers representing the JCDHR repeatedly perjured themselves by intentionally omitting evidence and/or documentation throughout the past five years on behalf of the Natural Parents ?

(6)    Whether the JCDHR and the Family Court in Jefferson County erred and blatantly abused their authority and power by having HEARINGS/REVIEWS in clandestine meetings and INTENTIONALLY, KNOWINGLY and WILLINGLY informed the Natural Parents that HEARINGS/REVIEWS were rescheduled, when in fact, court was in session?

## BACKGROUND FACTS

Mary Kay Mangina , natural mother, and her adoptive mother, Margaret Mangina, in July 2001, went to consult with Mike Kendall, Attorney, in Birmingham, Alabama, in a fact-finding mission to determine how to prevent Karl Lentz from legally obtaining custody rights to their unborn child.

At the time Mary Kay Mangina met Karl Lentz on 7 July 2000, she was unemployed and had been since December 1998.(Exhibit 1)

Margaret Mangina, 75 years old, was employed at a Tuxedo Rental Shop as a Clerk.

Mary Kay Mangina and her daughter, Brittany Anderson, 4 years old, lived with her adoptive mother, Margaret Mangina, and her adopted brother, Charlie Mangina, 38 and unemployed; and Patrick Mangina,40 and unemployed at 3123-C Lancaster Court, Homewood, Alabama 35209 - a tiny, two(2) bedroom apartment.

Mary Kay Mangina had been involved in incidences of domestic violence with Scott Anderson, the natural father of Brittany Anderson and, her brother, Charlie Mangina.(exhibit 2; exhibit 3)

Unbeknownst to Karl Lentz, Mary Kay Mangina had a history of public drinking, DUI's and domestic violence, which were alcohol-related incidences from 1992-1999.(exhibit 4)

Karl Lentz at this time was employed by Direct TV Satellite Company and earning/grossing approximately one thousand dollars ($1,000.00) per week as an independent contractor.

It was the intention of Mary Kay Mangina to become pregnant with Karl's child, file false claims of abuse against him and "run him out of town" and then receive child support of at least one thousand dollars ($1,000.00) per month as estimated by her lawyer, Mike Kendall.

This child support would enable Mary Kay Mangina and Margaret Mangina to live comfortably for eighteen (18) years; provide a much desired sibling for Brittany; and no interference from Karl Lentz because she did, in fact, eventually have an Order of Protection placed against him.
(Exhibit 5)

These allegations, which prompted and enforced an ORDER OF PROTECTION, and have been used against Karl Lentz to prevent him from gaining custody of his children, were proved unfounded and fabricated in a Deposition 5 May 2003. (Exhibit 6)


Karl Lentz , age 38, has not, nor has ever been, convicted of a crime of neglect and/or abuse of a child.

Deirdre March, Lisa Brown, all caseworkers and supervisors involved with this case in the JCDHR system, has erroneously referred to Karl Lentz, the natural father, as Kole Lentz, the son.  An attempt to correct this gross oversight was made 12 March 2002 in the open court of Judge Sparks.  This is just one, small example to demonstrate the arrogance of the JCDHR and the Judge's of the Family Court system.

Karl Lentz approached Judge Sparks and told him his name was not "Kole" - that "Kole was his son".

Patricia Russo, natural mother of Karl Lentz, and present in court 12 March 2002, commented in open court to Judge Sparks, that in fact, his given name is "Karl" not "Kole".

Judge Sparks admonished Patricia Russo in open court and stated that "if she opened her mouth again - she would go to jail..."

Karl Lentz attempted to explain, again, the predicament to Judge Sparks.  That no one, since 14 August 2001, had bothered to ask his name, ask for proof of identity - that the JCDHR workers presumed his name was Kole.

Judge Spark's response was "What are you trying to pull here?" Karl's response was to "...correct the record."

This condescending attitude towards the Defendant(s) named in JU-2001-51832.01 , the natural parent(s) in this case, in Court and at ISP's, has made it impossible to communicate with the Family Court and the Department of Human Resources, Social Services Division in Jefferson County.

———————————————

# STATEMENT of The FACTS

1.  Mary Kay Mangina went to Dr Gary Swicord, her dentist in Birmingham, for a routine root canal on 1 August 2001 at 8am. (Exhibit 7)

2.  Mary Kay Mangina went to her obstetrician at the High Risk Clinic, for a regularly scheduled appointment at 12pm.

3.  The nurses at the High-Risk Clinic noticed the unborn baby's heartbeat was irregular.

4.  Mary Kay Mangina was admitted into UAB for a stress test on 1 August 2001.

5.  Kole Patrick Mangina was born on 2 August 2001 at approximately 4am.

6.  No comment was made on the black-and-blue and swollen appearance of Mary Kay's face as a result of the previous days' root canal.

7.  Margaret Mangina ( Mary's adoptive mother), came to UAB to visit with Mary Kay Mangina (adopted daughter) to visit her new grandson.

8.  Margaret Mangina, (Mary Kay Mangina's adoptive mother) who was seeking a sibling for Brittany Anderson (Mary Mangina's daughter from a previous marriage), sought the aid of social worker, Calee Bradley to fabricate a false report of the "brutal beating" that Mary Kay Mangina sustained at the hands Karl Lentz on 1 August 2001 which allegedly precipitated her premature labor.

9.  Calee Bradley, Deirdre March, Lisa Brown proceeded to flagrantly misuse their authority as agents of the State of Alabama, in the capacity of social workers for the Department of Human Resources, by 'presuming' Karl was guilty *without* an investigation. (*Alabama Department of Human Resources, Social Services Division, Administrative Code Book,* 660-5-34-.04)

10. Margaret Mangina told social workers, Calee Bradley, Deirdre March, Lisa Brown and Dupree Williams that Mary's face was swollen and black-and-blue because Karl Lentz beat her so bad, he knocked a *molar* out of her head and allegedly causing Mary to go into premature labor.

11. Both Karl Lentz and Mary Kay Mangina refuted this allegation.

12. Mary Kay Mangina had gone to her dentist, Dr. Grady Swicord, Birmingham, Alabama, the day before ( 1 AUGUST 2001) to have a root canal performed.

13. Mary Kay Mangina was able to produce documentation of this dental work. (Exhibit 7)

14. Karl Lentz and Mary Kay Mangina demanded that either a doctor was called in to count Mary Kay's teeth, or that an x-ray be done. Appendix 1

15. Lisa Brown adamantly refused, stating that *"...it would traumatize the victim..."* Oddly enough, Ms Brown NEGLECTED to report, in her capacity as a mandated reporter, *Alabama Department of Human Resources, Social Services Division, Administrative Code Book,* 660-5-34-.03(2) , this brutal beating of a woman 7 ½ months pregnant to the authorities *Alabama Department of Human Resources, Social Services Division, Administrative Code Book,* 660-5-34-.05(a) . One must ask, *WHY?*

16. Deirdre March and Lisa Brown *knew* the alleged assault *never happened.* 13A-2-1(6)

17. Deirdre March and Lisa Brown *chose* to falsify documents and report false information to her supervisors and the Court.   13A-2-1(6); 6-5-104

18. This false and malicious information is what the DHR , the lawyers, the Guardian ad Litems and the Judges have based this illegal kidnaping of Kole Patrick Mangina, Kolette Shay Lentz and Kameryn Nicole Lentz. 42USC 21-1 §1983

19. Had Deirdre March, Lisa Brown and the Supervisors performed their jobs properly, without prejudice, *Alabama Department of Human Resources, Social Services Division, Administrative Code Book,* 660-5-34-.04 (4)(5) (a)(b), and actually questioned the dentist,   Kole Patrick Mangina would have come home.

20. Margaret Mangina, Deirdre March and Lisa Brown and their Supervisors had *presumed* based on Karl Lentz' "appearance", that of a single, older white male, a traveling independent contractor,   that he *must* have had a criminal record and that this *kidnaping* would be a slam-dunk.

21. Lisa Brown and her colleagues *presumed* that Karl and his extended family would not accept Kole *because* he is a child with Down Syndrome; the Mangina Family did not want a "damaged" child; the Lentz-Russo-Garner Family begged to have him returned to their custody.

22. Lisa Brown went so far as to report that Karl "had a strong negative reaction" to Kole. Not true. The Mangina Family - Margaret and Charlie, had a strong negative reaction. Once Kole was diagnosed with Down Syndrome, Margaret and Charlie never visited with Kole again.(exhibit 7)

23. Dr Guffee, escorted Mary Kay and Karl Lentz to the ICU where KPL was being cared for.

24. Also, in the ICU were the Staff Nurses and four (4) unknown social workers.

25. Dr Guffee told us that Kole Patrick may have Down Syndrome - and told us that "Kole was going to be blind, deaf, crippled and severely retarded..."

26. This news was shocking.

27. One tear came down Mary's face. That was the extent of our "strong, negative reaction."

28. Mary Kay Mangina understood the importance of breast milk and the unequivocal benefits for KPL, and immediately rented a breast pump from the Alabama Department of Public Health on 6 August 2001. (Exhibit 8)

29. Lisa Brown reported on 24 August 2001 that a "Dr. Demmitt ...refused to send child home with parents." Lisa Brown does not give supporting testimony why and how he came to this determination. We never met him.

30. Margaret Mangina went home and returned all the items she purchased for Kole and then changed the locks on the apartment at 3123-C Lancaster Court, so Mary Kay could not return with KPL once they were discharged.


31. DHR removed KPL to an undisclosed place within UAB Hospital and denied Karl and Mary Kay all opportunity to bond with their infant son. VIOLATION RC CONSENT DECREE #45(a);#58; #59 and Alabama Administrative Code Book 660-5-50-.04

32. Immediately following the removal of Kole from his parents, Karl Lentz, father, has :
>    (a) tried to ascertain the reason(s) why Kole Patrick was removed from his custody;
>>        (b) the code that the JCDHR was relying on to prohibit *any*

visitation of father/son for two (2) years.
Violation of RC Consent Decree 45(a); 58 and
 Alabama Administrative Code Book 660-5-50-.04 and
660-5-50-.06(c)

33.  On 14 August 2001, JCDHR case worker, Deirdre March, filed a
Dependent Petition citing Karl Lentz as the natural father.

34.  On 14 August 2001, Deirdre March falsely stated that she was not aware
"...of any person who is not a party to these proceedings who has physical
custody or claims to have custody or visitation rights with respect to this
child." (Exhibit 9)     6-5-104(3)(b)

35.  DHR was bombarded with phone calls (documented) from Karl Lentz, the
father, Patricia Russo, the paternal grandmother and Karen Garner, the
paternal aunt - all requesting that Kole be temporarily placed with his
family.

36.   Three days later, on 17 August 2001, Deirdre March recanted Karl's
parental status and, now refers to him as the "putative father" (Exhibit 9)

37.  The "parties" were not notified of their right to counsel; Karl and Mary Kay
were not told there were "charges" and/or "allegations", nor were they ever
in possession of any documentation until **AUGUST 2006.**
     (____USC CODE_____;
RC CONSENT DECREE #59

38.  The delay in placement of  KPL with his father, Karl Lentz,  occurred
because DHR and the Court REFUSED to recognize him as the biological
father .  13A-2-2(4)

39.  Karl Lentz and Mary Mangina signed an affidavit of paternity both agreeing
that Karl Lentz was , in fact, the biological father.  It was signed and
notarized in accordance with the *Alabama Department of Human
Resources Social Services Division, Administrative Code Book,*  660-3-11-
.03(3).

40.  This document was included in the case file, however, Deirdre March and
Lisa Brown still refused to acknowledge Karl Lentz as the biological father.
6-5-104(3)(b)

41.   Karl Lentz and Mary Mangina requested that a paternity test  was done at

UAB. Although Lisa Brown and Deirdre March had the authority to order one, they denied this request *Alabama Department of Human Resources, Social Services Division, Administrative Code Book* , 660-3-11-.03(b)(1).

42.    DHR denied , nor would entertain any placement of KPL with his paternal family stating that *"... it would be illegal to spend County and Federal money until a DNA test came back positive..."* and validated that DHR was indeed *"...working with the right family"*.

43.    Karl Lentz vigorously approached the Court and DHR and demanded a DNA test with no success for EIGHTEEN (18) MONTHS. The Court and DHR had ample opportunity to order a DNA test. The Family Court in Jefferson County has a testing facility on-site and offers free testing to determine paternity. 42 USC 21-1 1983

44.    As a resident of Alabama and a child in custody, Kole Patrick Mangina  had the right to a paternity test according to the *Alabama Department of Human Resources, Social Services Division, Administrative Code Book* 660-3-11-.02

45.    On 6 September 2001, Deirdre March recommended that Karl Lentz and Mary Kay Mangina attend parenting classes. 6-5-104(b)(4)

46.    Karl Lentz and Mary Kay Mangina left the "Intake meeting" and immediately signed up for Parenting classes at the Exchange Club.

47.    The parenting class program consists of 15 meetings spanning a fifteen (15) week period.

48.    Karl Lentz and Mary Kay Mangina completed the parenting classes on 26 September 2001 - *twenty-one (21) days later* - three(3) weeks,  not the average fifteen (15) weeks. - to prove their sincere desire to be reunited with KPL as fast as time would allow. Exhibit 10

49.    Karl Lentz and Mary Kay Mangina provided documentation of the completion of the program to Deirdre March and Lisa Brown and it became part of the case file. EXHIBIT 10

50.    However, although all "parties" agreed that KPL would be returned to his natural parents upon completion of the parenting program of the Exchange Club, Deirdre March and Lisa Brown "changed" their minds  - without

explanation, without cause, violated a lawful, binding contract between us. 6-5-104(b)(3)(4)

51.  On 9 November 2001, in an ISP submitted by Lisa Brown:

(A) Lisa Brown reports that Karl had completed parenting classes.

> Karl was not court-ordered to do so, but attended to support Mary Kay.

(B) "...Kole Lentz needs to learn how to parent and meet the needs of his children..."

> Karl Lentz at this time, is 40 years old, has raised two (2) step-children and has five (5) grandchildren without incident.

(C) Lisa Brown states that Karl and Mary "tried unsuccessfully to take Brittany away from her school and grandmother.

> (1) Karl was not involved;
> (2) Mary Kay still had legal custody of Brittany.

(D) JCDHR was in contempt of court for refusing to comply with their own recommendations:

> (1) actively and aggressively prohibited any contact with Kole for two years;
>> DIRECT VIOLATION OF RC CONSENT DECREE # 45(a) and 58;  ALABAMA ADMINISTRATIVE CODE BOOK 660-5-50-.04(1)(2); 660-5-50-.06; 660-5-50-.06(1)(e)
> (2) that the parents be involved with all doctor visits; ALABAMA ADMINISTRATIVE CODE BOOK 660-5-50-.06 (c)
> (3) that JCDHR will make a case aide to set-up bi-weekly visits to begin on 14 November 2001, and failed to follow through. ALABAMA ADMINISTRATIVE CODE BOOK 660-5-50-.06(c); 660-5-50-.06(e); RC CONSENT DECREE #45 (a), #58

.

(E) Lisa Brown claims Kole's reason for entry into care was "Father's history of domestic violence."  There were allegations, but no investigation, no evidence - no convictions.

(F) Mary Kay chose not to return to Margaret Mangina's apartment because:

> (1) Margaret and Charlie's strong negative reaction to KPL and that he was "damaged";
> (2) Charlie Mangina was abusive and dangerous to Mary Kay (Exhibit 11)
> (3) Mary Kay refused to return to an abusive household.

(G) Although Karl's mother, Patricia Russo, and his sister, Karen Garner, were able and willing to take care of Kole and in constant contact with Lisa

Brown and Deirdre March, in an attempt to prevent placement in Foster Care, they  fail to mention in this ISP that there are placement options.
6-5-101; 6-5-102;6-5-103;6-5-104(b)(1)(2)(3)

(H) Karl and Mary Kay did attend Kole's first doctor visit with Lisa Brown.
    (1) Lisa Brown attempted to convince the Pediatrician to "enhance" KPL's disabilities in order to receive additional federal funding.
        18USC Part I,Chap13 § 666
    (2) The Pediatrician refused.
    (3) Lisa Brown told her not to worry about it, that "...there were other ways to get more money..."

(I) Karl and Mary Kay immediately *went* to Montgomery, to the State Headquarters of the Department of Social Services, and informed Beth Schaeffer about Lisa Brown's attempted coercion of the intern to falsify medical documents and of the improprieties that took place during that visit.

(J) As a  result of the conversation with Beth Schaeffer and the ensuing investigation into these allegations against Lisa Brown, Karl and Mary Kay were forbidden any contact with Kole for two (2) years
    DIRECT VIOLATIONS RC CONSENT DECREE 45(a); 58;59 and the ALABAMA ADMINISTRATIVE CODE BOOK 660-5-50-.04(1)(2);660-5-50-.06(c); 660-5-50-.06(1)(e)


(K)    Karl Lentz and his Family requested that we have the opportunity to baptize KPL as is our tradition and according to our Roman Catholic beliefs.
    (i) Deirdre March and Lisa Brown stated that KPL *"...is in a Baptist household and his religious needs are being met..."*
    DIRECT VIOLATION: RC CONSENT DECREE #46

51.   Karl Lentz was summoned to court on 15 November 2001.

52.   Karl Lentz wanted to hire his own legal counsel, but couldn't because JCDHR and its agents refused to inform Karl of the "allegations" made against him, or divulge the purpose of the court appearance.
42 USC 21-I § 1986;42 USC 21-I §1983; 42 USC 21-I §1985

53.   Therefore, the court appointed Douglas Dellaccio, Jr to represent him.

54.  Douglas Dellaccio, Jr.
    :failed to disclose allegations made against Karl Lentz;
    : did not review the case with Karl Lentz prior to the hearing;
    : failed to provide Karl Lentz with competent legal counsel;
    : failed to discuss a plan of action.

55.  Karl Lentz was ordered to appear on 21 November 2001 at the Jefferson County Family Court.

56.  Karl Lentz and Mary Kay Mangina arrived at the Jefferson County Family Court at 8:30 - a half an hour prior to his/her scheduled appearance.

57.  The Security Guard in the Lobby told Karl that the Courthouse was closed; that it was the day before Thanksgiving and that no hearings were being held that day.

58.  Karl Lentz showed the Security Guard the Order to Appear, and the Security Guard gave him access to the building.

59.  As disclosed by the Security Guard, the Jefferson County Family Court was vacant.

60.  Karl Lentz and Mary Kay immediately went to Montgomery to complain.

61.  Karl Lentz and Mary Kay spoke with Beth Schaeffer, in the DHR State Headquarters in Montgomery and vehemently voiced their concerns and transgressions (reporting of false allegations by case workers, reclassifying paternity status, refusal to place with family members, using incorrect names and addresses, no documentation, no access to ISP and Court Hearings, etc....) at the hands of the case workers in Jefferson County.

62.  Interestingly, and oddly enough, a Court Report was generated on 21 November 2001 - without our presence, without counsel, without a Judge. (Exhibit 12)

63.  The Clerk of Court, Jefferson County and the JCDHR deliberately and improperly addressed  summons to appear in court in a concerted effort to "prove" that Karl Lentz and Mary Kay were not only irresponsible, but disinterested in regaining custody.
 (Exhibit 13 - 9 Nov 2001)

# STANDARD OF REVIEW

This court reviews jurisdictional issues and other questions of law de novo.

See, e.g., R.C. v ANDY HORNSBY, Commissioner of the Alabama Department of

Human Resources, in 1991(United States District Court for the Middle District of

Alabama), a.k.a. RC v FULLER..

## SUMMARY OF THE ARGUMENT

I. General Challenge: The complaint contains a general challenge to the operations and

procedures of the Jefferson County Department of Human Resources and its

manipulation and influence over the Family Court System in Jefferson County and

its ability to deny citizens their right to due process accorded to him/her provided

under the                              ALABAMA CODE OF 1975,

section 26-14-7.1(1),(4),(6),(7)(a)(b)(c)(d)(e)(f)(g)(h)(i)(j)(k), (8).


**II. Failure to Alter or Amend Order:** When the Jefferson Family Court became aware

that our due process and civil rights had been violated, the Court had several

opportunities to amend court orders which would have set the "wheels of justice" in

motion to reunite the children with their NATURAL PARENTS. This is based on

RULE 60(b)(3)(6) which permits the introduction of "new" evidence to be brought to the

attention of the Court to attempt to set the record "straight".

## IMPACT STATEMENT

I humbly beseech for a moment of this Honorable Court's time to be allowed to digress to articulate the atrocities that this Family has endured by the operational procedures of the Department of Human Resources and the Family Court systems in Jefferson County.

We have exhausted every administrative and judicial avenue in the attempt to rectify and reunite this Family within our legal rights of due process under the law. Any attempt to essay information of the "alleged" charges, the right to obtain counsel, in any way, shape, form or mean to become active in this process was immediately thwarted by the threat of imprisonment. That "HEARINGS" , "TRIALS" and "REVIEWS" were held without our knowledge, in clandestine meetings that irrevocably altered the course of our lives throughout the past five years.

That this civil lawsuit is a FIGHT for the PRESERVATION of MY FAMILY, not a lawsuit of mergers and acquisitions of mere baubles, nor the mere dalliances of an Agency's whim, but we are "FLESH AND BLOOD". We all are but the most sacred of God's creatures, and His Gift - our ability to have offspring, who are the culmination of all our HOPES, our DREAMS, our AMBITIONS.....our CHILDREN.

The Movant was denied through the use of malicious fraud, the custody of his/ this family's children: KPL, KSL and KNL by the STATE OF ALABAMA DEPARTMENT OF HUMAN RESOURCES , that by the willful Manipulation of this

administrative agency's "social workers" and by their total control within their sphere of influence over the Tenth Circuit Court of Alabama in Jefferson County, Family Court Judiciary Agents and legal counsellors have kidnaped my children.

Through the Racketeering activities of this Agency, through their reign of misery, sorrow and sheer terror not only upon the citizens ensnared in this "web of deceit", but also upon the their Defending Attorney's, who, too, are threatened by the Jefferson County Court REFEREES/JUDGES absolute and maniacal rule - enamored by their own sense of self-worth in an arena where a captive audience to proselytize their own theories and beliefs - are to reign supreme, disregarding the People's right of self-determination and be allowed the luxury of "family". The wanton abandon to inflict their will, without evidence, without due process on the lower economic classes of society is deplorable and reprehensible.

"IF" after years of transgressions and intimidation, the Department of Human Resources and the REFEREES/JUDGES are thwarted and do not "break" the indomitable spirit - to still have the *stamina* to not scream out "*Yes, I am guilty! Of what, I do not know, but please stop!*" To watch, to endure as the DHR taunts you - dangles your children before your eyes like a carrot on the end of a stick, to jump through their hoops without the benefit of an explanation or evidence is abhorrent. To completely understand that you have done nothing wrong, that "someone" has the POWER to take away your CHILDREN "just because" and that you are powerless; that you have NO recourse is debilitating. This Family has *suffered.* Jobs were lost, careers put on hold, holidays were meaningless - *TIME HAS BEEN IRRETRIEVABLY LOST CREATING MEMORIES*

will be decimated and that "collateral damage" is to be expected in all of life's endeavors - to justify the calamitous effects this 'experience' has had on this family is somewhat regrettable and a necessary evil is U N AC C E P T A B L E.

The Department of Human Resources and the Family Court system in Jefferson County and its Agents are unequivocally the source of this Family's nightmares, however, we are not seeking retaliation nor reprisals on a personal level. To repay these transgressions against this Family would only cause further harm. To place all the blame of the total and wanton destruction of this Family's civil rights and the irreparable harm by the hands of the Agents representing the State of Alabama to this Family, squarely on the shoulders of Jefferson County, would be unfair. For we, this Family, understand that this "child welfare system" is a billion dollar industry, not a non-profit faith-based organization. THIS IS A BUSINESS. It is easy federal money. DHR preys upon the lower economic classes with no access to legal resources and has no fear of reprisal or accountability because the presumption is "you must be guilty"and "Who will believe you?"

It is our hope that the ALABAMA DEPARTMENT OF HUMAN RESOURCES remains on FEDERAL PROBATION, to enforce upon them accountability for their actions and that wantonly separating families to increase the STATE coffers WILL NOT be tolerated.

We move for mercy to those who intentionally pained us through this ordeal. Through our faith in GOD, we hope they shall be moved to use better judgment and compassion and to let their conscience guide them through their world, just as God has blessed this Family.

IN Conclusion,  I fully understand that this is a "CIVIL COURT" not a "Common Law" Court and I /we , my Family will try to do our best from now on to not bestow inferences to the Almighty Creator. But still "May God speed us through and show each other kindness, justice, respect and mercy for all, may God guide us and bless us all, through these lawsuit proceedings ."

# REMEDY and RELIEF

## DIRECTION OF THE LAWSUIT - OPTIONS

### OPTION #1

The IMMEDIATE return of our children.

We will sue the top four named individuals: GOVERNOR BOB RILEY, PAGE WALLEY, acting DIRECTOR of the DHR; the HON. CHIEF JUSTICE NABERS, Presiding Head of the ALABAMA SUPREME COURT and the HON. TROY KING, as Head of the STATE of ALABAMA OFFICE of the ATTORNEY GENERAL for failure to properly train their STAFF, which permitted the eradication of our civil rights; which led to the kidnaping of our children Under the Color of Law.

### OPTION #2

The IMMEDIATE return of our children.

We will sue the employees/ agents/ representatives of the DEPARTMENT OF HUMAN RESOURCES of ALABAMA and the FAMILY COURT system in JEFFERSON COUNTY and others herein named for conspiring to kidnap, collusion to deny due process and civil rights; and, racketeering for manipulating and falsifying court reports and records to receive Federal Funding under false pretenses.

### OPTION #3

We will enter into MEDIATION, in which we will respectfully request the following:

    (1)    The IMMEDIATE return of our children, KPL, KSL and KNL;

    (2)    The ability to leave the STATE of ALABAMA unhindered and without incident;

    (3)    ONE BILLION DOLLARS in damages;

    (4)    That the "case files" are expunged from the record;

    (5)    That the ALABAMA DHR remains under FEDERAL PROBATION indefinitely with no more requests from the GOVERNORS office for leniency because the DHR is violating the civil rights of others ;

    (6)    That the STATE OF ALABAMA reimburse the FEDERAL GOVERNMENT for funds it illicitly received for kidnaping my children;

(7)    That, within the next three years, that the ALABAMA DHR is prohibited from acting as an intermediary solution between children and their families in regards of their placement and that the federal funding be directed to faith-based, for non-profit organizations promoting family unity.

## REMEDY, cont'd:

If these children were the daughters of President George Bush, I am sure he would bring to bear force against the "terrorists" dividing his family, one would assume he would find a way to use weapons of mass destruction to bring justice and reunification to his Family.

If these children were Martha Stewart's children, I am sure someone would go to a minimum security FEDERAL PRISON.

If these children belonged to Donald Trump, someone would certainly hear *"YOU'RE FIRED!"* by someone in authority.

The ANGUISH of the deprivation of civil rights this Family has suffered is beyond description. For us to only pray to this COURT for justice to this Family, to pray for their safe return is in keeping with our Christian beliefs- we are not asking for revenge, for jail sentences or for people to lose their jobs. We have had our children RIPPED from our lives and we have been STRIPPED of our CIVIL RIGHTS as AMERICANS. This Family has SUFFERED because of the unchecked POWER of the ALABAMA "SYSTEM OF CARE", and the enticement of unlimited Federal Funding motivates the "system of care" to go on a state-sanctioned witch-hunt, to find "problems" where none exist, where there is no motivation for the DHR and its Agents, to show mercy and use common sense, and in acting Under the Color of Law, in conjunction with the corrupt Family Court system in Jefferson County - where collusion and flagrant abuse of the LAW is a daily occurrence and condones these "legal" kidnappings.

## CERTIFICATE OF SERVICE

I, Karl R. Lentz, do hereby certify that prior to, or immediately after the

filing the foregoing with the Court, I mailed by U.S. Express Mail, postage pre-

paid, or delivered by hand a copy to (SEE ATTACHED) :

DATE: _October 17th_
_2006_    SIGNATURE: _Karl Lentz_

## CERTIFICATE OF COMPLIANCE

I, the undersigned hereby certifies that the foregoing has been prepared in

accordance with the font type and margin requirements of Local Rule _____

of the Middle District of ALABAMA, using the font type Times New Roman

and a point size of 14.

_OCTOBER 17th 2006_     _Karl Rudolph Lentz_
_710 Augusta Farms Rd_
_Waynesboro, VA 22980_
_678-665-0593_

*Exhibit A.*

## IN THE FAMILY COURT OF JEFFERSON COUNTY, ALABAMA

IN THE MATTER OF:      )
                           )

    **KOLLETTE SHAY LENTZ**    ) **CASE NOS: JU-2002-53701**
    **KOLE MANGINA**           )         **JU-2001-51832**
    **KAMERYN LENTZ**        )         **JU-2004-50504**

### MOTION TO DISMISS

COMES NOW the MOTHER, by and through her attorney of record, and moves this Honorable Court to dismiss the above styled cases, and as grounds therefore states as follows:

1. That the State of Virginia has completed an ICPC and found the maternal grandmother favorable for custody;

2. That DHR has failed to proceed on Termination of parental rights in a timely manner and is requesting that the care be continued;

3. That the Mother objects to a continuance of the case;

4. That the Mother therefore moves to dismiss theses cases for failure of the State to properly prosecute these cases.

WHEREFORE, PREMISES CONSIDERED, the mother moves this Court to grant this Motion dismissing these cases.

Respectfully submitted this 14th day of August, 2006.

_____
MARY KAY LAUMER   (LAU-004)
Attorney for Defendant
P.O. Box 59292
Birmingham, AL 35259
(205) 879-0088

## IN THE FAMILY COURT OF JEFFERSON COUNTY, ALABAMA

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | **CASE NUMBERS:** |
| KOLLETTE SHAY LENTZ | ) | JU 2002 53701 |
| KOLE MANGINA | ) | JU 2001 51832 |
| KAMERYN LENTZ | ) | JU 2004 50504 |

## MOTION FOR IMMEDIATE HEARING FOR CUSTODY TO FATHER

Comes Now, the Father, Carl Lentz, by and through his attorney of record, W. Alan Summers, Jr., and moves this Honorable Court for an order granting unto him custody of the above stated children, for the following reasons:

1.  That Dependency of Kole Mangina was found on March 12, 2002 and of Kolette Lentz and Kameryn Lentz on April 24, 2004;

2.  That at the March 12, 2002 hearing, the father was not represented by an attorney, nor was he afforded the right to a court appointed attorney, there was no trial in order for the court to accept testimony and/or evidence and no transcript or recording of any proceeding of said hearing;

3.  That at the April 24, 2004 hearing, the father was present and was represented by counsel, but was denied the right to a trial for the taking of testimony and the admittance of evidence. There is no transcript or recording to any proceeding on this date. Furthermore, an order was entered against the wishes of the father and his attorney, in which neither signed nor agreed to any of the contents of said order;

4.  That the father has never been allowed to defend any allegation listed in the Dependent Petitions, made the basis of the above styled cases;

5.  That the Jefferson County Department of Human Resources is in violation of the RC Consent Decree, in that they have failed to exhaust any and all of its administrative policies and procedures in efforts to rehabilitate this father and his children;

6.  That the father of said above named children was served with Petitions to Terminate his parental rights of Kole Mangina on August 4, 2003 and of Kolette Lentz and Kameryn Lentz on November 8, 2004. That on August 14, 2006, some one year and nine months plus later, said Petition to Terminate Parental Rights of the father was finally set for trial, giving the father his first opportunity to defend himself of the allegations and present testimony, but was learned that DHR had made a request to dismiss the petitions due to the paternal grandmothers years of involvement with the case, a favorable homestudy, and her desire to have custody of the children;

7.    Furthermore, a Motion to Dismiss was filed in the above stated cases on August 14, 2006, based on the activity as described in Paragraph 6 herein above, and after consideration, this Honorable Court "Granted" said motion on August 16, 2006, dismissing any further action of this court. Said motion is attached as "Exhibit A";

8.    That since the dismissal of said case, DHR has failed and/or refused to return physical custody of said children to the father;

9.    That due to the constant delays, the inability of the father to have his day in court, and the poor administration of the case, the father has suffered irreparable harm in that his family has been estranged one from the other causing them not only the lose of their physical bond between this family but also any mental and/or emotional bond and clearly violates any policy and procedures in which Jefferson County Department of Human Resources and this court is reasonably expected to perform.

Wherefore, Premises Considered, the father moves this Honorable Court for an order returning immediate custody of the said minor children to the father for reasons as stated above. Furthermore, the father would request any other, further and/or different relief in which he may be entitled, and has not herein requested.

Respectfully submitted this the 3rd day of October, 2006.

W. Alan Summers
Attorney for the Father
1275 Center Point Parkway
Ste. 100
Birmingham, Alabama 35215
853-3913

10/10/2006  23:12    2056560852                SUMMERS STARR SUMMERS                  PAGE  04/05

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true and exact copy of the foregoing Motion for Immediate Hearing for Custody, to all counsel of record, by facsimile, hand delivery or by placing a copy of the same in the US Mail, with proper prepaid postage, affixed and properly addressed, this the 3rd day of August, 2006.

W. Alan Summers

Kay Laumer, Esquire
Attorney for the Mother
PO Box 59292
Homewood, Alabama 35259

John Schlenker, Esquire
DHR Legal Attorney
PO Box 13248
Birmingham, Alabama 35202

Celia Nadler, Esquire
GAL
120 2nd Court North
Birmingham, Alabama 35204

IN THE JUVENILE COURT OF JEFFERSON COUNTY, ALABAMA

MARY KAY MANGINA,

CASE NUMBER:
2004 05 193201

v.

DHR OF JEFFERSON COUNTY,
ALABAMA,

### MOTION TO DISMISS

COMES NOW the petitioner, Mary Kay Mangina, by and through her attorney of record and requests this Honorable Court to Dismiss the Petition for Termination of Parental Rights filed in this Honorable Court, for the following reasons:

1. That the Department of Human Resources, prior to the trial June 20, 2006, has failed to present any charges against me, having to do with endangering the welfare, safety, and/or any form of neglect to my infant children.

2. We have been informed that 14 days prior to the trial is the Day of Discovery and they, DHR, had called only one witness on their behalf.

3. The Court received our witness list 14 days prior to the trial as rules of conduct dictated and not one of our witnesses were subpoenaed on our behalf to present evidence of our innocence of false, malicious, and fraudulent charges that has been fabricated with, for the last 18 months.

4. So we feel beyond a shadow of a doubt that our 5th amendment rights have been encroached upon, infringed upon, (squashed), molested, and at every opportunity at DHR's behalf circumvented by not allowing ANY evidence that we have submitted to the Court on our behalf or our "proof" of our innocence to be viewed by the Judge. Through multiple "hearings" we have been told that any proof of our innocence can not be heard by the Judge until the day of our trial which has been put off on numerous occasions and by objections of our attorneys have been delayed until once again on June 20, 2006.

WHEREFORE PREMISES CONSIDERED, you, Petitioner prays that this Honorable Court would dismiss her Petition for Termination of Parental Rights Custody for the above stated reasons.

This the 24 th day of June, 2005.


Mary Kay Klardina

Customer Service: 1 800 222-0300
Text Phone (TTY): 1 800 833-3232
Internet Address:  www.att.com

Aug 11-Sep 10, 2001
Customer ID: 540 337-4587
Page 4 of 8

## AT&T One Rate® Calling Card Plan calls

| Description | Amount |
|---|---|
| AT&T One Rate® Calling Card Plan monthly fee Sep 10 - Oct 10, 2001 | 1.00 |
| Calling card calls | 9.50 |

**Total AT&T One Rate® Calling Card Plan calls** ......................................... **$10.50**

## AT&T calling card calls

### Card number: 842 091 2939

| | Date | Number called | Where | Time | Rate | Type | Min | Amount |
|---|---|---|---|---|---|---|---|---|
| 1 | Aug 24 | 540 337-4587 Called from 563 386-8909 | Waynesboro,VA PAYPHONE,IA | 8:01pm | night | station | 17 | 4.25 |
| 2 | Aug 25 | 206 246-2610 Called from 219 778-9283 | Seattle,WA PAYPHONE,IN | 12:10pm | night | station | 1 | .25 |
| 3 | Sep 6 | 540 337-4587 Called from 970 867-9926 | Waynesboro,VA PAYPHONE,CO | 5:53pm | night | station | 14 | 3.50 |
| 4 | Sep 7 | 540 337-4587 Called from 308 532-9833 | Waynesboro,VA PAYPHONE,NE | 7:44pm | night | station | 6 | 1.50 |
| | | | | | | | 38 | $9.50 |

## AT&T One Rate® Off-Peak II Plan calls

| Description | Amount |
|---|---|
| AT&T One Rate® Off-Peak II Plan monthly fee Sep 10 - Oct 10 , 2001 | 4.95 |
| Direct dialed calls | 63.50 |

**Total AT&T One Rate® Off-Peak II Plan calls** ............................................ **$68.45**

## Direct dialed calls

| | Date | Number called | Where | Time | Rate | Type | Min | Amount |
|---|---|---|---|---|---|---|---|---|
| 5 | Aug 10 | 631 723-3675 | Hamptnbays,NY | 4:39pm | day | direct | 3 | .30 |
| 6 | Aug 10 | 631 723-3675 | Hamptnbays,NY | 4:46pm | day | direct | 2 | .20 |
| 7 | Aug 10 | 631 723-3675 | Hamptnbays,NY | 6:05pm | day | direct | 3 | .30 |
| 8 | Aug 12 | 631 723-3675 | Hamptnbays,NY | 8:29pm | night | direct | 8 | .40 |
| 9 | Aug 12 | 631 981-0379 | Ronkonkoma,NY | 10:26pm | night | direct | 40 | 2.00 |
| 10 | Aug 15 | 727 934-7494 | Holiday,FL | 8:28pm | night | direct | 1 | .05 |
| 11 | Aug 16 | 727 934-7494 | Holiday,FL | 5:32pm | day | direct | 1 | .10 |
| 12 | Aug 16 | 631 723-3675 | Hamptnbays,NY | 5:35pm | day | direct | 48 | 4.80 |
| 13 | Aug 16 | 205 229-0419 | Birmingham,AL | 6:25pm | day | direct | 30 | 3.00 |
| 14 | Aug 16 | 631 723-3675 | Hamptnbays,NY | 7:00pm | night | direct | 9 | .45 |
| 15 | Aug 16 | 727 934-7494 | Holiday,FL | 8:16pm | night | direct | 1 | .05 |
| 16 | Aug 16 | 727 934-7494 | Holiday,FL | 8:16pm | night | direct | 1 | .05 |

Recycled paper

Consumer Services  1 800 222-0300
Text Phone (TTY)  1 800 833-3232
Internet Address:  www.att.com

Customer ID. 540 337-4587
Page 5 of 8

AT&T

## Direct dialed calls

| | Date | Number called | Place | Time | | Type | Min | Amount |
|---|---|---|---|---|---|---|---|---|
| 17 | Aug 16 | 207 449-1414 | Birmingham,AL | 4 28am | night | direct | 11 | .66 |
| 18 | Aug 16 | 727 934-7494 | Holiday,FL | 4 40am | night | direct | 1 | .05 |
| 19 | Aug 16 | 631 725-3675 | Hamptnbays,NY | 8 41am | night | direct | 1 | .05 |
| 20 | Aug 17 | 631 725-3675 | Hamptnbays,NY | 8 17am | day | direct | 1 | .10 |
| 21 | Aug 17 | 631 725-3675 | Hamptnbays,NY | 5 16pm | day | direct | 6 | .60 |
| 22 | Aug 17 | 205 229-0419 | Birmingham,AL | 5 24pm | day | direct | 45 | 4.50 |
| 23 | Aug 18 | 631 725-3675 | Hamptnbays,NY | 8 54pm | night | direct | 2 | .10 |
| 24 | Aug 19 | 727 934-7494 | Holiday,FL | 8 41am | night | direct | 1 | .05 |
| 25 | Aug 19 | 631 725-3675 | Hamptnbays,NY | 7 54pm | night | direct | 1 | .05 |
| 26 | Aug 20 | 205 229-0419 | Birmingham,AL | 9 07am | day | direct | 1 | .10 |
| 27 | Aug 20 | 631 725-3675 | Hamptnbays,NY | 8 58pm | night | direct | 9 | .45 |
| 28 | Aug 21 | 205 940-1112 | Birmingham,AL | 8 15am | day | direct | 1 | .10 |
| 29 | Aug 21 | 205 229-0419 | Birmingham,AL | 8 15am | day | direct | 2 | .20 |
| 30 | Aug 21 | 205 229-0419 | Birmingham,AL | 1 45pm | day | direct | 12 | 1.20 |
| 31 | Aug 21 | 631 567-1060 | Sayville,NY | 2 17pm | day | direct | 11 | 1.10 |
| 32 | Aug 21 | 631 728-3325 | Hamptnbays,NY | 2 27pm | day | direct | 6 | .60 |
| 33 | Aug 21 | 631 567-1060 | Sayville,NY | 3 21pm | day | direct | 1 | .10 |
| 34 | Aug 21 | 631 567-1060 | Sayville,NY | 3 24pm | day | direct | 6 | .60 |
| 35 | Aug 21 | 631 567-1060 | Sayville,NY | 3 31pm | day | direct | 3 | .30 |
| 36 | Aug 21 | 631 567-1060 | Sayville,NY | 3 34pm | day | direct | 16 | 1.60 |
| 37 | Aug 21 | 631 567-1060 | Sayville,NY | 5 13pm | day | direct | 3 | .30 |
| 38 | Aug 21 | 727 934-7494 | Holiday,FL | 6 49pm | day | direct | 11 | 1.10 |
| | | Call continued at next rate | | | | | | |
| 39 | Aug 21 | 727 934-7494 | Holiday,FL | 7 00pm | night | direct | 35 | 1.75 |
| | | Call continued from previous rate | | | | | | |
| 40 | Aug 21 | 205 229-0419 | Birmingham,AL | 8 53pm | night | direct | 1 | .05 |
| 41 | Aug 21 | 631 725-3675 | Hamptnbays,NY | 8 55pm | night | direct | 2 | .10 |
| 42 | Aug 22 | 205 229-0419 | Birmingham,AL | 10 20am | day | direct | 1 | .10 |
| 43 | Aug 22 | 516 443-6265 | Selden,NY | 11 31am | day | direct | 2 | .20 |
| 44 | Aug 22 | 516 443-6265 | Selden,NY | 3 41pm | day | direct | 2 | .20 |
| 45 | Aug 22 | 516 443-6265 | Selden,NY | 3 42pm | day | direct | 1 | .10 |
| 46 | Aug 22 | 516 443-6265 | Selden,NY | 3 43pm | day | direct | 1 | .10 |
| 47 | Aug 22 | 516 443-6265 | Selden,NY | 4 41pm | day | direct | 1 | .10 |
| 48 | Aug 22 | 631 567-1060 | Sayville,NY | 4 44pm | day | direct | 8 | .80 |
| 49 | Aug 23 | 205 940-1115 | Birmingham,AL | 10 03pm | night | direct | 55 | 2.75 |
| 50 | Aug 23 | 205 940-1115 | Birmingham,AL | 11 44pm | night | direct | 32 | 1.60 |
| 51 | Aug 24 | 205 940-1115 | Birmingham,AL | 8 08am | day | direct | 1 | .10 |
| 52 | Aug 24 | 205 940-1115 | Birmingham,AL | 8 12am | day | direct | 1 | .10 |
| 53 | Aug 24 | 205 229-0419 | Birmingham,AL | 10 27am | day | direct | 8 | .80 |
| 54 | Aug 24 | 205 229-0419 | Birmingham,AL | 10 45am | day | direct | 8 | .80 |
| 55 | Aug 24 | 205 229-0419 | Birmingham,AL | 3 17pm | day | direct | 9 | .90 |
| 56 | Aug 24 | 516 443-6265 | Selden,NY | 5 57pm | day | direct | 1 | .10 |
| 57 | Aug 24 | 631 878-4618 | Cmmnchs,NY | 8 55pm | night | direct | 1 | .05 |
| 58 | Aug 24 | 205 940-1115 | Birmingham,AL | 9 20pm | night | direct | 129 | 6.45 |
| 59 | Aug 25 | 516 443-6265 | Selden,NY | 6 25pm | night | direct | 1 | .05 |
| 60 | Aug 25 | 516 443-6265 | Selden,NY | 6 26pm | night | direct | 1 | .05 |
| 61 | Aug 26 | 631 981-0379 | Ronkonkoma,NY | 9 49pm | night | direct | 49 | 2.45 |
| 62 | Aug 27 | 205 229-0419 | Birmingham,AL | 5 31pm | day | direct | 9 | .90 |
| 63 | Aug 27 | 631 981-0379 | Ronkonkoma,NY | 8 26pm | night | direct | 5 | .25 |
| 64 | Aug 27 | 617 325-6035 | Roslindale,MA | 8 33pm | night | direct | 1 | .05 |
| 65 | Aug 27 | 352 726-8475 | Inverness,FL | 8 52pm | night | direct | 16 | .80 |
| 66 | Aug 27 | 727 934-7494 | Holiday,FL | 8 53pm | night | direct | 1 | .05 |
| 67 | Aug 28 | 631 725-3675 | Hamptnbays,NY | 9 22pm | night | direct | 1 | .05 |

**Continues on back**

## Direct dialed calls

|    | Date | Number called | Where | Time | Rate | Type | Min | Amount |
|----|------|---------------|-------|------|------|------|-----|--------|
| 19 | Sep 30 | 631 981-0379 | Ronkonkoma,NY | 10:32pm | night | direct | 46 | 2.30 |
| 20 | Oct 3 | 240 285-3039 | Poolesvl,MD | 5:34pm | day | direct | 1 | .10 |
| 21 | Oct 3 | 205 229-0419 | Birmingham,AL | 8:37pm | night | direct | 1 | .05 |
| 22 | Oct 3 | 631 567-1060 | Sayville,NY | 8:38pm | night | direct | 165 | 8.25 |
| 23 | Oct 5 | 631 723-3675 | Hamptnbays,NY | 8:59am | day | direct | 54 | 5.40 |
| 24 | Oct 5 | 631 723-3675 | Hamptnbays,NY | 3:27pm | day | direct | 1 | .10 |
| 25 | Oct 5 | 205 918-5100 | Birmingham,AL | 4:04pm | day | direct | 1 | .10 |
| 26 | Oct 5 | 205 918-5100 | Birmingham,AL | 4:05pm | day | direct | 1 | .10 |
| 27 | Oct 5 | 205 918-5100 | Birmingham,AL | 4:06pm | day | direct | 1 | .10 |
| 28 | Oct 5 | 205 324-2135 | Birmingham,AL | 4:07pm | day | direct | 8 | .80 |
| 29 | Oct 5 | 205 918-2403 | Birmingham,AL | 4:15pm | day | direct | 1 | .10 |
| 30 | Oct 5 | 205 918-5100 | Birmingham,AL | 4:16pm | day | direct | 18 | 1.80 |
| 31 | Oct 5 | 205 229-0419 | Birmingham,AL | 4:43pm | day | direct | 10 | 1.00 |
| 32 | Oct 5 | 205 229-0419 | Birmingham,AL | 5:07pm | day | direct | 23 | 2.30 |
| 33 | Oct 7 | 631 723-3675 | Hamptnbays,NY | 6:53pm | night | direct | 1 | .05 |
| 34 | Oct 7 | 631 723-3675 | Hamptnbays,NY | 6:54pm | night | direct | 60 | 3.00 |
| 35 | Oct 7 | 631 981-0379 | Ronkonkoma,NY | 8:50pm | night | direct | 38 | 1.90 |
| 36 | Oct 7 | 631 723-3675 | Hamptnbays,NY | 9:32pm | night | direct | 5 | .25 |
| 37 | Oct 7 | 631 723-3675 | Hamptnbays,NY | 10:06pm | night | direct | 28 | 1.40 |
| 38 | Oct 7 | 631 723-3675 | Hamptnbays,NY | 10:46pm | night | direct | 2 | .10 |
| 39 | Oct 7 | 631 723-3675 | Hamptnbays,NY | 10:48pm | night | direct | 28 | 1.40 |
| 40 | Oct 8 | 631 723-3675 | Hamptnbays,NY | 4:24pm | day | direct | 1 | .10 |
| 41 | Oct 8 | 727 934-7494 | Holiday,FL | 4:25pm | day | direct | 1 | .10 |
|    |      |              |       |      |      |      | 803 | $46.40 |

## AT&T operator assisted calls

### Domestic calls

|    | Date | Number called | Where | Time | Rate | Type | Min | Amount |
|----|------|---------------|-------|------|------|------|-----|--------|
| 42 | Sep 30 | 540 337-4587 | Waynesboro,VA | 4:41pm | night | stacoll | 2 | 4.09 |
|    |      | Called from 205 246-2610 | Seattle WA |      |      |      |     |        |
|    |      |              |       |      |      |      | 2 | $4.09 |

## Other charges and credits

|    | Date | Description | Amount |
|----|------|-------------|--------|
| 43 |      | Universal connectivity charge | 6.24 |
|    |      | For an explanation of this charge, please call 1 800 532-2021. |        |
| 44 |      | PAYPHONE - Recovers a payphone usage fee imposed upon AT&T ( 2 calls in total) | .60 |
|    |      |             | $6.84 |

Recycled paper

Text Phone (TTY): 1 800 833-3232
Internet Address:  www.att.com

Customer ID: 540 337-4587
Page 4 of 6

## AT&T One Rate® Calling Card Plan calls

| Description | Amount |
|---|---|
| AT&T One Rate® Calling Card Plan monthly fee Nov 10 - Dec 10, 2001 | 1.00 |
| Calling card calls | 6.00 |

**Total AT&T One Rate® Calling Card Plan calls** ........................................ **$7.00**

## AT&T calling card calls

### Card number: 842 091 2939

| | Date | Number called | Where | Time | Rate | Type | Min | Amount |
|---|---|---|---|---|---|---|---|---|
| 1 | Oct 10 | 540 337-4587 Called from 507 376-9629 | Waynesboro,VA PAYPHONE,MN | 6:01pm | night | station | 15 | 3.75 |
| 2 | Oct 16 | 540 337-4587 Called from 845 692-2423 | Waynesboro,VA PAYPHONE,NY | 10:00pm | night | station | 9 | 2.25 |
| | | | | | | | 24 | $6.00 |

## AT&T One Rate® Off-Peak II Plan calls

| Description | Amount |
|---|---|
| AT&T One Rate® Off-Peak II Plan monthly fee Nov 10 - Dec 10 , 2001 | 4.95 |
| Direct dialed calls | 31.40 |

**Total AT&T One Rate® Off-Peak II Plan calls** ........................................ **$36.35**

## Direct dialed calls

| | Date | Number called | Where | Time | Rate | Type | Min | Amount |
|---|---|---|---|---|---|---|---|---|
| 3 | Oct 12 | 631 723-3675 | Hamptnbays,NY | 7:24pm | night | direct | 1 | .05 |
| 4 | Oct 12 | 727 934-7494 | Tarpon Spg,FL | 8:03pm | night | direct | 73 | 3.65 |
| 5 | Oct 14 | 205 289-0419 | Birmingham,AL | 1:21pm | night | direct | 1 | .05 |
| 6 | Oct 14 | 205 940-1115 | Birmingham,AL | 8:59pm | night | direct | 107 | 5.35 |
| 7 | Oct 14 | 631 981-0379 | Ronkonkoma,NY | 10:45pm | night | direct | 32 | 1.60 |
| 8 | Oct 18 | 631 723-3675 | Hamptnbays,NY | 7:24am | day | direct | 2 | .20 |
| 9 | Oct 20 | 631 723-3675 | Hamptnbays,NY | 9:25am | night | direct | 21 | 1.05 |
| 10 | Oct 20 | 631 723-3675 | Hamptnbays,NY | 7:09pm | night | direct | 73 | 3.65 |
| 11 | Oct 21 | 727 934-7494 | Tarpon Spg,FL | 6:58pm | night | direct | 43 | 2.15 |
| 12 | Oct 21 | 631 981-0379 | Ronkonkoma,NY | 7:43pm | night | direct | 47 | 2.35 |
| 13 | Oct 21 | 631 723-3675 | Hamptnbays,NY | 8:30pm | night | direct | 14 | .70 |
| 14 | Oct 22 | 631 723-3675 | Hamptnbays,NY | 6:21pm | day | direct | 16 | 1.60 |
| 15 | Oct 25 | 631 723-3675 | Hamptnbays,NY | 8:03am | day | direct | 6 | .60 |
| 16 | Oct 28 | 631 723-3675 | Hamptnbays,NY | 9:09am | night | direct | 11 | .55 |
| 17 | Oct 28 | 727 934-7494 | Tarpon Spg,FL | 9:25am | night | direct | 9 | .45 |
| 18 | Oct 28 | 631 981-0379 | Ronkonkoma NY | 9:30pm | night | direct | 34 | 1.70 |

♻ Recycled paper

OFFICE OF THE GOVERNOR

BOB RILEY
GOVERNOR



STATE CAPITOL
MONTGOMERY, ALABAMA 36130

(334) 242-7100
FAX (334) 242-0937

## STATE OF ALABAMA

November 14, 2005

Ms. Patricia Russo
310 Augusta Farms Road
Waynesboro, Virginia 22980-9228

Dear Ms. Russo:

Thank you for contacting my office regarding your grandchildren.

I have forwarded your concerns to Dr. Page Walley, Commissioner of the Alabama
Department of Human Resources. I am confident that Dr. Walley and his staff will
evaluate your concerns and take any appropriate or available action. Should you have
additional comments or questions, please contact Dr. Walley at (866) 668-6385.

Again, I appreciate you contacting me regarding this matter. If I can ever be of assistance
to you in the future, please do not hesitate to contact my office again.

Sincerely,

Bob Riley

BR:Mm

CC:   Dr. Page Walley
      DHR PACT





State of Alabama

Department of Human Resources

S. Gordon Persons Building
50 Ripley Street
P.O. Box 304000
Montgomery, Alabama 36130-4000
(334) 242-1310
www.dhr.state.al.us

BOB RILEY
Governor

Page B. Walley, Ph.D.
Commissioner

November 30, 2005

Ms. Patricia Russo
710 Augusta Farms Road
Waynesboro, Virginia 22980-6226

Dear Ms. Russo:

I would like to thank you for writing the Governor regarding your concerns. It appears that your family has undergone many challenges, yet your desire to see the family reunited is understandable and admirable.

After contacting the Jefferson County Department of Human Resources, it appears that the county is working within the guidelines of DHR and the Juvenile/Family Court. I'm aware that many delays have taken place, one being a newly appointed judge with past involvement in the case recusing himself and another judge assigned. Nevertheless, DHR does not have the power to set or continue hearings. Like you, we would like the custody and placement matters determined as quickly as possible within the guidelines of the court.

Based on information from the county office, your grandchildren's names have not been changed. It is my sincere hope that your family will work with Jefferson County DHR and the Juvenile/Family Court to resolve all concerns that may still be a factor in the possible placement and reunification of the family.

Our children are our greatest resource. I encourage you to work with the different agencies involved to ensure your grandchildren's safety and emotional well-being.

Sincerely,

Page B. Walley, Ph.D.
Commissioner

Cc:    Ms. Kim Mashego, Assistant Director
          Jefferson County Department of Human Resources

PBW/tm

HR# 572

An Affirmative Action / Equal Opportunity Employer

710 Augusta Farms Rd.
Waynesboro, VA 22980
November 2, 2004(?)

Bob Riley, Governor
State Capitol
600 Dexter Ave.
Montgomery, AL 36130

Dear Governor Riley:

My family has been involved in a very upsetting situation in your state. We have been the victims of unethical and unprofessional behavior involving libel and slander and falsification of court documents. While it may be true that DHR, in some cases, has a positive effect on families, this is not our situation.

Our grand-children have been detained by DHR for almost 4 ½ years with no end in sight. There are no charges against the parents. I (the paternal grandmother) have had 2 positive home studies and still we have not had any cooperation in uniting our family. A second home study became necessary because of repeated delays and postponements by DHR. Only after the first home study expired did we have an actual Hearing and the Judge was then told that the ICPC had expired and needed to be done again. (An ICPC can take anywhere from 6 months to a year).

I also believe our Civil Rights are being violated by the excessive postponements and delays. There have been 4 trials scheduled and all have been postponed by DHR and the Court. Each time there is a "Day of Discovery", DHR has no charges against the parents and no witnesses. I know our 5 grandchildren are being held illegally. With no reason to justify their actions, DHR and the Court are trying the only way possible to resolve this case which is to let enough time go by and make it impossible to give the children to their parents or grandparents. This is a subject I can't humanly discuss. I have contacted the DHR office at the State Capitol and have spoken to Beth Schaffer many times over the years. This case has been investigated twice and I have asked for a change of venue, which of course was denied. I am sure the Jefferson County DHR does not want anyone else involved in this case. The offences that have occurred in this case met the list of items too numerous to mention in this letter.

What DHR has successfully done is to falsify court documents. This information and documentation was presented to the State District Attorney Office. They advised us to take our information to the Federal level and we are pursuing this action.