# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA

**Karl Rudolph Lentz, Natural Father,**
**Plaintiff, Pro se**

**KPL, infant son, a.k.a. KPM;**

**( represented, at this time, by Karl Rudolph Lentz**
**to protect his rights as well. )**

vs.

**ALABAMA STATE BOARD OF HUMAN RESOURCES, and**
**GOVERNOR BOB RILEY, Chairman, in his official capacity to Execute and**
**individual capacities;**

**ALABAMA DEPARTMENT OF HUMAN RESOURCES, and**
**PAGE WALLEY,  Acting Director, in his official capacity as Administrator and**
**individual capacities;**

**ALABAMA SUPREME COURT, and CHIEF JUSTICE NABERS , in his  official**
**Judiciary capacities;**

**STATE OF ALABAMA OFFICE OF THE ATTORNEY GENERAL, and**
**STATE ATTORNEY GENERAL, TROY KING, in his official Judiciary and**
**Prosecuting capacities;**

**STATE OF ALABAMA OFFICE OF THE ATTORNEY GENERAL, and**
**ASSISTANT STATE ATTORNEY GENERAL, SANDRA JOHNSON and, in her**
**official and individual capacities;**

**STATE OF ALABAMA OFFICE OF THE ATTORNEY GENERAL, and**
**ASSISTANT STATE ATTORNEY GENERAL, JONATHON S. SCHLENKER, in**
**his official and individual capacities;**

**ALABAMA SUPREME COURT, and VERY HONORABLE JUDGE WILLIAM**
**HEREFORD, ST. CLAIRE COUNTY, in his official and individual capacities;**

RECEIVED

2006 NOV 13  P 4 43

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

06 CV 942 - MEF

## Page 1 of  68

ALABAMA  TENTH CIRCUIT COURT a.k.a. JEFFERSON COUNTY
COURTHOUSE, and CHIEF JUDGE VOWELL, in his official and individual
capacities;

ALABAMA  TENTH CIRCUIT COURT FAMILY DIVISION a.k.a.. JEFFERSON
COUNTY FAMILY COURT, and CHIEF JUDGE SANDRA STORM, in her
official and individual capacities;

JEFFERSON COUNTY PUBLIC DEFENDERS OFFICE OF THE FAMILY
COURT and CHIEF JUDGE SANDRA STORM, retired, in her official and
individual capacities;

ALABAMA  TENTH CIRCUIT COURT FAMILY DIVISION a.k.a.. JEFFERSON
COUNTY FAMILY COURT, and CHIEF JUDGE BRIAN HUFF, in his official and
individual capacities ;

JEFFERSON COUNTY PUBLIC DEFENDERS OFFICE OF THE FAMILY
COURT, and CHIEF JUDGE BRIAN HUFF, in his official and individual
capacities ;

ATTORNEY, BRIAN HUFF, as an associate in the Law Firm of
BOYD, FERNAMBUCQ, VINCENT & DUNN, P.C., in his professional capacity;

ATTORNEY,  BRIAN HUFF, in his individual capacity;

ALABAMA  TENTH CIRCUIT COURT FAMILY DIVISION a.k.a.. JEFFERSON
COUNTY FAMILY COURT, and REFEREE JUDGE ANDRE SPARKS, in his
limited official and individual capacities;

ALABAMA  TENTH CIRCUIT COURT FAMILY DIVISION a.k.a.. JEFFERSON
COUNTY FAMILY COURT, and JUDGE BAHAKEL  in his/her official and
individual capacities;

ALABAMA  TENTH CIRCUIT COURT FAMILY DIVISION a.k.a.. JEFFERSON
COUNTY FAMILY COURT, and JUDGE BARCLAY, in his/her official and
individual capacities;

Page 2 of 68

JEFFERSON COUNTY PUBLIC DEFENDERS OFFICE OF THE FAMILY COURT and, DOUGLAS A DELLACCIO JR. in his official and individual capacities;

JEFFERSON COUNTY PUBLIC DEFENDERS OFFICE OF THE FAMILY COURT and, MARY KAYE LAUMER, in her official and individual capacities;

LEGAL AID SOCIETY OF JEFFERSON COUNTY, FAMILY COURT OF JEFFERSON COUNTY and, SANDRA EUGENE GREGORY, in her official and individual capacities;

LEGAL AID SOCIETY OF JEFFERSON COUNTY, FAMILY COURT OF JEFFERSON COUNTY appointed GUARDIAN AD LITEM JULIE MARKS, in her official and individual capacities;

LEGAL AID SOCIETY OF JEFFERSON COUNTY, FAMILY COURT OF JEFFERSON COUNTY GUARDIAN AD LITEM OFFICE and, CELIA LAPIDUS NADLER, in her official and individual capacities;

JEFFERSON COUNTY DEPARTMENT OF HUMAN RESOURCES, and TRISH MUSCOLINO, Interim Director, JCDHR, in her official and individual capacity;

ANGELA TANVEER, Assistant Director / Child Welfare, JCDHR, in her official and individual capacity;

KIM MASHEGO, Assistant Director / Child Welfare, JCDHR, in her official and individual capacity;

BARBARA GALLOWAY, Assistant Director / Child Welfare, JCDHR, in her official and individual capacity;

TENISHA FELTON , original Intake Supervisor, JCDHR, Supervisor, in her official and individual capacity;

DEIRDRE MARCH, original Intake Caseworker, JCDHR, in her official and individual capacity;

LISA BROWN, Caseworker, JCDHR, in her official and individual capacity;

ANITA SCOTT-SMITH, a JCDHR, Supervisor, in her official and individual capacity;

KAREN BAZINET, Caseworker, JCDHR, in her official and individual capacity;

TRACIE CURRY, Caseworker, JCDHR, in her official and individual capacity;

TERRY BEASLEY, Caseworker, JCDHR, in her official and individual capacity;

BETH SCHAEFER, - STATE HEADQUARTERS OF ALABAMA DEPARTMENT OF HUMAN RESOURCES - Montgomery, AL. in her official and individual capacity;

COURT CLERK, Jefferson County Family Court, in their official capacity;

DR. GUFFY, attending Pediatric Physician, UAB Hospital in Birmingham, Alabama, in his official capacity;

MARGARET MANGINA, adoptive mother of Mary Kary Mangina, maternal grandmother of KPL.

## BRIEF OF PLAINTIFF
### KPL, infant son
### and
### Karl Rudolph Lentz

## RELIEF FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA
### for damages due to
## DENIAL OF DUE PROCESS OF RIGHTS

Karl R. Lentz
710 Augusta Farms Rd
Waynesboro, VA 22980
678.665.0593

## STATEMENT REGARDING ORAL ARGUMENT

The issues presented herein are novel and of tremendous importance. Therefore, the Plaintiff believes that oral argument would be of benefit to the Court.

## TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT.............................................................

TABLE OF CONTENTS...........................................................................................

TABLE OF AUTHORITIES......................................................................................

STATUTES

    US CODES..........................................................................................................

    ALABAMA CODES of 1975..................................................................................

    ALABAMA ADMINISTRATIVE CODE BOOK.......................................................

    RULES...............................................................................................................

    CONSTITUTIONAL PROVISIONS.........................................................................

    ALABAMA CONSTITUTION OF 1901...................................................................

    OTHER AUTHORITIES.......................................................................................

U.S. CODE DEFINITIONS.......................................................................................

STATEMENT OF JURISDICTION............................................................................

    DISTRICT COURT JURISDICTION.......................................................................

    11th CIRCUIT COURT JURISDICTION..................................................................

COMPLAINT.......................................................................................................

PARTIES.............................................................................................................

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW.........................................

STATEMENT OF THE CASE

    A. Background Facts...........................................................................................

    B. Statement of the Facts....................................................................................

STANDARD OF REVIEW......................................................................................

SUMMARY OF THE ARGUMENT..........................................................................

IMPACT STATEMENT..........................................................................................

CONCLUSION - REMEDY....................................................................................

CERTIFICATE OF SERVICE..................................................................................

CERTIFICATE OF COMPLIANCE..........................................................................

## TABLE OF AUTHORITIES

CASES and JUDGEMENTS

Monroe v. Pape, 365 U.S. 167, 81 S. Ct. 473, (1961)

Monell v. New York City Department of Social Services , 436 U.S. 658, 98 S ...

City of Oklahoma City v. Tuttle, 471 U.S. 808, 105 S.Ct. 2427 (1985),

City of Canton v. Harris,489 U.S. 378, 109 S. Ct. 1197 (1989)

Tennessee v. Garner, 471 U.S. 1, 105 S. Ct. 1694, 85 L.Ed.2d 1 (1985)

Vineyard v. County of Murray, 990 F.2d 1207 (11th Cir.), cert. denied 510 U.S. 1024 (1993)

Sewell v. Town of Lake Hamilton, 117 F.3d 488 (11th Cir. 1997), cert. denied 118 S Ct. 852
                                                      (1998)

Tennessee v. Garner, 471 U.S. 1, 105 S. Ct. 1694, 85 L.Ed.2d 1 (1985), can be said to be "so obvious," that the failure to do so could properly be characterized as "deliberate indifference" to constitutional rights 489 U.S. at 390, n.10. Indeed, it is from this language that much of the litigation over the sufficiency of evidence to show liability for a government's failure to train has arisen.

## The jurisdiction of this court is invoked pursuant to :

### U.S. Codes

> 42 USC 21-1(2) § 1985 (2) (3)
>
> 42 USC 21-1  § 1983
>
> 42 USC 21-1 (a) § 1988
>
> 18 USC 18-1-13   § 242
>
> 18 USC 18-1-13   § 241
>
> 42 USC 21-1 § 1986

### ALABAMA CODES of 1975

*Acts 1973, No.1056,p 1699 & sect;16;Acts 1975,No.130,p.603,& sect;1;Acts 1995, No. 95-194,p.269,&sect;1.*

> 36-25-17(a)
>
> 36-25-17(b)

*Code 1907, § 4299; Code 1923, § 8050; Code 1940,T.7, §109.*

> 6 -5-102

*Code 1923, § § 7353,7354; Code 1940, T.7, § §111,112.*

> 6-5-104 (a)
>
> 6-5-104(b)(1)
>
> 6-5-104 (b)(2)
>
> 6-5-104(b)(3)
>
> 6-5-104(b)(4)

*Code 1923, § § 7353,7354; Code 1940, T.7, § §111,112, continued*

> 6-5-182
>
> 6-5-100/103
>
> 6-5-102
>
> 36-25-17

## ALABAMA ADMINISTRATIVE CODE BOOK. DEPARTMENT OF HUMAN RESOURCES, SOCIAL SERVICES DIVISION

> 660-3-11-.03(3)
>
> 660-3-11-.03(b)(1)
>
> 660-5-34-.02

660-5-34-.03(2)

660-5-34-.04

660-5-34-.04 (4)

660-5-34-.04 (5)(a)

660-5-34-.04(5)(b)

660-5-34-.05(a)

660-5-47-.04(a)

660-5-47-.04(8)

660-5-47-.06

660-5-50-.04

660-5-50-.06(c)

660-5-50-.06(d)

660-5-50-.06(e)

660-5-50-.06(1)

660-5-50-.06(e)

660-5-50-.09

# The Jurisdiction of this Court is invoked pursuant to:

TITLE 18—CRIMES AND CRIMINAL PROCEDURE;

TITLE 42 – THE PUBLIC HEALTH AND WELFARE ;

TITLE 28--JUDICIARY AND JUDICIAL PROCEDURE ;

TITLE 18, PART I, CHAPTER 13  § 241 ;
   **"Conspiracy against rights ".**

TITLE 18, PART I, CHAPTER 13  § 242 ;
   **"Deprivation of rights under color  of law"..**

TITLE 18, PART I, CHAPTER 13  § 247 ;
   **"Obstruction of persons in the free exercise of religious beliefs".**

TITLE 18, PART I, CHAPTER 13 § 641 ;.
   **" Public money, property or records"**

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or

Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—

Shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate, combining amounts from all the counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both.

The word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.

TITLE 18, PART I, CHAPTER 13 § 666 ;.

Theft or bribery concerning programs receiving Federal funds

(a) Whoever, if the circumstance described in subsection (b) of this section exists—

Page 8 of  68

(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—

(A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that—

(i) is valued at $5,000 or more, and

(ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; or

(B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more; or

(2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;

shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

(c) This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.

(d) As used in this section—

(1) the term "agent" means a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative;

(2) the term "government agency" means a subdivision of the executive, legislative, judicial, or other branch of government, including a department, independent establishment, commission, administration, authority, board, and bureau, and a corporation or other legal entity established, and subject to control, by a government or governments for the execution of a governmental or intergovernmental program;

(3) the term "local" means of or pertaining to a political subdivision within a State;

(4) the term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States; and

(5) the term "in any one-year period" means a continuous period that commences no earlier than twelve months before the commission of the offense or that ends no later than twelve months after the commission of the offense. Such period may include time both before and after the commission of the offense.

# TITLE 42, CHAPTER 21, SUBCHAPTER I § 1983 ;

**"Civil action for deprivation of rights"**

.

# TITLE 42, CHAPTER 21, SUBCHAPTER I § 1986 ;

Action for neglect to prevent ;

" Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action

# TITLE 42, CHAPTER 21, SUBCHAPTER I § 1985 :

**"Conspiracy to interfere with civil rights".**

(2) Obstructing justice; intimidating party, witness, or juror

(3) Depriving persons of rights or privileges.

# TITLE 42, CHAPTER 21, SUBCHAPTER I § 1986

"Proceedings in vindication of civil rights".

(a) Applicability of statutory and common law

# TITLE 28  PART V  CHAPTER 115- § 1746 ;

EVIDENCE; DOCUMENTARY

(1).Unsworn declarations under penalty of perjury

Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement,

Page 10 of 68

oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

# ALABAMA CODES OF 1975

**TITLE 6 – CIVIL PRACTICE**

**TITLE 13A – CRIMINAL CODE**

**TITLE 36 – PUBLIC OFFICERS and EMPLOYEES**

**TITLE 6 – CIVIL PRACTICE  CHAPTER 5 - ACTIONS**

Article 8 Fraud, Misrepresentation, and Deceit

## TITLE 6 , CHAPTER 5 § 100  - "FRAUD"

**Fraud - Right of action generally.**

Fraud by one, accompanied with damage to the party defrauded, in all cases gives a right of action.

*(Code 1907, §2468; Code 1923, §5676; Code 1940, T. 7, §107.)*

## TITLE 6 , CHAPTER 5 § 101 - " Fraud" -

**Misrepresentations of material facts.**

Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud.

*(Code 1907, §4298; Code 1923, §8049; Code 1940, T. 7, §108.)*

## TITLE 6 , CHAPTER 5 § 102 - " Fraud"

**Suppression of material facts.**

Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case.

*(Code 1907, §4299; Code 1923, §8050; Code 1940, T. 7, §109.)*

## TITLE 6 , CHAPTER 5 § 103 - " Fraud"
### Deceit - Right of action generally.

**Willful misrepresentation of a material fact made to induce another to act, and upon which he does act to his injury, will give a right of action. Mere concealment of such a fact, unless done in such a manner as to deceive and mislead, will not support an action. In all cases of deceit, knowledge of a falsehood constitutes an essential element. A fraudulent or reckless representation of facts as true, which the party may not know to be false, if intended to deceive, is equivalent to a knowledge of the falsehood.**

*(Code 1907, §2469; Code 1923, §5677; Code 1940, T. 7, §110.)*

## TITLE 6 , CHAPTER 5 § 104 - " Fraud"
## Deceit - Fraudulent deceit ;

**(a) One who willfully deceives another with intent to induce him to alter his position to his injury or risk is liable for any damage which he thereby suffers.**

**(b) A deceit within the meaning of this section is either:**

**(1) The suggestion as a fact of that which is not true by one who does not believe it to be true;**

**(2) The assertion as a fact of that which is not true by one who has no reasonable ground for believing it to be true;**

**(3) The suppression of a fact by one who is bound to disclose it or who gives information of other facts which are likely to mislead for want of communication of that fact; or**

**(4) A promise made without any intention of performing it.**

*(Code 1923, §§7353, 7354; Code 1940, T. 7, §§111, 112.)*

## TITLE 6 , CHAPTER 5 § 104 - "Libel or slander"

## Burden of proof.

**In an action for libel or slander, the plaintiff must prove, unless it shall be admitted by the defendant, the facts showing that the alleged defamatory matter was published or spoken of the plaintiff.**
*(Code 1923, §7357; Code 1940, T. 7, §910.)*

## TITLE 13A - CRIMINAL CODE,
### CHAPTER 2 – PRINCIPLES OF CRIMINAL LIABILITY
### ARTICLE 1 CULPABILITY

## TITLE 13A , CHAPTER 5 § 103

## Page 12 of 68

Section 13A-2-1

**Definitions - Generally.**

**The following definitions apply to this Criminal Code:**

**(1) ACT.** A bodily movement, and such term includes possession of property.

**(2) VOLUNTARY ACT.** An act performed consciously as a result of effort or determination, and such term includes the possession of property if the actor was aware of his physical possession or control thereof for a sufficient time to have been able to terminate it.

**(3) OMISSION.** A failure to perform an act as to which a duty of performance is imposed by law.

**(4) CONDUCT.** An act or omission and its accompanying mental state.

**(5) TO ACT.** Either to perform an act or to omit to perform an act.

**(6) CULPABLE MENTAL STATE.** Such term means "intentionally" or "knowingly" or "recklessly" or with "criminal negligence," as these terms are defined in Section 13A-2-2.

*(Acts 1977, No. 607, p. 812, §301.)*

Section 13A-2-2

**1. Definitions - Definitions of culpable mental state.**

**The following definitions apply to this Criminal Code:**

**(1) INTENTIONALLY.** A person acts intentionally with respect to a result or to conduct described by a statute defining an offense, when his purpose is to cause that result or to engage in that conduct.

**(2) KNOWINGLY.** A person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of that nature or that the circumstance exists.

**(3) RECKLESSLY.** A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates a risk but is unaware thereof solely by reason of voluntary intoxication, as defined in subdivision (e)(2) of Section 13A-3-2, acts recklessly with respect thereto.

**(4) CRIMINAL NEGLIGENCE.** A person acts with criminal negligence with respect to a result or to a circumstance which is defined by statute as an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the

circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation. A court or jury may consider statutes or ordinances regulating the defendant's conduct as bearing upon the question of criminal negligence.

*Acts 1977, No. 607,p.812 § 305*

## TITLE 36 - PUBLIC OFFICERS AND EMPLOYEES

### CHAPTER 25 - CODE OF ETHICS FOR PUBLIC OFFICIALS, EMPLOYEES, ETC.

## TITLE SECTION 36- 25-1 ; "DEFINITIONS"

(1) BUSINESS. Any corporation, partnership, proprietorship, firm, enterprise, franchise, association, organization, self-employed individual, or any other legal entity.

(13) GOVERNMENTAL CORPORATIONS AND AUTHORITIES. Public or private corporations and authorities, including but not limited to, hospitals or other health care corporations, established pursuant to state law by state, county or municipal governments for the purpose of carrying out a specific governmental function. Notwithstanding the foregoing, all employees, including contract employees, of hospitals or other health care corporations and authorities are exempt from the provisions of this chapter.

*(Acts 1973, No. 1056, p. 1699, &amp;sect;2; Acts 1975, No. 130, p. 603, &amp;sect;1; Acts 1979, No. 79-698, p. 1241, § 1; Acts 1982, No. 82-429, p. 677, § 1; Acts 1986, No. 86-321, p. 475, &amp;sect;1; Acts 1995, No. 95-194, p. 269, &amp;sect;1; Acts 1997, No. 97-651, p. 1217, &amp;sect;1.)*

## TITLE SECTION 36- 25-17 ;

"Reports of violations; cooperation of agency heads".

(a) Every governmental agency head shall within 10 days file reports with the commission on any matters that come to his or her attention in his or her official capacity which constitute a violation of this chapter.

(b) Governmental agency heads shall cooperate in every possible manner in connection with any investigation or hearing, public or private, which may be conducted by the commission.

*(Acts 1973, No. 1056, p. 1699, &sect;16; Acts 1975, No. 130, p. 603, &sect;1; Acts 1995, No. 95-194, p. 269, &sect;1.)*

## TITLE SECTION 36- 25-4 - "State Ethics Commission - Duties; complaint; investigation; rights of respondent concerning hearing; collection of fees; result once violation found".

SECTIONS ; (a) (1) (2) (3) (4) (5) (6) (7) (8) (9) (10)) (11)  (b) (c) (d) (e)   "(e) The commission shall provide discovery to the respondent pursuant to the Alabama Rules

of Criminal Procedure as promulgated by the Alabama Supreme Court"
(Acts 1973, No. 1056, p. 1699, &sect;18; Acts 1975, No. 130, p. 603,
&sect;1; Acts 1979, No. 79-460, p. 814, §1; Acts 1995, No. 95-194, p. 269, &sect;1.)

# Constitution of Alabama of 1901;

SECTION 1

1. Equality and rights of men.

That all men are equally free and independent; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness

SECTION 2

1. People source of power.

That all political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit; and that, therefore, they have at all times an inalienable and indefeasible right to change their form of government in such manner as they may deem expedient

SECTION 5

1. Unreasonable search and seizure; search warrants.

That the people shall be secure in their persons, houses, papers, and possessions from unreasonable seizure or searches, and that no warrants shall issue to search any place or to seize any person or thing without probable cause, supported by oath or affirmation

SECTION 6

1. Rights of persons in criminal prosecutions generally; self-incrimination; due process of law; right to speedy, public trial; change of venue.

That in all criminal prosecutions, the accused has a right to be heard by himself and counsel, or either; to demand the nature and cause of the accusation; and to have a copy thereof; to be confronted by the witnesses against him; to have compulsory process for obtaining witnesses in his favor; to testify in all cases, in his own behalf, if he elects so to do; and, in all prosecutions by indictment, a speedy, public trial, by an impartial jury of the county or district in which the offense was committed; and he shall not be compelled to give evidence against himself, nor be deprived of life, liberty, or property, except by due process of law; but the legislature may, by a general law, provide for a change of venue at the instance of the defendant in all prosecutions by indictment, and such change of venue, on application of the defendant, may be heard and determined without the personal presence of the defendant so applying therefor; provided, that at the time of the application for the change of venue, the defendant is imprisoned in jail or some legal place of confinement.

SECTION 10

1. Right to prosecute civil cause.

That no person shall be barred from prosecuting or defending before any tribunal in this state, by himself or counsel, any civil cause to which he is a party.

SECTION 13     Courts to be open; remedies for all injuries; impartiality of justice.

That all courts shall be open; and that every person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law; and right and justice shall be administered without sale, denial, or delay.

## SECTION 15

1. Excessive fines; cruel or unusual punishment.

That excessive fines shall not be imposed, nor cruel or unusual punishment inflicted.

## SECTION 21

1. Suspension of laws.

That no power of suspending laws shall be exercised except by the legislature.

## SECTION 36

1. Construction of Declaration of Rights.

That this enumeration of certain rights shall not impair or deny others retained by the people; and, to guard against any encroachments on the rights herein retained, we declare that everything in this Declaration of Rights is excepted out of the general powers of government, and shall forever remain inviolate.

## SECTION 75

Change of venue in civil and criminal cases.

The power to change the venue in civil and criminal causes is vested in the courts, to be exercised in such manner as shall be provided by law.   ( say the need for us to take this suit to a common-law court).

# Article V ; The Executive Department.

## SECTION 113

1. Supreme executive power vested in governor.

The supreme executive power of this state shall be vested in a chief magistrate, who shall be styled "The Governor of the State of Alabama."

## SECTION 121

Governor may require reports from officers of executive department and officers and managers of state institutions; false reports or failure to file reports constitutes impeachable offense.

Page 16 of 68

The governor may require information in writing, under oath, from the officers of the executive department, named in this article, or created by statute, on any subject, relating to the duties of their respective offices, and he may at any time require information in writing, under oath, from all officers and managers of state institutions, upon any subject relating to the condition, management and expenses of their respective offices and institutions. Any such officer or manager who makes a willfully false report or fails without sufficient excuse to make the required report on demand, is guilty of an impeachable offense.

# Article VI ; The Judicial Department;

SECTION 140

1. Jurisdiction of supreme court generally; power of supreme court to issue certain remedial and original writs.

Except in cases otherwise directed in this Constitution, the supreme court shall have appellate jurisdiction only, which shall be coextensive with the state, under such restrictions and regulations, not repugnant to this Constitution, as may from time to time be prescribed by law, except where jurisdiction over appeals is vested in some inferior court, and made final therein; provided, that the supreme court shall have power to issue writs of injunction, habeas corpus, quo warranto, and such other remedial and original writs as may be necessary to give it a general superintendence and control of inferior jurisdictions.

SECTION 143

2. Jurisdiction of circuit courts.

The circuit court shall have original jurisdiction in all matters civil and criminal within the state not otherwise excepted in this Constitution; but in civil cases, other than suits for libel, slander, assault and battery, and ejectment, it shall have no original jurisdiction except where the matter or sum in controversy exceeds fifty dollars.

SECTION 144

1. When and where circuit courts to be held; circuit judges may hold court for each other; power of circuit judges to issue writs of injunction returnable to courts of chancery.

A circuit court, or a court having the jurisdiction of the circuit court, shall be held in each county in the state at least twice in every year, and judges of the several courts mentioned in this section may hold court for each other when they deem it expedient, and shall do so when directed by law. The judges of the several courts mentioned in this section shall have power to issue writs of injunction, returnable to the courts of chancery, or courts having the jurisdiction of courts of chancery.

Tennessee v. Garner, 471 U.S. 1, 105 S. Ct. 1694, 85 L.Ed.2d 1 (1985), can be said to be "so obvious," that the failure to do so could properly be characterized as "deliberate indifference" to constitutional rights 489 U.S. at 390, n.10. Indeed, it is from this language that much of the litigation over the sufficiency of evidence to show liability for a government's failure to train has arisen.

Vineyard v. County of Murray, 990 F.2d 1207 (11th Cir.), cert. denied 510 U.S. 1024 (1993)

the policy was the moving force of the constitutional violation." 990 F.2d at 1213. As phrased by the Eleventh Circuit, this inquiry is as follows: "Would the injury have been avoided had the employee been trained under a program that was not deficient?"

<u>Sewell v. Town of Lake Hamilton</u>, 117 F.3d 488 (11th Cir. 1997), cert. denied 118 S.Ct. 852 (1998), claiming that it failed to adequately train its officers not to barter arrests for sexual favors: in our case, the bartering of our children for political and/or personal gain .
 Our take on it will be : *(1) denying us "LAWFUL",  through standard vitiation policies in the State of Alabama Administrative Handbook and Policies For the Department of Human Resources : Code 660-5-50 - .02 (5) and Also in the RC Consent Decree of 1991. That A "form" or BARTER system is being used to coerce, through punishing us if we do not abide to their demands. which is in direct violation of*

Those whose practices include civil rights litigation (we believe inherent rights as well) therefore need to be familiar with the stringent standards applied in this complex area of the law.

# COMPLAINT
## FOR
### Injunction and Jurisdiction

This is a complaint for relief under 42 USC § 1983, against certain current and past court judges, and social workers, that are regulated by Federal, State and Local, Administrative Codes, Statutory Codes and Regulations, from which they derive their Authority and Control.

(1)     That these Agents/employees who, in acting on behalf of their Government sponsored/ sanctioned "Programs" with their ability "Under Color of Law", through their official and individual capacities within the borders of the State in the United States known as "ALABAMA". By their own sworn duty to uphold these positions as acting Agents to the aforementioned Agencies, failed to uphold their legal and moral duties and responsibilities they hereby, knowingly, through the use and misuse of delegated power and/or authority, by their use and misuse of the Administrative, Executive, Judicial and Medical "positions" blatantly procured for themselves, their agencies, and their STATE OF ALABAMA, federal funding they were not entitled to and/or personally profited from said use and misuse of the authority UNDER THE COLOR OF LAW;

(2)     That, through malicious fraud, intrinsic fraud, embezzlement, and outright fraud with intent to "take from one to give to another" without the benefit of due process, nor consent (kidnaping);

(3)     That we pray, that the preponderance of evidence collected thus far shall be deemed sufficient to proceed on with this endeavor, for this Honorable Court to take this matter under consideration, the transgressions that have been borne upon this Family;

(4)     For we, in our humble opinions, have exhausted every Administrative, Executive and Judicial remedy at our disposal in THE STATE OF ALABAMA, known to us at this time of writing, 12 October 2006 - this we pray, to be taken into consideration by the JUDGES who preside in the UNITED STATES DISTRICT COURT OF MIDDLE ALABAMA;

(5)     To this we pray, with the utmost diligence, an injunctive relief granted by this Honorable Court, shall enforce an immediate action to prevent any further irreparable damage and estrangement to occur by the wrongdoings of the Jefferson County's Department of Human Resources and Family Court system.

Page 19 of 68

# **Parties**

1.   Governor Bob Riley,  CHAIRMAN for the Department of Human Resources
     knows:

>    (a) All STATES accepting federal money under the
>    *Americans with Disabilities Act of 1974,* that he is required to abide by
>    certain "principles" or "standards" or "codes" and "ethics";
>
>    (b) By accepting federal money and the rules regulating the receipt of
>    such funds, the STATE waivers their 11th Amendment right to
>    immunity as a Defendant in a lawsuit(s) as a result of their non-
>    compliance to laws, rules, regulations and/ or guidelines.
>
>    ( C )Governor Bob Riley and his Staff in Montgomery have been
>    contacted and have had the opportunity to become familiar with the
>    procedural transgressions taking place in Jefferson County.
>
>    (d) That through his action and  inaction, and that of his Staff, Governor
>    Bob Riley permitted the violations of our due process and civil rights in
>    collusion with the Jefferson County Department of Human Resources
>    and the Jefferson County Family Court.
>
>    (e) Through his actions and inaction(s), and that of his Staff, he has
>    opened the door to litigation addressing these violations in a civil
>    lawsuit (violations of due process and civil rights) and possible criminal
>    prosecution or convictions  (kidnaping, intrinsic fraud and
>    embezzlement).

**The *Americans with Disabilities Act of 1975* clearly stipulates that in order**
to qualify as a "Social Service Agency" within the borders of the United
States, ALABAMA "must" with the utmost discretion, separate families.

>    (f) The bond between mother/ father to her/his child is an
>    Inherent Right: that "these are but the holiest of bonds";
>
>    (g) The Department of Human Resources, Social Services Division of
>    ALABAMA should proceed with the utmost discretion and caution in
>    *considering* the separation of parent/child.

That, in his official and individual capacities, Governor Bob Riley and his Staff have
received numerous written, mailed, e-mailed and oral requests for his intervention in
his capacity as the Chairman of the Department of Human Resources .

The Department of Human Resources in the State of ALABAMA has already been found to have acted, individually and collectively, to have violated the civil rights and due process under the color of law of its citizenry.

(h)   The result of this wrongdoing led to the placement of this AGENCY on federal probation;

(i)   A "guideline", a standard of conduct, was established herein referred to the R.C. Consent Decree, which was to be meticulously adhered to maintain their status as a SOCIAL SERVICE AGENCY and to be entitled to receive federal funding.

We pray that this Honorable Court will deny any application or petition from the Department of Human Resources in ALABAMA to be released from Federal Probation.

(j)   That the temptation of unbridled federal funding, coupled with possibility of exponentially increasing the STATE's GENERAL FUND, and personal and/or political gain necessitates a Federal Monitor

2.   Page Walley, as the acting DIRECTOR for the Department of Human Resources knows:

(a) All STATES accepting federal money under the *Americans with Disabilities Act of 1974,* that he is required to abide by certain "principles" or "standards" or "codes" and "ethics";

(b) By accepting federal money and the rules regulating the receipt of such funds, the STATE waivers their 11th Amendment right to immunity as a Defendant in a lawsuit(s) as a result of their non-compliance to laws, rules, regulations and/ or guidelines.

Page Walley, acting Administrative Director of the Department of Human Resources and his Staff in the State Office in Montgomery have been contacted and have had the opportunity to become familiar with the procedural transgressions taking place in Jefferson County.

(c) That through his action and inaction, and that of his Staff, Page Walley permitted the violations of our due process and civil rights in collusion with the Jefferson County Department of Human Resources and the Jefferson County Family Court.

(d) Through his actions and inaction(s), and that of his Staff, he has opened the door to litigation addressing these violations in a civil lawsuit (violations of due process and civil rights) and possible criminal prosecution or convictions (kidnaping, intrinsic fraud and embezzlement).

The *Americans with Disabilities Act of 1975* clearly stipulates that in order to qualify as a "Social Service Agency" within the borders of the United States, ALABAMA "must" with the utmost discretion, separate families.

(e) The bond between mother/ father to her/his child is an Inherent Right: that "these are but the holiest of bonds";

(f) The Department of Human Resources, Social Services Division of ALABAMA should proceed with the utmost discretion and caution in *considering* the separation of parent/child.

That, in his official and individual capacities, acting DIRECTOR Page Walley and his Staff have received numerous written, mailed, e-mailed and oral requests for his intervention in his capacity as Director .

The Department of Human Resources in the State of ALABAMA has already been found to have acted, individually and collectively, to have violated the civil rights and due process under the color of law of its citizenry.

(g) The result of this wrongdoing led to the placement of this AGENCY on federal probation;

(h) A "guideline", a standard of conduct, was established herein referred to the R.C. Consent Decree, which was to be meticulously adhered to maintain their status as a SOCIAL SERVICE AGENCY and to be entitled to receive federal funding.

We pray that this Honorable Court will deny any application or petition from the Department of Human Resources in ALABAMA to be released from Federal Probation.

(i)     That the temptation of unbridled federal funding, coupled with possibility of exponentially increasing the STATE's GENERAL FUND, and personal and/or political gain necessitates a Federal Monitor to ensure against fraud and abuse of power.

3    HON. CHIEF JUSTICE NABERS, as Presiding Judge for the ALABAMA SUPREME COURT, that as a result of improper training and supervision of his STAFF, permitted the blatant disregard of the due process rights of the Plaintiffs;  by the courts, judges and clerks of courts;

4    HON. TROY KING, as the Head of the STATE OF ALABAMA OFFICE OF THE ATTORNEY GENERAL, that as a result of improper training and supervision of his STAFF, permitted the blatant disregard of the due process rights of the Plaintiffs and aggressively prevented the reunification of Plaintiff's Family;

5    SANDRA JOHNSON, as the ASSISTANT ATTORNEY GENERAL, stated during an ISP that "...*as long as I am involved in this case, these children will NEVER be returned to your families custody...*" The "opinion" and unjustified "bias" of SANDRA JOHNSON directly resulted in the continuation of the violations of the RC CONSENT DECREE and the ALABAMA ADMINISTRATIVE CODE BOOK, DEPARTMENT OF HUMAN RESOURCES, SOCIAL SERVICES DIVISION and the ALABAMA CODE of 1975 against the NATURAL FATHER and offspring;

6    JONATHON S SCHLENKER, STATE PROSECUTOR, actively prevented the commencement of a TPR trial within the 12-18 month time allotment permitted by LAW, and through intensive back ground checks over a period of FIVE YEARS was still unable to prosecute the NATURAL FATHER;

7    HON. JUDGE HEREFORD, appointed by the SUPREME COURT should have accused himself when he realized that at a preliminary TPR hearing the state prosecutor handed over the DHR's court report to the judge;

(a).  After a severe protest by the father stating"We have waited 5 years for a "untainted "judge to hear this case , and you sir,

## Page 23 of 68

have just been tainted by the prosecutors by accepting their court report during this preliminary hearing, when it clearly states, we the defendants, are allowed access to "the court report" five (5) days prior to a hearing/trial, and if our version differs with that of the DHR's ,we the defendants are entitled and or allowed to submit an "amended version" to the court report" which I, in vain, attempted, begged, and pleaded for him to "take" our amendments to the court report, as well as those by the DHR and The State Prosecutor.

I attempted to inform the Judge, (maybe he was not trained to know that he is to accept the defendants "story of the events they would like to have addressed by the judge/court as well as the state prosecutors "story/concerns", that although we were not given the court report 5 days prior to hearing, (fortunately or unfortunately, for us, we ASSUMED, what they The DHR, and State prosecutor were going to do/say/state in their version of events, how they were going to "tell" the Judge in their biased opinions how and what they felt must be done in this our trial, watching this transpire in front of the whole courtroom, in front of all the attorneys, family members, and court staff, to me was outrageous , behavior, if they wanted to have only one-side of the story heard , yet again by another judge, why did not the Judge and State prosecutor, just" slip the report into the judges hands when noone was looking, no they ( I was told), that this one-sided event(s) occur all the time for the defendants, defended by the public defenders office are not competent enough in law , that the average defendant is unaware that the practice/acceptance of one-sided evidence in a courtroom, is not only immoral, but illegal as well, we're going to enter into the court report, ( I assume they never witnessed a defendant such as myself , who knew the proper filing to a judge/court procedure), that his, Judge Herefords response was, " *in this courtroom we'll have the say, what I read and what I don't read, who's papers I will accept and whose I will not*" It goes without saying just"whose"paper work he accepted, and those he had not !

    (b) This family has been denied their access to a Judge to be heard; DUE PROCESS for five (5) years, where the time limit is set for 12 months, and in extreme TPR cases 18 months

        (1)   When in just the first few days we were informed the Judge requested and was delivered all (5) years worth of CPS  case files, and all case files held by the clerk of courts office, which we the defendants still have not received either the CPS files or 2 of the 3 case files the clerk of court holds to this day after numerous motions granted by judges for their release ,most recently in APRIL 2006 by JUDGE VOWELL, so that we may defend ourselves years (5) years into this and still not be allowed

to defend ourselves.

( c ).did not question the conduct or motives of the court-appointed attorney's upon realizing that:

(1) the NATURAL PARENTS reaction when informed they had just won a "great victory", (what victory? We still are not allowed the proper amount of visits to be able to bond) prior to us even entering into the room this was all decided without our attorneys *"OOPS"* my mistake of forgetting to write on the motion a remedy/relief.) of *a* dismissal of the case.

    (a).*ALL* proceedings that were to take place on 14th of AUGUST 2006, at 9 am, when we were summoned to appear, all was decided *before* 9am , without out knowledge of ( and it should have been painfully clear to the judge, or at least obviously clear, to the just , that there must be a TREMENDOUS lack of communication going on between ,the public defenders, and their clientele. That, whatever the motion that was submitted by our defense attorneys even  said/requested on our behalf, to allow a discussion of the case to occur prior to the 9AM commencement of the trial, prior to the arrival of the parents/defendants, That a motion for case to be dismissed by 'our' attorneys, without :.

        (1) no remedy for relief addressed , which, all we were seeking is the immediate return of OUR children to us, the natural parents ;

        (2)upon noticing parents outrage of no remedy being addressed , did not question, the public defense attorneys or admonish them, the public defenders, for their clients reaction to their case being dismissed with no mention of the return remedy for the "motion to dismiss".Should have sent up a signal that something is *terribly not right here today!*

(d). The NATURAL PARENTS had not authorized their attorney's to agree to anything without consulting them first, by their reactions, angst and bewilderment of, was a clear sign that they were unaware of ANY of the proceedings;

(e).Should have been obvious that the NATURAL PARENTS were

unaware that MARY KAY LAUMER had not only submitted a
MOTION TO DISMISS , the case in its entirety - not just TPR, but
failed to gain one, yes, even just one concession,  so at first glance it
would conceived as some sort of *"GREAT VICTORY!!"*QUOTED BY
OUR DEFENSE ATTORNEY, Ms. Laumer.

8     HON. JUDGE VOWELL, PRESIDING HEAD OF THE ALABAMA TENTH
CIRCUIT COURT, in his capacity as overseer of this County's court system,
and as SUPERVISOR of the PUBLIC DEFENDERS, for the failure to
effectively train and supervise court-appointed attorney's activities;

9     JUDGE SANDRA STORM, for threatening then-attorney Brian Huff to
withdraw the change of venue of this case or risk being disbarred; and
FORBID ANY CONTACT WITH THE NATURAL PARENTS with their
infant son, KPL, for TWO YEARS;

10    CHIEF JUDGE BRIAN HUFF, for permitting the Court-appointed attorneys
under his supervision to continue to work against the best interest of his/her
client(s), for not allowing the  NATURAL FATHER to enter into evidence
documentation in his behalf, to allow the continuing suppression of
NATURAL FATHER's due process rights;

11    BRIAN HUFF, lawyer for NATURAL FATHER, for not aggressively seeking
to protect his client's due process rights, for suggesting that the "NATURAL
FATHER" just *"walk away and have kids with someone else..."* , for
personally and politically benefitting from usurping the due process and civil
rights of the NATURAL FATHER;

12    REFEREE JUDGE ANDRE SPARKS, upon entering the courtroom remarked
without ever meeting and/or speaking with the NATURAL PARENTS that he
*"....never met such a cruel, twisted, perverted, sordid person..."* and
proceeded to hand down a judgment without advising the NATURAL
PARENTS:
    (A) Why they were there;
    (B) That they were ENTITLED to legal counsel;
    (C)Failed to mention that the day's proceedings would be ex parte;
    (D) DENIED the NATURAL PARENTS the opportunity to SPEAK
        or enter any evidence or testimony on their behalf;
    (E) Made the decision for the NATURAL PARENTS to 'appear'
        "PRO SE"
    (F) Denied the NATURAL PARENTS any access to the records and/or
        transcripts of the Hearing;

13    JUDGE BAHAKEL, for rendering decisions WITHOUT

(A) physically seeing DEFENDANTS;

(B) advising the NATURAL PARENTS of their DUE PROCESS RIGHTS;

(C) Defendant's attorneys being present;

(D) failed to note that the DEFENDANTS were NEVER present during trials/hearings/reviews.

(E) For allowing Deirdre March, Lisa Brown and Tenisha Felton undue influence to the Judge's Chambers and prejudicing his/her opinion and causing the due process rights of the NATURAL PARENTS to be deemed unworthy of consideration;

14    JUDGE BARCLAY, for rendering decisions WITHOUT

(A) physically seeing DEFENDANTS;

(B) advising the NATURAL PARENTS of their DUE PROCESS RIGHTS;

(C) Defendant's attorneys being present;

(D) failed to note that the DEFENDANTS were NEVER present during trials/hearings/reviews.

(E) For allowing Deirdre March, Lisa Brown and Tenisha Felton undue influence to the Judge's Chambers and prejudicing his/her opinion and causing the due process rights of the NATURAL PARENTS to be deemed unworthy of consideration;

15    DOUGLAS DELLACCIO, JR., the original court-appointed lawyer, who misrepresented himself by:

(A) introducing himself as "OUR" attorney;

(B) by advising us to sign a "VOLUNTARY AGREEMENT" as a *"...sign of good faith, that you are willing to work with DHR"*,

(C) That signing the "VOLUNTARY AGREEMENT" would be the *"...only way to get your son back...."*

(D) That, at *"any time"* we could request custody and legally, DHR *"...would be required by LAW to return your son..."*

(E) REFUSED to inform of any/all proceedings and its implications,

(F) REFUSED to discuss case with us,

(G) REFUSED to accept phone calls from us,

(H) REFUSED to return ANY calls,

(I) REFUSED to meet with us and prepare us for Hearings/Reviews.

In essence, the behavior of Douglas Dellaccio, Jr. throughout his service to the NATURAL PARENTS was unprofessional and unethical.

16    MARY KAYE LAUMER, failed to act in the best interest of her client by:

(A) failing to advise NATURAL MOTHER of her due process rights,

(B) failing to aggressively DEFEND the NATURAL MOTHER against the malicious and fraudulent allegations of Deirdre March, Lisa Brown, Tenisha Felton and other agents

## Page 27 of 68

of the JCDHR throughout this ordeal,

( C) for constantly and consistently refusing to file motions in behalf of
the  NATURAL MOTHER (ie: release of court reports and any/all
information being used against her),

(D) for constantly and continuously refusing to petition the Court for
daily, routine visits in accordance with the RC CONSENT DECREE
and the  ALABAMA ADMINISTRATIVE CODE BOOK,
DEPARTMENT OF HUMAN RESOURCES, SOCIAL SERVICES
DIVISION,

(E) for FAILURE to follow through on requests for
INTERROGATORIES,

(F) for FAILURE to present evidence and testimony on behalf on the
NATURAL MOTHER,

(G) for FAILURE to properly advise NATURAL MOTHER of the
DEPENDENCY HEARINGS and their implications.

(H) CONTEMPT OF COURT for REFUSING to relinquish evidence,
documentation, narratives that are being used against the
NATURAL  PARENTS;

Although her mortification of Brian Huff's mysterious ascension to his current
position as the Presiding Judge of the Family Court may have dissuaded a lesser
person, Mary Kay Laumer remains a staunch advocate of the JCDHR and its
methodical illicit acquisition of Federal Funds by ignoring the civil and due process
rights of her client.

17    BETH SCHAEFFER, CELIA NADLER, TRISH MUSCOLINO, ANGELA
TANVEER, BARBARA GALLOWAY as Supervisors and/or Directors for
failing to:

(A) train their STAFF properly;

(B) to stress the importance of adhering to the guidelines set forth by the
RC CONSENT DECREE;

(C)in failing to address concerns brought to their attention by the NATURAL
PARENTS, PATERNAL GRANDMOTHER and PATERNAL AUNT,
such        as:

(1) denial of frequent visits in accordance with the RC CONSENT
DECREE;

(2) KPL's failure to thrive;

(3) the environment of the visitation room at the JCDHR building;

(4) repeated requests to access KPL's IEP reports;

(5) KPL arriving at visits without his glasses, leaving him virtually
blind;

(6) frequent missed visits of KPL, KSL and KNL;which is devastating
because the NATURAL PARENTS only are permitted one visit per
month for two hours, a direct violation of the RC CONSENT DECREE

of 1991 and the ALABAMA ADMINISTRATIVE CODE BOOK.

(7) denial to have the children baptized in accordance with their Roman Catholic heritage;

(8) FAILURE to address the name changes by the foster care providers; We have provided video documentation to the above mentioned Supervisors/Directors.

(9) CONTEMPT OF COURT for REFUSING to relinquish evidence, documentation, narratives that are being used against the NATURAL PARENTS;

(10) Refusing to inform the NATURAL PARENTS of medical procedures and treatments received by KPL, KSL and KNL.

18    SANDRA GREGORY, GUARDIAN AD LITEM for not ensuring that, in the best interest of the children, that they develop and maintain strong, healthy bonds with their NATURAL PARENTS and each other as provided by the RC CONSENT DECREE of 1991 and the ALABAMA ADMINISTRATIVE CODE BOOK .

        We are not trying to "say"or judge what a person does for "recreational enjoyment" with her interactions of fellow mal contents/associates, who may just happen to be, drug dealers, gun runners, or convicted felons, the company she chooses to keep, for her being a free U.S. citizen , is her "right". For whom, or what, she chooses to do at 9am in the morning, after just dropping her child off to school, and knowing for the rest of the day her child will be taken care of is to be commended, by at least making sure her child is safe, before she decided to delve into an , our opinion a very questionable elicit affair" with known drug dealers, gun runners, or convicted felons who she chooses to be with at 9 am, in the morning, what ever she needs to do in her life, in her pursuit of happiness, should not be impeded, to find fulfilment, we will defend her "rights" to do as she pleases, in a motel room , behind closed doors, as long as those activities have no impact on others,.... this is where we have this moral, ethical, legal, DILEMMA......

        (a). As our children's court appointed attorney, was she ever under the influence of narcotics of a criminal nature, that by the use of these "drugs" was her ability to render justice influenced or affected? Was she able to "think" clearly?  Was, when she was at meetings, hearings, and trials representing the best interests of our children, as well as other families children was she really "all" there, in her  mental capacity to be "all" there, do delegate her official duties to these children she represented?

            It is now laughable, (but at the time was quite, tragic and traumatic, for all concerned for her well being and safety, her friends ,families, coworkers and the concerned public as well ),for the ability for the local police, state police, and federal FBI, and the implementation of the "Amber Alert" system to work so well. and, for the media CNN, in

particular to get the word out, for all involved in the search for Ms. Gregory, to pull together their resources, so quickly and effectively is impressive for this was not just a "local" event but a National, even an International news story as well. We are suggesting that after recent these events that unfolded, that for the Jefferson County Family Court, to think about looking a little more throughly, into Ms. Gregory's, extremely questionable, "lifestyle" activities she enjoys to partake in either after work, or before work . This "lifestyle", (for this is the woman everyone "thought" was kidnaped and being taken/forced into a hotel room against her will, while it was an actual consensual "endeavor"). For us the defendants to have to live up to her "standards" of "proper conduct" is laughable, just how many other Sandra Eugene Gregory "types" does DHR employ? Just what is their screening process, and who often do their employees mandate to take drug tests , to ensure "proper" state of mind, can at the very least, to be maintained. For this woman never had told the court or in our personal contestations or in meetings discussing the issue of placement, and reunification with family for our children, she NEVER had one decent opinion of her view of the father , that when looking his way, to outwardly show utter disgust , for even having to be in the same space, room, building, or planet such a vile animal, that some how someone was "allowing" me the right to breath air, that she felt she was entitled too, she effectively attempted in every mannerisms imaginable, to persuade the Judge, other DHR workers, other attorneys , defense attorneys as well as state attorney generals, for she was the LAW that represented our children, to elicit her disdain to the court on DHR 's behalf , but now after this "motel mid-day rendevous", it is now apparent to us, her total disorientation during our encounters with, Ms. Gregory her "look" of misorientation, this needs to be seriously addressed and all her other cases as well where it was her job to tell the court the TRUTH, which has apparently been able to skirt for who knows how long, but her legal impact on other cases she preceded over.

19  KIM MASHEGO , ANITA SCOTT-SMITH , KAREN BAZINET and TERRY BEASLEY for :
> (1) denial of frequent visits in accordance with the RC CONSENT DECREE;
> (2) KPL's failure to thrive;
> (3) the environment of the visitation room at the JCDHR building;
> (4) repeated requests to access KPL's IEP reports;
> (5) KPL arriving at visits without his glasses, leaving him virtually blind;
> (6) frequent missed visits of KPL, KSL and KNL;
>    which is devastating because the NATURAL PARENTS only

Page 30 of 68

are permitted one visit per month for two hours, a direct violation
of the RC CONSENT DECREE of 1991 and the ALABAMA
ADMINISTRATIVE CODE BOOK.

(7) denial to have the children baptized in accordance with their
    Roman Catholic heritage;

(8) FAILURE to address the name changes by the foster care providers;
    We have provided video documentation to the above mentioned
    Supervisors/Directors.

(9) CONTEMPT OF COURT for REFUSING to relinquish evidence,
documentation, narratives that are being used against the NATURAL
PARENTS;

(10) Refusing to inform the NATURAL PARENTS of medical
procedures and treatments received by KPL, KSL and KNL.

20    DEIRDRE MARCH, TENISHA FELTON, and TRACIE CURRY for their:
(A) racist attitudes towards the NATURAL FATHER who happens to be an
older, white/caucasian man, their judgements on a man they never spoke to or
met, to consorting with each other, thereby causing him deprivation of his civil
rights.

(B) Based upon their training, relied upon "PROFILING" techniques
    and *assumed* that based solely on his appearance, that the NATURAL
    FATHER

> "...*must be a violent, abusive man that drinks, smokes and
> does drugs cause he has longhair, looks like a biker and
> does not act like us because he is a yankee...*"

(C)DENIED the NATURAL PARENTS of any contact with KPL for two
years because just *"...hearing his name, made my skin crawl..."*
[Deirdre March]

(D) manipulated information gathered at ISP's to create documents that
made it "appear" that the NATURAL PARENTS were in agreeance with all
procedures and recommendations;

(E) had undue influence over the Court's ear and effectively prejudiced
the Court against the NATURAL PARENTS sight unseen;

(F) continue to disseminate false information regarding the NATURAL
FATHER's "alleged" abusive behavior which was discredited in a
Deposition in May 2003;

(G) continually FAIL to mention to the COURT, that it is ILLEGAL
to prohibit visitation between parents and their children;

(H) FAIL to address concerns the NATURAL PARENTS, the PATERNAL
GRANDMOTHER , and the PATERNAL AUNT regarding:
    (1) denial of frequent visits in accordance with the RC CONSENT DECREE;

    (2) KPL's failure to thrive;

    (3) the environment of the visitation room at the JCDHR building;

    (4) denied repeated requests to access KPL's IEP reports;

    (5) KPL arriving at visits without his glasses, leaving him virtually blind;

    (6) frequent missed visits of KPL, KSL and KNL;
which is devastating because the NATURAL PARENTS only are permitted
one visit per month for two hours, a direct violation of the RC CONSENT
DECREE of 1991 and the ALABAMA  ADMINISTRATIVE CODE BOOK.

    (7) denial to have the children baptized in accordance with their
     Roman Catholic heritage;

    (8) FAILURE to address the name changes by the foster care providers;
     We have provided video documentation to the above mentioned
     Supervisors/Directors.
    (9) CONTEMPT OF COURT for REFUSING to relinquish evidence,
documentation, narratives that are being used against the NATURAL
PARENTS;

    (10) Refusing to inform the NATURAL PARENTS of medical procedures
    and treatments received by KPL, KSL and KNL.

21     LISA BROWN, for becoming personally involved with OUR children and
    deliberately manipulating and falsifying court reports, and:
    (1) denial of frequent visits in accordance with the RC CONSENT DECREE;
    (2) CONTEMPT OF COURT for  PURPOSELY delaying the paternity test
    that was ordered in DEC 2001 and managed to MANIPULATE the system
    and blatantly disregard the DUE PROCESS rights not only of the Natural
    Father, but that of KPL, who *has a family that is willing, able and ready* to
    welcome him into the FAMILY; (JCDHR *FINALLY* produced KPL in NOV
    2003)
    (3)KPL's failure to thrive;
    (3) the environment of the visitation room at the JCDHR building;
    (4) denied repeated requests to access KPL's IEP reports;
    (5) KPL arriving at visits without his glasses, leaving him virtually blind;
    (6) frequent missed visits of KPL, KSL and KNL;
     which is devastating because the NATURAL PARENTS only

are permitted one visit per month for two hours, a direct violation of the RC CONSENT DECREE of 1991 and the ALABAMA ADMINISTRATIVE CODE BOOK.

(7) denial to have the children baptized in accordance with their Roman Catholic heritage;

(8) FAILURE to address the name changes by the foster care providers; We have provided video documentation to the above mentioned Supervisors/Directors.

(9) CONTEMPT OF COURT for REFUSING to relinquish evidence, documentation, narratives that are being used against the NATURAL PARENTS;

(10) Refusing to inform the NATURAL PARENTS of medical procedures and treatments received by KPL, KSL and KNL.

22    DR GUFFY, for giving false testimony which directly resulted in the loss of custody of KPL.

23    MARGARET MANGINA, for:

(A) conspiring with MARY KAY MANGINA to abscond with KPL with the sole purpose for acquiring a sibling for BM, MARY KAY MANGINA's four-year old daughter, and a healthy child support check;

(B) for persuading MARY KAY MANGINA to file false police reports;

(C)for attempting to file false police reports with the City of Homewood.

24    JEFFERSON COUNTY CLERK OF COURT, FAMILY DIVISION, for;

(A) failure to produce the case file as court ordered , numerous times and to this day November 10th 2006 will still only have one-third 1/3 of the case file, the case file for KPL , not for the other two children involved.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

(1)    Whether the Jefferson County Family Court erred by prohibiting the Plaintiff's due process rights under 26-14-7.1?

(2)    Through the manipulation and falsifying of court reports, did the STATE of ALABAMA illegally receive Federal funding?

(3)    Whether the DHR abused its discretion when it prevented the Natural Parents from baptizing their children according to their Roman Catholic beliefs, and stated that the children were "...*in good Baptist homes and* [a Roman Catholic] *baptism wouldn't be necessary*" ?

(4)    Whether the legal counsel and/or court-appointed attorney's provided by the Jefferson County Family Court system adhered to a code of standard and ethics to reasonably defend his/her client(s)?

(5)    Whether the Social Workers representing the JCDHR repeatedly perjured themselves by intentionally omitting evidence and/or documentation throughout the past five years on behalf of the Natural Parents to ensure prolonged funding?

(6)    Whether the JCDHR and the Family Court in Jefferson County erred and blatantly abused their authority and power by having HEARINGS/REVIEWS in clandestine meetings and INTENTIONALLY, KNOWINGLY and WILLINGLY informed the Natural Parents that HEARINGS/REVIEWS were rescheduled, when in fact, court was in session?

## BACKGROUND FACTS

Mary Kay Mangina , natural mother, and her adoptive mother, Margaret Mangina, in July 2001, went to consult with Mike Kendall, Attorney, in Birmingham, Alabama, in a fact-finding mission to determine how to prevent Karl Lentz from legally obtaining custody rights to their unborn child.

At the time Mary Kay Mangina met Karl Lentz on 7 July 2000, she was unemployed and had been since December 1998.

Margaret Mangina, 75 years old, was employed at a Tuxedo Rental Shop as a Clerk.

Mary Kay Mangina and her daughter, Brittany Anderson, 4 years old, lived with her adoptive mother, Margaret Mangina, and her adopted brother, Charlie Mangina, 38 and unemployed; and Patrick Mangina,40 and unemployed at 3123-C Lancaster Court, Homewood, Alabama 35209 - a tiny, two(2) bedroom apartment.

Mary Kay Mangina had been involved in incidences of domestic violence with Scott Anderson, the natural father of Brittany Anderson and, her brother, Charlie Mangina.

Unbeknownst to Karl Lentz, Mary Kay Mangina had a history of public drinking, DUI's and domestic violence, which were alcohol-related incidences from 1992-1999.

Karl Lentz at this time was employed by Direct TV Satellite Company and earning/grossing approximately one thousand dollars ($1,000.00) per week as an independent contractor.

It was the intention of Mary Kay Mangina to become pregnant with Karl's child, file false claims of abuse against him and "run him out of town" and then receive child support of at least one thousand dollars ($1,000.00) per month as estimated by her lawyer, Mike Kendall.

This child support would enable Mary Kay Mangina and Margaret Mangina to live comfortably for eighteen (18) years; provide a much desired sibling for Brittany; and no interference from Karl Lentz because she did, in fact, eventually have an Order of Protection placed against him.


These allegations, which prompted and enforced an ORDER OF PROTECTION, and have been used against Karl Lentz to prevent him from gaining custody of his children, were proved unfounded and fabricated in a Deposition 5 May 2003.

Karl Lentz , age 38, has not, nor has ever been, convicted of a crime of neglect and/or abuse of a child.

Deirdre March, Lisa Brown, all caseworkers and supervisors involved with this case in the JCDHR system, has erroneously referred to Karl Lentz, the natural father, as Kole Lentz, the son. An attempt to correct this gross oversight was made 12 March 2002 in the open court of Judge Sparks. This is just one, small example to demonstrate the arrogance of the JCDHR and the Judge's of the Family Court system.

Page 35 of 68

Karl Lentz approached Judge Sparks and told him his name was not "Kole" - that "Kole was his son".

Patricia Russo, natural mother of Karl Lentz, and present in court 12 March 2002, commented in open court to Judge Sparks, that in fact, his given name is "Karl" not "Kole".

Judge Sparks admonished Patricia Russo in open court and stated that "if she opened her mouth again - she would go to jail..."

Karl Lentz attempted to explain, again, the predicament to Judge Sparks. That no one, since 14 August 2001, had bothered to ask his name, ask for proof of identity - that the JCDHR workers presumed his name was Kole.

Judge Spark's response was "What are you trying to pull here?" Karl's response was to "...correct the record."

This condescending attitude towards the Defendant(s) named in JU-2001-51832.01 , the natural parent(s) in this case, in Court and at ISP's, has made it impossible to communicate with the Family Court and the Department of Human Resources, Social Services Division in Jefferson County.

---

## STATEMENT OF FACTS

1.  Mary Kay Mangina went to Dr Gary Swicord, her dentist in Birmingham, for a routine root canal on 1 August 2001 at 8am. (Exhibit 1)

2.  Mary Kay Mangina went to her obstetrician at the High Risk Clinic, for a regularly scheduled appointment at 12pm.

3.  The nurses at the High-Risk Clinic noticed the unborn baby's heartbeat was irregular.

4.  Mary Kay Mangina was admitted into UAB for a stress test on 1 August 2001.

5.  Kole Patrick Mangina was born on 2 August 2001 at approximately 4am.

6.  No comment was made on the black-and-blue and swollen appearance of Mary Kay's face as a result of the previous days' root canal.

7.  Margaret Mangina ( Mary's adoptive mother), came to UAB to visit with Mary Kay Mangina (adopted daughter) to visit her new grandson.

8.  Margaret Mangina, (Mary Kay Mangina's adoptive mother) who was seek a sibling for Brittany Anderson (Mary Mangina's daughter from a previc

marriage), sought the aid of social worker, Calee Bradley to fabricate a false report of the "brutal beating" that Mary Kay Mangina sustained at the hands Karl Lentz on 1 August 2001 which allegedly precipitated her premature labor.

9.    Calee Bradley, Deirdre March, Lisa Brown proceeded to flagrantly misuse their authority as agents of the State of Alabama, in the capacity of social workers for the Department of Human Resources, by 'presuming' Karl was guilty *without* an investigation. (*Alabama Department of Human Resources, Social Services Division, Administrative Code Book*, 660-5-34-.04)

10.    Margaret Mangina told social workers, Calee Bradley, Deirdre March, Lisa Brown and Dupree Williams that Mary's face was swollen and black-and-blue because Karl Lentz beat her so bad, he knocked a *molar* out of her head and allegedly causing Mary to go into premature labor.

11.    Both Karl Lentz and Mary Kay Mangina refuted this allegation.

12.    Mary Kay Mangina had gone to her dentist, Dr. Grady Swicord, Birmingham, Alabama, the day before ( 1 AUGUST 2001) to have a root canal performed.

13.    Mary Kay Mangina was able to produce documentation of this dental work. (Exhibit 1)

14.    Karl Lentz and Mary Kay Mangina demanded that either a doctor was called in to count Mary Kay's teeth, or that an x-ray be done.

15.    Lisa Brown adamantly refused, stating that "...*it would traumatize the victim...*" Oddly enough, Ms Brown NEGLECTED to report, in her capacity as a mandated reporter, *Alabama Department of Human Resources, Social Services Division, Administrative Code Book*, 660-5-34-.03(2) , this brutal beating of a woman 7 ½ months pregnant to the authorities *Alabama Department of Human Resources, Social Services Division, Administrative Code Book*, 660-5-34-.05(a) . One must ask, *WHY?*

16.    Deirdre March and Lisa Brown *knew* the alleged assault *never happened.* 13A-2-1(6)

17.    Deirdre March and Lisa Brown *chose* to falsify documents and report false information to her supervisors and the Court.    13A-2-1(6); 6-5-104

18.    This false and malicious information is what the DHR , the lawyers, the Guardian ad Litems and the Judges have based this illegal kidnaping of Kole Patrick Mangina, Kolette Shay Lentz and Kameryn Nicole Lentz. 42USC 21-

1 §1983

19.   Had Deirdre March, Lisa Brown and the Supervisors performed their jobs properly, without prejudice, *Alabama Department of Human Resources, Social Services Division, Administrative Code Book,* 660-5-34-.04 (4)(5) (a)(b), and actually questioned the dentist,   Kole Patrick Mangina would have come home.

20.   Margaret Mangina, Deirdre March and Lisa Brown and their Supervisors had *presumed* based on Karl Lentz' "appearance", that of a single, older white male, a traveling independent contractor,   that he *must* have had a criminal record and that this *kidnaping* would be a slam-dunk.

21.   Lisa Brown and her colleagues *presumed* that Karl and his extended family would not accept Kole *because* he is a child with Down Syndrome; the Mangina Family did not want a "damaged" child; the Lentz-Russo-Garner Family begged to have him returned to their custody.

22.   Lisa Brown  went so far as to report that Karl  "had a strong negative reaction" to KPL. Not true. The Mangina Family - Margaret and Charlie, had a strong negative reaction. Once KPL was diagnosed with Down Syndrome, Margaret and Charlie never visited with Kole again.

23.   Dr Guffee, escorted Mary Kay and Karl Lentz to the ICU where KPL was being cared for.

24.   Also, in the ICU were the Staff Nurses and four (4) unknown social workers.

25.   Dr Guffee told us that Kole Patrick may have Down Syndrome - and told us that "KPL was going to be blind, deaf, crippled and severely retarded..."

26.   This news was shocking.

27.   One tear came down Mary's face.  That was the extent of our "strong, negative reaction."

28.   Mary Kay Mangina understood the importance of breast milk and the unequivocal benefits for KPL, and immediately rented a breast pump from the Alabama Department of Public Health on 6 August 2001.

29.   Lisa Brown reported on 24 August 2001 that a "Dr. Demmitt ...refused to send child home with parents." Lisa Brown does not give supporting testimony why and how he came to this determination.  We never met him.

30.   Margaret Mangina went home and returned all the items she purchased for

Kole and then changed the locks on the apartment at 3123-C Lancaster Court, so Mary Kay could not return with KPL once they were discharged.

31.   DHR removed KPL to an undisclosed place within UAB Hospital and denied Karl and Mary Kay all opportunity to bond with their infant son. VIOLATION RC CONSENT DECREE #45(a);#58; #59 and Alabama Administrative Code Book 660-5-50-.04

32.   Immediately following the removal of Kole from his parents, Karl Lentz, father, has :
      (a) tried to ascertain the reason(s) why Kole Patrick was removed from his custody;
          (b) the code that the JCDHR was relying on to prohibit *any* visitation of father/son for two (2) years.
      Violation of RC Consent Decree 45(a); 58 and
      Alabama Administrative Code Book 660-5-50-.04 and 660-5-50-.06(c)

33.   On 14 August 2001, JCDHR case worker, Deirdre March, filed a Dependent Petition citing Karl Lentz as the natural father.

34.   On 14 August 2001, Deirdre March falsely stated that she was not aware "...of any person who is not a party to these proceedings who has physical custody or claims to have custody or visitation rights with respect to this child."    6-5-104(3)(b)

35.   DHR was bombarded with phone calls (documented) from Karl Lentz, the father, Patricia Russo, the paternal grandmother and Karen Garner, the paternal aunt - all requesting that Kole be temporarily placed with his family.

36.   Three days later, on 17 August 2001, Deirdre March recanted Karl's parental status and, now refers to him as the "putative father"

37.   The "parties" were not notified of their right to counsel; Karl and Mary Kay were not told there were "charges" and/or "allegations", nor were they ever in possession of any documentation until *AUGUST 2006.*
    (____USC CODE_____; RC CONSENT DECREE #59

38.   The delay in placement of KPL with his father, Karl Lentz, occurred because DHR and the Court REFUSED to recognize him as the biological father . 13A-2-2(4)

39.   Karl Lentz and Mary Mangina signed an affidavit of paternity both agreeing that Karl Lentz was , in fact, the biological father. It was signed and notarized in accordance with the *Alabama Department of Human Resources*

*Social Services Division, Administrative Code Book,* 660-3-11-.03(3).

40. This document was included in the case file, however, Deirdre March and Lisa Brown still refused to acknowledge Karl Lentz as the biological father. 6-5-104(3)(b)

41. Karl Lentz and Mary Mangina requested that a paternity test was done at UAB. Although Lisa Brown and Deirdre March had the authority to order one, they denied this request *Alabama Department of Human Resources, Social Services Division, Administrative Code Book* , 660-3-11-.03(b)(1).

42. DHR denied , nor would entertain any placement of KPL with his paternal family stating that *"... it would be illegal to spend County and Federal money until a DNA test came back positive..."* and validated that DHR was indeed *"...working with the right family".*

43. Karl Lentz vigorously approached the Court and DHR and demanded a DNA test with no success for EIGHTEEN (18) MONTHS. The Court and DHR had ample opportunity to order a DNA test. The Family Court in Jefferson County has a testing facility on-site and offers free testing to determine paternity. 42 USC 21-1 1983

44. As a resident of Alabama and a child in custody, Kole Patrick Mangina had the right to a paternity test according to the *Alabama Department of Human Resources, Social Services Division, Administrative Code Book* 660-3-11-.02

45. On 6 September 2001, Deirdre March recommended that Karl Lentz and Mary Kay Mangina attend parenting classes. 6-5-104(b)(4)

46. Karl Lentz and Mary Kay Mangina left the "Intake meeting" and immediately signed up for Parenting classes at the Exchange Club.

47. The parenting class program consists of 15 meetings spanning a fifteen (15) week period.

48. Karl Lentz and Mary Kay Mangina completed the parenting classes on 26 September 2001 - *twenty-one (21) days later* - three(3) weeks, not the average fifteen (15) weeks. - to prove their sincere desire to be reunited with KPL as fast as time would allow.

49. Karl Lentz and Mary Kay Mangina provided documentation of the completion

of the program to Deirdre March and Lisa Brown and it became part of the case file.

50.    However, although all "parties" agreed that KPL would be returned to his natural parents upon completion of the parenting program of the Exchange Club, Deirdre March and Lisa Brown "changed" their minds - without explanation, without cause, violated a lawful, binding contract between us.
6-5-104(b)(3)(4)

51.    On 9 November 2001, in an ISP submitted by Lisa Brown:

(A) Lisa Brown reports that Karl had completed parenting classes. Karl was not court-ordered to do so, but attended to support Mary Kay.

(B) "...Kole Lentz needs to learn how to parent and meet the needs of his children..."

> Karl Lentz at this time, is 40 years old, has raised two (2) step-children and has five (5) grandchildren without incident.

(C) Lisa Brown states that Karl and Mary "tried unsuccessfully to take Brittany away from her school and grandmother.

> (1) Karl was not involved;

> (2) Mary Kay still had legal custody of Brittany.

(D) JCDHR was in contempt of court for refusing to comply with their own recommendations:

> (1) actively and aggressively prohibited any contact with Kole for two years;    DIRECT VIOLATION OF RC CONSENT DECREE # 45(a) and 58;  ALABAMA ADMINISTRATIVE CODE BOOK 660-5-50-.04(1)(2); 660-5-50-.06; 660-5-50-.06(1)(e)

> (2) that the parents be involved with all doctor visits;

> ALABAMA ADMINISTRATIVE CODE BOOK 660-5-50-.06 (c)

> (3) that JCDHR will make a case aide to set-up bi-weekly visits to begin on 14 November 2001, and failed to follow through. ALABAMA ADMINISTRATIVE CODE BOOK 660-5-50-.06(c);

660-5-50-.06(e); RC CONSENT DECREE #45 (a), #58

(E) Lisa Brown claims Kole's reason for entry into care was "Father's history of domestic violence." There were allegations, but no investigation, no evidence - no convictions.

(F) Mary Kay chose not to return to Margaret Mangina's apartment because:

 (1) Margaret and Charlie's strong negative reaction to KPL and that he was "damaged";

 (2) Charlie Mangina was abusive and dangerous to Mary Kay

 (3) Mary Kay refused to return to an abusive household.

(G) Although Karl's mother, Patricia Russo, and his sister, Karen Garner, were able and willing to take care of Kole and in constant contact with Lisa Brown and Deirdre March, in an attempt to prevent placement in Foster Care, they fail to mention in this ISP that there are placement options. 6-5-101; 6-5-102;6-5-103;6-5-104(b)(1)(2)(3)

(H) Karl and Mary Kay did attend Kole's first doctor visit with Lisa Brown.

 (1) Lisa Brown attempted to convince the Pediatrician to "enhance" KPL's disabilities in order to receive additional federal funding. 18USC Part I,Chap13 § 666

 (2) The Pediatrician refused.

 (3) Lisa Brown told her not to worry about it, that "...there were other ways to get more money..."

(I) Karl and Mary Kay immediately *went* to Montgomery, to the State Headquarters of the Department of Social Services, and informed Beth Schaeffer about Lisa Brown's attempted coercion of the intern to falsify medical documents and of the improprieties that took place during that visit.

(J) As a result of the conversation with Beth Schaeffer and the ensuing investigation into these allegations against Lisa Brown, Karl and Mary Kay were forbidden any contact with Kole for two and a half (2 1/2) years
 DIRECT VIOLATIONS RC CONSENT DECREE 45(a); 58;59 and the ALABAMA ADMINISTRATIVE CODE BOOK 660-5-50-.04(1)(2);660-5-50-.06(c); 660-5-50-.06(1)(e)

(K)    Karl Lentz and his Family requested that we have the opportunity to

Page 42 of 68

baptize KPL as is our tradition and according to our Roman Catholic beliefs.

(i) Deirdre March and Lisa Brown stated that KPL *"...is in a Baptist household and his religious needs are being met..."* DIRECT VIOLATION: RC CONSENT DECREE #46

51.  Karl Lentz was summoned to court on 15 November 2001.

52.  Karl Lentz wanted to hire his own legal counsel, but couldn't because JCDHR and its agents refused to inform Karl of the "allegations" made against him, or divulge the purpose of the court appearance. 42 USC 21-I § 1986;42 USC 21-I §1983; 42 USC 21-I §1985

53.  Therefore, the court appointed Douglas Dellaccio, Jr to represent him.

54.  Douglas Dellaccio, Jr.
:failed to disclose allegations made against Karl Lentz;
: did not review the case with Karl Lentz prior to the hearing;
: failed to provide Karl Lentz with competent legal counsel;
: failed to discuss a plan of action.

55.  Karl Lentz was ordered to appear on 21 November 2001 at the Jefferson County Family Court.

56.  Karl Lentz and Mary Kay Mangina arrived at the Jefferson County Family Court at 8:30 - a half an hour prior to his/her scheduled appearance.

57.  The Security Guard in the Lobby told Karl that the Courthouse was closed; that it was the day before Thanksgiving and that no hearings were being held that day.

58.  Karl Lentz showed the Security Guard the Order to Appear, and the Security Guard gave him access to the building.

59.  As disclosed by the Security Guard, the Jefferson County Family Court was vacant.

60.  Karl Lentz and Mary Kay immediately went to Montgomery to complain.

61.  Karl Lentz and Mary Kay spoke with Beth Schaeffer, in the DHR State Headquarters in Montgomery and vehemently voiced their concerns and transgressions (reporting of false allegations by case workers, reclassifying paternity status, refusal to place with family members, using incorrect names and addresses, no documentation, no access to ISP and Court Hearings,

etc....) at the hands of the case workers in Jefferson County.

62. **Interestingly, and oddly enough, a Court Report was generated on 21 November 2001 - without our presence, without counsel, without a Judge.** (Exhibit 2)

63. The Clerk of Court, Jefferson County and the JCDHR deliberately and improperly addressed  summons to appear in court in a concerted effort to "prove" that Karl Lentz and Mary Kay were not only irresponsible, but disinterested in regaining custody.

64. On 3 December 2001,   Judge Sandra Storm ordered a paternity test, to be paid for by JCDHR, for Karl Lentz.(EXHIBIT 3)

65. Karl Lentz never denied paternity of KPL and welcomed the opportunity to prove to Deirdre March and Lisa Brown that he was indeed, KPL's natural father, which they still adamantly refused to believe and/or accept.

66. It was divulged in the 5 December 2001 evaluation of Mary Kay Mangina by the Altamont Counseling Associates, P.C, 300 Vestavia Parkway, Suite 2300, Birmingham, Alabama 35216-3788, - specifically Patrick Dunne, MA, LPC that Deirdre March told him that
    *Her social worker [Deirdre March] reported the boyfriend [Karl Lentz] had used such discipline as putting the children outside all day without supervision "to make a man out of him."*

67. Karl Lentz NEVER HAD physical custody of his son, KPL.

68. The last male child born to the Lentz-Russo-Garner family was born in December 1983, nineteen (19) years ago.

69. Karl Lentz never had a male child in his care.

70. This statement was *completely,* intentionally, knowingly and maliciously fabricated by Deirdre March.42 USC 21-I § 1985(2)

71. Deirdre March and Lisa Brown further slandered Karl Lentz by stating that he referred to his son was a "freak on a leash".

72. However, when Patrick Dunne, evaluator, asked Mary Kay if Karl Lentz had an "issue" with KPL being diagnosed with  Down Syndrome, Mary Kay replied,

    *"It doesn't bother him to have a child with Down's syndrome."*

73.  On 8 December 2001, Mary Kay filed, through the prodding of Lisa Brown, JCDHR and her mother, Margaret Mangina to conspire and create charges with the expressed goal of reunification with her children BA and KPL,. a false police report claiming she was a victim of domestic assault.

  (A)  In doing so, it would demonstrate that Mary Kay was willing to "work" with the Jefferson County DHR to achieve their "final solution";

  (B)  Criminal charges were filed against Karl Lentz ; he was subsequently arrested and released on bail.

  (C)  Karl Lentz, through his attorney, Brian Huff, demanded a deposition, forced Mary Kay, under oath, to testify that her claim was fraudulent
       Exhibit 16 5/5/03 Deposition

  (D)  Mary Kay attempted to stick to her original story, but under cross-examination, the massive inconsistencies within her testimony of the actual events that happened that day proved that the charges were unfounded.

## 2002

74.  Lisa Brown and Kim Mashego submitted a court report for Judicial Review to Judge Bahakel on 12 March 2002.

75.  Lisa Brown reports that Mary Kay

  *"...reported to a caseworker that she had Mr Lentz arrested two times after a particularly brutal beating, once with the Birmingham Police Department and once with the Homewood Police Department within 24- hour period."*

and

  *"...Ms Mangina failed to attend and press charges on Mr Lentz...."*

  (a) Lisa Brown fails to mention that Mary Kay *had admitted* to falsifying aforementioned police reports.

  (b) Mary Kay did show up for one of these court dates in _____and was admonished by Judge_____for filing a false police report.

  (c)At this time, Judge_____ told Mary Kay that the next time she attempted to appear in Court to swear to false testimony, that she would be doing jail time.

  (d) Ergo, Mary Kay *"failed to attend and press charges on Mr Lentz..."*

76. Lisa Brown manages to slander and libel Patricia Russo, paternal grandmother in the 12 March 2002 court report.

    (a) Lisa Brown accuses Patricia Russo of *"...abusing drugs and alcohol."*
    (b) Patricia Russo has no history of drug and/or alcohol abuse.

77. Lisa Brown claims that Patricia Russo *"does not return calls".*
    (a) Upon learning that KPL was taken into custody, Patricia Russo, paternal grandmother, aggressively and actively maintained phone contact with Lisa Brown, Tenesha Felton and other supervisors in the JCDHR.

78. Lisa Brown states that
    *" Ms Russo stated that they were not sure at this time if they would be able to care for KPL."*

    (a) At no time, did Patricia Russo not offer/demand/plead for KPL's release to her custody.

    (b)Patricia Russo had already researched and investigated several options to address the special needs of KPL and, forwarded this information on to Lisa Brown.
        (i)Patricia Russo:
            -visited daycare centers;
            - a support group of Parents of Children with Down Syndrome;
            -Valley Community Services "LIFT" Program
                - the local school district's program specifically designed to meet the needs of children with Down Syndrome.

79. Lisa Brown comments on a visit of Karl and Mary Kay with KPL.

    *"Mr Lentz prefers to have the lights remain off during the supervised visits."*

    (a) The supervised visit took place at the Department of Human Resources in the Administrative Building in the City of Birmingham.

        (i) Instead of permitting the visit to take place in an upstairs "Family Room" replete with carpeting and appropriate seating, the visits took place in a concrete BUNKER intended for interrogations, not for visits with infants;

(ii) Visits were NOT permitted in a natural setting or allowed outside of the Administrative Building;
ALABAMA ADMINISTRATIVE CODE BOOK 660-5-50-.06(d)

(iii)the BUNKER was approximately an 8x8 stark white room, with glaring fluorescent lights with a long table and wooden chairs. There was no room to walk around, no room to sit on the floor and engage in any form of play.

(1) Karl and Mary Kay complained vehemently to Lisa Brown, Tenesha Felton , Tracy Currie, Anita Turner, and Beth Schaeffer.

(2) Their concerns were immediately dismissed and were told to "*Talk to your lawyer.*" and never informed they could request  help from an outside advocacy program.
RC CONSENT DECREE #59

(iii)Lisa Brown intentionally conducted the supervised visits in an alien environment to ensure that KPL would be as uncomfortable as humanly possible.
ALABAMA ADMINISTRATIVE CODE BOOK 660-5-50-.06(d)

(1) Lisa Brown attempts to allude that by keeping the lights off during the supervised visits is somehow inappropriate, bizarre and menacing.

(2) The fluorescent light in the BUNKER was going bad.

A)Karl Lentz realized that if it exploded during the visit, KPL would be covered in oil;

B)The humming from the fluorescent light was so incessant and loud, it interfered with any and all communication;

C) Taking KPL's condition and comfort level into consideration, Karl Lentz requested that the lights would be turned off.

80.    In the Court Order, signed by Judge Sparks on 12 March 2002, Karl Lentz:
-did not have counsel;
-not afforded the right to a court-appointed attorney;
-was not informed of the alleged charges against him;
-was not made aware that this was a "Dependency Hearing" and its implications;

Page 47 of 68

-could not address the Court;
  - because it was not a "trial" the Court would not accept testimony and/or evidence
-could not procure a record or transcript of said hearing.;
ALABAMA Code of 1975 26-14-7.1 (a)(b)(c)(d)(e)(f)(g)(h)(i)(j)(k)
-visitation was suspended until further notice without reason
    RC CONSENT #59; ALABAMA ADMINISTRATIVE CODE BOOK 660-5-50-.04(1)(2);  660-5-50-.06(1)(e);ALABAMA CODE of 1975 26-14-7.1 (a)-(k).
(EXHIBIT 4)

81.    The COURT granted the DEPENDENCY of KPL "...*from clear and convincing evidence and having considered all relevant and material evidence presented...*"
    (a)  Karl Lentz did NOT have counsel, nor afforded the opportunity to have court-appointed counsel;
    (b) Karl Lentz was not permitted to enter any evidence, documentation or testimony in his behalf.
    ALABAMA Code of 1975 26-14-7.1 (a)(b)(c)(d)(e)(f)(g)(h)(i)(j)(k)

82.    Any use of information purveyed during an ISP is without merit and borderline frivolous.  Even the acknowledgment that an "OFFICIAL" ISP took place under any guidelines and under certain procedural policies is a farce. The policy and practice ascribed by the ALABAMA ADMINISTRATIVE CODE BOOK, to the best of our knowledge, was never followed.

    (a) Lisa Brown still reports that Karl Lentz has a history of domestic violence which was proved unfounded;

    (b) Lisa Brown REFUSES to include any of our statements or concerns within these reports. ALABAMA ADMINISTRATIVE CODE BOOK 660-5-47-.05(5)(b)

83.    During late summer of 2002, Karl and Mary Kay Lentz relocated to the family farm in Stuarts Draft, Virginia.

84.    KSL , sibling to KPL.  was born in Augusta County on 28 September 2002.

85.    KSL, was a healthy 8lbs.3oz.

86.    KSL was under the care of a local pediatrician, Dr Castello, Augusta Pediatrics, Fishersville, VA.
    (a) KSL received the appropriate immunizations in a timely manner.

87.    KSL, while living in Virginia:

(a) lived with her natural parents;
(b) was breast-fed;
(c) received timely and appropriate medical care;
(d) excellent supervision;
(e) beautiful, new clothing;
(f) love and adoration of her paternal grandparents, paternal aunts, uncles and cousins.

88.  That Mary Kay, the Natural Mother, applied for, and was approved for, Food Stamps and Medicaid by the Social Services in Augusta County, Virginia.

89.  That the Natural Father, approximately six (6) weeks after the birth of KSL, returned to work, as an independent contractor, and resumed work in Florida.

90.  That the Natural Mother, two (2) weeks later, decided to join him in Florida and, on the way, to visit her family in Alabama to show off her new baby daughter.

91.  Lisa Brown, a case worker for the Jefferson County DHR, issued a pick-up order based on the charges of "NEGLECT" for KSL upon learning of the visit to Alabama.

92.  The pick-up order, dated 20 November 2002, was filed under the false pretense of neglect. Kolette Shay Lentz was happy, healthy and thriving while in the care of her Natural Parents and at the time of pick-up by Lisa Brown and Officers from the local Police Department.

    **(a) At the time of pick-up, nor any time previous was there any of evidence of "NEGLECT"** as defined by the
ALABAMA ADMINISTRATIVE CODE BOOK
660-5-34-.02 :
        (1)    internal injuries (3)(a)(2);
        (2)    burns and/or scalding (a)(3);
        (3)    bone fracture(s) (a)(4);
        (4)    cuts and/or bruises (a)(5);
        (5)    evidence of human bites (a)(6);
        (6)    sprains and/or dislocations(a)(7);
        (7)    tying, close confinement (a)(8);
        (8)    Fetal Alcohol Syndrome (a)(9);
        (9)    Factitious disorder by proxy (a)(10).

660-5-34-.02(3)
    (1) abandonment;
660-5-34-.02(8)
    (1) failure to thrive;
660-5-34-.02(9)

Page 49 of 68

(1) Mary Kay Lentz did NOT test positive for alcohol and/or drugs at the time of birth.

93. Lisa Brown knowingly and maliciously claimed that she was unaware of the whereabouts of the Natural Father, or of any paternal relative(s) that would be willing to accept temporary placement for Kolette.

94. That false documentation was submitted by Lisa Brown on 20 November 2002 - failing in a mandated "reasonable effort" to avoid removal from the family.

95. That Lisa Brown has been relieved of her duties as a JCDHR agent as a direct result of this and other fraudulent court reports against the Natural Father.

96. The Natural Father objected to the JCDHR, and eventually the Family Court in Jefferson County, Alabama, to hear a custody case on the grounds that he, nor KSL, has ever been a domiciliary of Alabama.
Code 20-146.1

97. In the 5 December 2002 ISP, Lisa Brown forbids any contact between Karl Lentz and his daughter, KSL. RC CONSENT DECREE # ; ALABAMA ADMINISTRATIVE CODE BOOK

## 2003

98. Three months after the birth of KSL, in the 14 January 2003 ISP, Lisa Brown was already recommending that KSL be put up for adoption.

99. Lisa Brown also reports that KPL is "doing well in his placement with the Parsons." despite the fact that his paternal side of the family was vehemently raising concerns about KPL's failure to thrive.

100. KPL has been twenty-two pounds for 2 years.

101. Lisa Brown still maintains that KPL *"is too retarded to eat"* and that the foster parents report that *"...KPL only eats cheese doodles and pepsi..."*

102. Karl Lentz and his Family requested that we have the opportunity to baptize KSL as is our tradition and according to our Roman Catholic beliefs.
   (a) Lisa Brown stated that KSL *"...is in a Baptist household and his religious needs are being met..."*
   DIRECT VIOLATION: RC CONSENT DECREE #46

103. 14 January 2003, Lisa Brown is still using visitation as a reward/punishment to enforce compliance with her recommendations.
ALABAMA ADMINISTRATIVE CODE BOOK

104. Although a paternity test was ordered in December 2001 by Judge/Referee Sandra Storm, Lisa Brown still has not produced KPL for a paternity test and state in 14 January 2003 ISP, "*Without paternity, Mr Lentz and his family have no legal rights to KPL.*"

105. Lisa Brown also reports that Karl Lentz would not agree to the paternity test. Karl Lentz, nor his attorney, were present at this ISP to refute this claim.

106. In paperwork that we received in **AUGUST 2006**, we have learned that a DEPENDENCY Hearing for KPL was set for 29 January 2003; the Natural Father had no knowledge of this.

107. In the 27 January 2003 Report of Diagnostic Evaluation, Mary Kay Mangina-Lentz acknowledged only one arrest in her life. During the May 2003 Deposition, she revealed that she was arrested six times(6); once for Domestic Violence involving her brother, two times for Public Intoxication and four times for DUI.

108. Lisa Brown absolutely forbids ANY contact between KPL and Karl Lentz.
ALABAMA ADMINISTRATIVE CODE BOOK ; RC CONSENT DECREE

109. Sandi Gregory, GAL, is bound by LAW to inform the JUDGE/REFEREE Andra Sparks, that forbidding visitation is ILLEGAL.
ALABAMA ADMINISTRATIVE CODE BOOK; RC CONSENT DECREE

110. Karl Lentz was not informed, nor represented by counsel for the 29 January 2003 Dispositional Hearing that negatively impacted his ability to form and maintain parent/child bonds.
ALABAMA CODE of 1975 26-14-7.1; ALABAMA ADMINISTRATIVE CODE BOOK

111. On 3 February 2003, the Dispositional Hearing was brought up again, this time to Judge Sandra Storm, who again, knowing that the Natural Father was not informed, nor represented by counsel, concurred with the findings of Senior Trial Referee, Andra Sparks and ratified the DEPENDENCY of KPL and forbid any contact between father and son.
ALABAMA CODE of 1975 26-14-7.1; ALABAMA ADMINISTRATIVE CODE BOOK

112. On February 27,2003, Karl Lentz attempted to hire a lawyer from MITCHELL

Page 51 of 68

& GRAHAM, P.C. in Birmingham, AL.

113. This firm accepted a deposit from Karl Lentz .

114. This firm gained access to the Court Report(s), and, after reading the case file, regretted to inform Karl Lentz that he had "no chance of winning" and promptly refunded his deposit.

115. In a 5 May 2003 deposition led by Brian Huff, attorney for Karl Lentz, disclosed that the 'alleged' occurrences of domestic violence involving Karl Lentz were unfounded.

116. Lisa Brown claims that the *"whereabouts of any unknown father, are unknown and cannot be ascertained after the exercise of due and reasonable diligence"* and submits, under Rule 4.3 to be given notice by publication on 14 May 2003.
   - (a)    Lisa Brown knows how to contact Karl Lentz;
   - (b)    Lisa Brown is in the possession of contact numbers for Karl's family since AUGUST 2001;
   - ( c )    Karl Lentz has never denied paternity;
   - (d)    Lisa Brown still has failed to produce KPL for a DECEMBER 2001 court-ordered paternity test, *yet* continues on with the TPR process;
   - (e)    Lisa Brown is aware that Brian Huff is the Father's attorney and can get in touch with him at any time.

117. Even after the 5 May 2003 deposition, Lisa Brown refuses to acknowledge that Mary Kay Mangina and her mother, Margaret Mangina conspired against Karl Lentz, continued to falsely report that KPL was at *"..high risk of abuse and neglect ....that the baby's father is physically and abusive ..."* in spite of the fact that, while under his care, KSL was well-taken care of, had access to a local pediatrician and was happy and healthy when she was taken into custody.

118. In the PETITION FOR TERMINATION OF PARENTAL RIGHTS filed on 14 May 2003, Lisa Brown falsely claims that the *"putative father blamed her for the child's disability, and he was unaccepting of the child."*
   - (a)    Karl Lentz, the natural father, is an educated man and knows that Down Syndrome is the result of a genetic mutation, and not "anyone's fault"; and
   - (b)    It was previously reported by Patrick Dunne, evaluator, in a session with Mary Kay if Karl Lentz had an "issue" with KPL being diagnosed with  Down Syndrome, Mary Kay replied,

   *"It doesn't bother him to have a child with Down's syndrome."*

**These action(s) and false reports by Lisa Brown were created with the sole purpose of defaming and slandering the moral character of the natural father, Karl Lentz.** ALABAMA CODE of 1975

119. Lisa Brown further attempts to destroy the reputation of Karl Lentz by falsely stating that *"...the mother stated that BA was abused by Karl Lentz..."*

        (a) As a result of the 5 May 2003 Deposition, Mary Kay clearly states BA never lived with them, nor did she suffer any abuse *EVER* because of any action on Karl's behalf; and

        (b) In a psychological evaluation by Dr. Jon Williamson, MD, on March 2002, BA states that she had never been abused.

120. Lisa Brown also notes that the parents failed *" to attend all doctor appointments..."*

        (a) When Karl and Mary witnessed Lisa Brown trying to coerce the doctor at the one appointment they were permitted to attend, and reported this behavior to Beth Schaeffer in Montgomery, Lisa Brown retaliated by refusing to inform the parents of :

            (1)    any other doctor visits;
            (2)    any medical procedures;
            (3)    **any contact with KPL for 2 ½ years**.

121. Lisa Brown falsely claims that Karl Lentz has refused to participate in a paternity test.

        (1)    **Lisa Brown was court-ordered 3 December 2001 to produce KPL for a paternity test at the expense of the JCDHR,** and eighteen (18) months later, is still in contempt of court;(EXHIBIT 3)

        (2)    Karl Lentz hired Brian Huff with the sole intention of forcing Lisa Brown to comply with the 3 December 2001 Order granted by Judge Sandra Storm to produce KPL for the paternity test.

122. Lisa Brown also falsely claims that she*"... cannot confirm the parents compliance with the orders of this court."* in respect to the parenting and domestic violence classes.

        (a)    Karl Lentz completed the Parenting Class on 26 SEPTEMBER 2001;

        (b)    Karl Lentz completed the Domestic Violence Class on 20 March 2004; and

        ( c )    Lisa Brown has copies of the certificates, yet documents that she cannot confirm his participation.

123. Lisa Brown falsely reports that *"...there exists no known appropriate relative*

*resources for the placement of the said child [KPL]."*

    (a)    Lisa Brown is fully cognizant of the fact that Karl and his family have been aggressively seeking custody of KPL since he was taken into custody in AUGUST 2001; and

    (b)    Lisa Brown actively and intentionally prohibited placement with the paternal family by refusing to produce KPL for the court-ordered paternity test for eighteen (18) months.

124. A TPR trial was set for 4 August 2003.

125. The TPR trial was rescheduled by Judge Sandra Storm for 8 December 2003.

126. On 8 August 2003, Judge Sandra Storm issued yet another court-order for paternity via a separate order because Lisa Brown and the JCDHR have neglected, failed and refused to produce KPL for a paternity test, which was originally court-ordered 3 December 2001 - twenty-one (21) months prior.

127. Immediately after this court appearance, Karl Lentz went *directly* to the UAB, Department of Genetics, 424 Kaul Human Genetics Building, 720 20th Street South, Birmingham, Alabama to participate in the paternity test.

128. On 30 October 2003, paternal grandmother, Patricia Russo, contacted Beth Schaeffer in Montgomery with her continued concern and frustration that JCDHR and Lisa Brown is still refusing to produce KPL for the paternity test.

129. In the MOTION TO CONTINUE submitted by Sandra Johnson on 24 November 2003, it states that the *"GAL and the putative father agree to the continuance."*

    (a) Brian Huff , attorney for the Father, and the Father wanted the TPR to take place as soon as possible to allow them the opportunity to present evidence and testimony in his behalf, which has been previously denied to him; they did NOT agree to a continuance.

    (b) Karl had been denied ANY visitiation(s) with his son, KPL for TWO AND A HALF YEARS.

    (EXHIBIT 5)

130. On 2 December 2003, Karl Lentz was informed by Brian Huff, attorney, that the 8 December 2003 TPR trial was rescheduled, but no date had been set.

131. On 2 December 2003, Patricia Russo, paternal grandmother, was informed by Lisa Brown and verified by her Supervisors - Tracy Currie, Anita Turner and Kim Mashego, that the TPR trial was rescheduled and no date had been set.

132. Dismayed by yet another delay, Patricia Russo wrote to Judge Sandra Storm to relay her disappointment.(EXHIBIT 6)

133. The 8 December 2003 TPR trial that we were told on 2 December 2003 was cancelled, took place as scheduled in the Family Court of Jefferson County and heard by Judge Sandra Storm.(EXHIBIT 7)

134. Oddly enough, Brian Huff, attorney for the Father was in attendance. (EXHIBIT 7)

135. Re-appointed court-appointed attorney, Mary Kay Laumer appeared in behalf of the mother, Mary Kay Mangina, although she had informed the mother that the TPR trial was rescheduled.(EXHIBIT 7)

136. Lisa Brown was in attendance, even though she informed the paternal grandmother, Patricia Russo, that the TPR trial was cancelled.(EXHIBIT 7)

137. As a direct result of this blatant collusion between attorneys and the agents of the JCDHR and the Jefferson County Family Court, Karl Lentz was denied ANY opportunity to visit with his children, KPL and KSL. (EXHIBIT 7)

138.        Due to the Father's "absence" the "*Court concurs with DHR's plan of adoption.*"

139. Also determined on 8 December 2003, permanent placement of BA was given to the maternal grandmother, without the mother being present, without the mother's knowledge and without the benefit of competent counsel.

140. Lisa Brown insinuates that the paternity test is still not done, giving the Court the impression that Karl Lentz is the one failing to comply with the two previous court-orders for paternity testing.

141. Lisa Brown and her Supervisors were aware that Karl Lentz went for testing on 8 August 2003 and that KPL was finally produced 14 Nov 2003. (EXHIBIT 8)

142. The TPR trial was reset for 26 March 2004.
        (1)    Lisa Brown, Tracy Currie, Angela Tanveer, Kim Mashego,

Page 55 of 68

Tenisha Felton, Anita Scott-Smith and Terry Beasley
neglected to inform Karl Lentz, Mary Kay Mangina and
Patricia Russo of the new date despite constant and continuous
inquiries of the above-mentioned parties.

143. On 9 December 2003, in a phone call with the paternal grandmother,
Brian Huff learned that Patricia Russo had written to Judge Storm regarding
the delay of the TPR trial.

144. Brian Huff reprimanded Patricia Russo for contacting the Judge without
his knowledge.

145.    Brian Huff expeditiously filed a <u>MOTION TO SET ASIDE</u> on 11
December
2003, requesting that the Judge rescind the Order(s) granted on 8
DECEMBER 2003, in an effort to cover his inappropriate behavior
unbecoming of an attorney two (2) days prior.  Exhibit (11)

146. Brian Huff also draws to the Court's attention that the Father has been
denied the opportunity to present evidence in his behalf for TWO YEARS.

147. Brian Huff also notes that the Court *"has not yet considered any relative
resources available for placement of the minor children."*
    (a) An ICPC was initiated by the JCDHR on the paternal grandmother,
and was approved.

148. Unfortunately, Brian Huff neglected to inform the Court that it is ILLEGAL
to deny visitations between a child and his/her parent(s).
ALABAMA ADMINISTRATIVE CODE BOOK 660-5-50; RC CONSENT
DECREE #

149. On 19 December 2003, the Genetics Department of UAB released the
findings of the court-ordered paternity test.(EXHIBIT 8)

150. It was proved that Karl Lentz was, in fact, the biological father of KPL.

151. Interestingly on 19 December 2003, Patricia Russo, paternal grandmother,
received a letter from Kim Mashego, who also cc'd: Terry Beasley, Tenesha
Felton, Lisa Brown, Beth Schaeffer and Iris Glasco regarding a phone
conversation on 4 December 2003.
    (a)   Kim Mashego verifies that the 8 December 2003 TPR trial
        was rescheduled;
            *but it had taken place*
    (b)   Kim Mashego relays that another court date had not been set;
            *but one had been set on 26 March 2004*

Page 56 of 68

( c )    Kim Mashego states that paternity for Karl and KPL is still
pending
*but UAB had already released the results to JCDHR
earlier in the day*

(d)    Kim Mashego refused to acknowledge Karl's paternity of KSL
*In violation of the ALABAMA ADMINISTRATIVE CODE
BOOK 660-3-11 ?*

(EXHIBIT 9)

## STANDARD OF REVIEW

This court reviews jurisdictional issues and other questions of law de novo.

See, e.g., <u>R.C. v ANDY HORNSBY, Commissioner of the Alabama Department</u>

<u>of Human Resources,</u> in 1991(United States District Court for the Middle District

of Alabama), a.k.a. <u>RC v FULLER.</u>.

## SUMMARY OF THE ARGUMENT

**I. <u>General Challenge</u>:**

The complaint contains a general challenge to the operations and procedures of the

Jefferson County Department of Human Resources and its manipulation and

influence over the Family Court System in Jefferson County and its ability to deny

citizens their right to due process accorded to him/her provided under the

<u>ALABAMA CODE OF 1975,</u> section 26-14-7.1(1),(4),(6),(7)(a)(b)(c)(d)(e)(f)(g)(h)(i)

(j)(k),and 8.

**II. <u>Failure to Alter or Amend Order</u>:**

When the Jefferson Family Court became aware that our due process and civil rights

had been violated, the Court had several opportunities to amend court orders which

would have set the "wheels of justice" in motion to reunite the children with their

NATURAL PARENTS. This is based on RULE 60(b)(3)(6) which permits the

introduction of "new" evidence to be brought to the attention of the Court to

attempt to set the record "straight".

Page 57 of 68

## IMPACT STATEMENT

I humbly beseech for a moment of this Honorable Court's time to be allowed to digress to articulate the atrocities that this Family has endured by the operational procedures of the Department of Human Resources and the Family Court systems in Jefferson County.

We have exhausted every administrative and judicial avenue in the attempt to rectify and reunite this Family within our legal rights of due process under the law. Any attempt to essay information of the "alleged" charges, the right to obtain counsel, in any way, shape, form or mean to become active in this process  was immediately thwarted by the threat of imprisonment. That "HEARINGS" , "TRIALS" and "REVIEWS" were held without our knowledge, in clandestine meetings that irrevocably altered the course of our lives throughout the past five years.

That this civil lawsuit is a FIGHT for the PRESERVATION of MY FAMILY, not a lawsuit of mergers and acquisitions of mere baubles, nor the mere dalliances of an Agency's whim, but we are "FLESH AND BLOOD".  We all are but the most sacred of God's creatures, and His Gift - our ability to have offspring, who are the culmination of all our HOPES, our DREAMS, our AMBITIONS.....our CHILDREN.

The Movant was denied through the use of malicious fraud, the custody of his/ this family's children: KPL,  KSL and KNL by the STATE OF ALABAMA DEPARTMENT OF HUMAN RESOURCES , that by the willful Manipulation of this administrative agency's  "social workers" and by their total control within their sphere of influence over the Tenth Circuit Court of Alabama in Jefferson County, Family Court Judiciary Agents and legal counsellors have kidnaped my children.

Through the Racketeering activities of this Agency, through their reign of misery, sorrow and sheer terror not only upon the citizens ensnared in this "web of deceit", but also upon the their Defending Attorney's, who, too, are threatened by the Jefferson County Court REFEREES/JUDGES absolute and maniacal rule - enamored by their own sense of self-worth in an arena where a captive audience to proselytize their own theories and beliefs - are to reign supreme, disregarding the People's right of self-determination and be allowed the luxury of "family".  The wanton abandon to inflict their will, without evidence, without due process on the lower economic classes of society is deplorable and reprehensible.

Page 58 of  68

"IF" after years of transgressions and intimidation, the Department of Human Resources and the REFEREES/JUDGES are thwarted and do not "break" the indomitable spirit - to still have the *stamina* to not scream out *"Yes, I am guilty! Of what, I do not know, but please stop!"* To watch, to endure as the DHR taunts you - dangles your children before your eyes like a carrot on the end of a stick, to jump through their hoops without the benefit of an explanation or evidence is abhorrent. To completely understand that you have done nothing wrong, that "someone" has the POWER to take away your CHILDREN "just because" and that you are powerless; that you have NO recourse is debilitating. This Family has *suffered*. Jobs were lost, careers put on hold, holidays were meaningless - *TIME HAS BEEN IRRETRIEVABLY LOST CREATING MEMORIES WITH OUR CHILDREN.*

That an "Agency" under Color of Law can deny you of Holidays, Birthdays, Vacations, Religious milestones "just because" or a supposition that, even though evidence doesn't exist now, but perhaps "maybe" "someday" "something *might* go wrong" in the Future is ludicrous, repugnant and un-American.

We, the common man, are not the only individuals that are adversely affected nor have a total disdain for the phrase *"Department of Human Resources"* a.k.a *"DHR"* in Alabama, and those individuals would be the hapless "alleged" DEFENSE ATTORNEY. Any attorney that has the misfortune of having his/her die cast into a social services "case", that after a methodical procession of agonizing depravity by DHR's manipulation of hearts, spirits, minds and souls - that through their incessant proselytizing of abusive operational policies including, but not limited to: intimidation, terrorism, fear, humiliation, coercion, punishment, threat of reprisals - reprisals as repulsive as: alienation of affection through enforced separation, name changes, the denial of participating in daily milestones, denial of access to his/her family - essentially, stripping any bond and connection of the parent/child/family relationship, the Defense Attorney has no choice but to turn the other way or be victimized himself/herself.

The plight of the Defense Attorney to recognize that injustices are occurring and feeling powerless to put a stop to it, must feel emasculated. It is with empathy that we view our Defense Attorney. He realized that the "system of care" in Jefferson County was encroaching on and annihilating our civil rights and, lamented that there was nothing he could do. The Machiavellian attitude to rationalize that occasionally, an

innocent family will be decimated and that "collateral damage" is to be expected in all of life's endeavors - to justify the calamitous effects this 'experience' has had on this family is somewhat regrettable and a necessary evil is U N AC C E P T A B L E.

The Department of Human Resources and the Family Court system in Jefferson County and its Agents are unequivocally the source of this Family's nightmares, however, we are not seeking retaliation nor reprisals on a personal level. To repay these transgressions against this Family would only cause further harm. To place all the blame of the total and wanton destruction of this Family's civil rights and the irreparable harm by the hands of the Agents representing the State of Alabama to this Family, squarely on the shoulders of Jefferson County, would be unfair. For we, this Family, understand that this "child welfare system" is a billion dollar industry, not a non-profit faith-based organization. THIS IS A BUSINESS. It is easy federal money. DHR preys upon the lower economic classes with no access to legal resources and has no fear of reprisal or accountability because the presumption is "you must be guilty"and "Who will believe you?"

It is our hope that the ALABAMA DEPARTMENT OF HUMAN RESOURCES remains on FEDERAL PROBATION, to enforce upon them accountability for their actions and that wantonly separating families to increase the STATE coffers WILL NOT be tolerated.

We move for mercy to those who intentionally pained us through this ordeal. Through our faith in GOD, we hope they shall be moved to use better judgment and compassion and to let their conscience guide them through their world, just as God has blessed this Family.

IN Conclusion, I fully understand that this is a "CIVIL COURT" not a "Common Law" Court and I /we , my Family will try to do our best from now on to not bestow inferences to the Almighty Creator. But still "May God speed us through and show each other kindness, justice, respect and mercy for all, may God guide us and bless us all, through these lawsuit proceedings ."

Page 65 of 68

## REMEDY and RELIEF

### DIRECTION OF THE LAWSUIT - OPTIONS

#### OPTION #1

The IMMEDIATE return of our children.

We will sue the top four named individuals: GOVERNOR BOB RILEY, PAGE WALLEY, acting DIRECTOR of the DHR; the HON. CHIEF JUSTICE NABERS, Presiding Head of the ALABAMA SUPREME COURT and the HON. TROY KING, as Head of the STATE of ALABAMA OFFICE of the ATTORNEY GENERAL for failure to properly train their STAFF, which permitted the eradication of our civil rights; which led to the kidnaping of our children Under the Color of Law.

#### OPTION #2

The IMMEDIATE return of our children.

We will sue the employees/ agents/ representatives of the DEPARTMENT OF HUMAN RESOURCES of ALABAMA and the FAMILY COURT system in JEFFERSON COUNTY and others herein named for conspiring to kidnap, collusion to deny due process and civil rights; and, racketeering for manipulating and falsifying court reports and records to receive Federal Funding under false pretenses.

#### OPTION #3

We will enter into MEDIATION, in which we will respectfully request the following:

(1)     The IMMEDIATE return of our children, KPL, KSL and KNL;

(2)     The ability to leave the STATE of ALABAMA unhindered and without incident;

(3)     ONE BILLION DOLLARS in damages;

(4)     That the "case files" are expunged from the record;

(5)     That the ALABAMA DHR remains under FEDERAL PROBATION indefinitely with no more requests from the GOVERNORS office for leniency because the DHR is violating the civil rights of others ;

(6)     That the STATE OF ALABAMA reimburse the FEDERAL GOVERNMENT for funds it illicitly received for kidnaping my children;

(7)     That, within the next three years, that the ALABAMA DHR is prohibited from acting as an intermediary solution between children and their families in regards of their placement and that the federal funding be directed to faith-based, for non-profit organizations promoting family unity.

If these children were the daughters of President George Bush, I am sure he would bring to bear force against the "terrorists" dividing his family, one would assume he would find a way to use weapons of mass destruction to bring justice and reunification to his Family.

If these children were Martha Stewart's children, I am sure someone would go to a minimum security FEDERAL PRISON.

If these children belonged to Donald Trump, someone would certainly hear "YOU'RE FIRED!" by someone in authority.

The ANGUISH of the deprivation of civil rights this Family has suffered is beyond description. For us to only pray to this COURT for justice to this Family, to pray for their safe return is in keeping with our Christian beliefs- we are not asking for revenge, for jail sentences or for people to lose their jobs. We have had our children RIPPED from our lives and we have been STRIPPED of our CIVIL RIGHTS as AMERICANS. This Family has SUFFERED because of the unchecked POWER of the ALABAMA "SYSTEM OF CARE", and the enticement of unlimited Federal Funding motivates the "system of care" to go on a state-sanctioned witch-hunt, to find "problems" where none exist, where there is no motivation for the DHR and its Agents, to show mercy and use common sense, and in acting Under the Color of Law, in conjunction with the corrupt Family Court system in Jefferson County - where collusion and flagrant abuse of the LAW is a daily occurrence and condones these "legal" kidnapings.

## CERTIFICATE OF SERVICE

I, Karl R. Lentz, do hereby certify that prior to, or immediately after the filing the foregoing with the Court, I mailed by U.S. Express Mail, postage pre-paid, or delivered by hand a copy to (SEE ATTACHED) :

DATE: __11·13·2006__    SIGNATURE: _____

## CERTIFICATE OF COMPLIANCE

I, the undersigned hereby certifies that the foregoing has been prepared in accordance with the font type and margin requirements of Local Rule ____ of the Middle District of ALABAMA, using the font type Times New Roman and a point size of 14.

_____

710 Augusta Farms Road
Waynesboro, Virginia 22980
1.678.665.0593
13 November 2006


re: 2:06CV942-MEF

Honorable Judge Fuller;

Please find attached exhibits documenting the violations of our due process rights
by the Jefferson County Family Court and the Jefferson County Department of
Social Services.

There appeared to be confusion in reference to what we are seeking. We are
seeking that this Court stop the time clock that will allow the illegal adoption of
our children, KPL, KSL and KNL, until such time that we have a day in court to
present evidence in our behalf proving that the case against us was based on false
allegations and prejudice   and was permitted to continue for over five (5) years as
a direct result of the active, aggressive and malicious denial of our civil rights.

We are aware that you may not return custody to us - that it is beyond your
jurisdiction. In this court's response to our TRO, it is within this Court's
jurisdiction to address due process issues.

Sincerely,
Karl and Mary Lentz

# IN THE  UNITED STATES COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| Karl R. Lentz | ) | |
| Plaintiff, Pro se | ) | CASE NO. |
| V. | ) | 2:06CV942-MEF |
| | ) | |
| ALABAMA DEPARTMENT | ) | |
| of HUMAN RESOURCES, and | ) | |
| its AGENTS; | ) | HON. JUDGE FULLER |
| and | ) | |
| JEFFERSON COUNTY | ) | |
| FAMILY COURT, and its | ) | |
| OFFICERS | ) | |
| DEFENDANTS | ) | |

## TEMPORARY RESTRAINING ORDER

Upon consideration for Plaintiff's Petition for Declaratory Injunction and Plaintiff's Expedited Request for a Temporary Restraining Order on this the 13th day of  November 2006 ,it hereby is ORDERED   that:

1.      That the Federal adoption "clock"( "clock" pertaining to a federal law stating if children are placed in foster care system in a state for three (3) years, and a qualifying foster family petitions for adoptions they are to be adopted away or the state to face federal embezzlement funding charges .) to be stopped until there has been an investigation from the Dept. of Justice Civil division in Birmingham Alabama .To Allow Federal Civil Attorney Mr. Callahan ,the ability to have time to "see" if there has been a pattern of corruption/abuse of rights against this family/children

2.      The above-mentioned Defendants shall not pursue adoption for the children: KPL, KSL, and KNL.
This Court will determine if the above-metnioned Defendants have illegally  deprived the plaintiff(s) of his/her civil rights which has caused irreparable harm and undue suffering of the plaintiff(s).

_____

U.S. Middle District Court Judge

## IN THE UNITED STATES COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

Karl R. Lentz       )
       Plaintiff, Pro se    )     CASE NO.
                        )        2:06CV942-MEF
        v                 )
                        )
**ALABAMA DEPARTMENT** )
**of HUMAN RESOURCES, and** )
**its AGENTS;**           )     **APPLICATION FOR AN EXPEDITED**
         and           )     **TEMPORARY RESTRAINING ORDER**
**JEFFERSON COUNTY**    )
**FAMILY COURT, and its**    )
**OFFICERS**             )     **IN FORMA PAUPERIS**
      **DEFENDANTS**     )

## PLAINTIFF'S MOTION FOR AN IMMEDIATE RESTRAINING ORDER

Pursuant to Federal Rule of Civil Procedure 65(b), and incorporating by

reference paragraphs 17-28 of the Complaint for Declaratory and Injunctive

Relief, filed this date, plaintiff hereby moves this Court to issue a Temporary

Restraining Order.

First, there is the likelihood that the Plaintiff will prevail on the merits of

the Complaint.

Secondly, if Relief is not immediately granted, the Plaintiff, and his

children: KPL, KSL and KNL will suffer from irreparable harm caused by the

estrangement - both physically and emotionally from each other, through the

methodical deprivation of the Plaintiffs civil rights by the Defendants for five years. It is the intention of the Defendants to permit the three year time constraint mandated by the Federal Government to allow the foster care providers to adopt the plaintiff's children, in spite of the fact the State Prosecutor, Jonathon Schlenker could not prosecute the plaintiff after five years of investigation and the TPR trial was dismissed on 14 August 2006.

Third, the issuance of a Temporary Restraining Order will not harm the Defendants, however, it will prevent the Defendants from proceeding with seeking an adoption alternative for the above-mentioned children.

The Plaintiff has exhausted every Administrative and Judicial avenue in an attempt to rectify the transgressions of the illegal and fraudulent activities of the Jefferson County Department of Human Resources and the Jefferson County Family Court system. Through the poor administration of this case, the Defendants clearly violated all policies and procedures of the ALABAMA Code of 1975, RC CONSENT DECREE of 1991, and guidelines found within the ALABAMA ADMINISTRATIVE CODE BOOK, DEPARTMENT of HUMAN RESOURCES, SOCIAL SERVICES DIVISION :

1.      Deirdre March and Lisa Brown failed to produce KPL as court-ordered on 3 Dec 2001 for a paternity test and effectively manipulated
        the Family Court system to ignore said court order until Nov 2003;

2.        The sole purpose of this delay was to deny the placement of KPL with his Father or paternal relatives;

3.        That the Dependency Hearing of KPL was found on 12 March 2002, and of KSL and KNL on 24 April 2004;

4.        That at the 12 March 2002 Hearing, the plaintiff was not represented by an attorney, nor was he afforded the opportunity of a court-appointed attorney, nor did he have access to the "allegations" against him, there was no trial in order for the Court to accept testimony and/or evidence and there is not a transcript or recording of any proceeding of said hearing;

5.        That at the 24 April 2004 Hearing, the father was present and was represented by counsel, but was not informed that the hearing was for Dependency, Plaintiff was denied the right to a trial for the taking of testimony and/or evidence, there is not a transcript or recording of any proceeding of said hearing, an Order was entered against the wishes of the father and his attorney, in which neither signed, nor agreed to any of the contents therein;

6.        That the Jefferson County Department of Human Resources is in violation of the RC CONSENT DECREE, in that they have failed to inform the parents of their rights, denied the parents any and all access to KPL for two years, failure to inform parents of medical conditions and/or procedures, failed to place children with paternal relatives in a timely manner, falsified court reports, failed to follow ISP guidelines, failed to address concerns of natural parents:(foster care parents changed the names of plaintiff's daughters, foster care providers encourage plaintiff's daughters to call them "Mommy" and "Daddy", KPL's failure to thrive - he was 22 pounds for three years, failure to provide sufficient and consistent early intervention programs to KPL, a child with Down Syndrome,) refused to provide natural parents written documentation of ISP's, refused to incorporate concerns of natural parents, paternal grandparents, and paternal aunt into the ISP, intentionally delayed trials and/or hearings to prolong placement, refused to allow the parents to baptize their children in keeping with their Roman Catholic upbringing, etc.....;

7.   That the JCDHR violated the plaintiffs protected due process rights by a pattern and practice of criminally editing, falsifying and manipulating court reports and depriving him of any meaningful remedy;

8.   That the court-appointed attorney's failed to aggressively protect the plaintiff's civil rights, failure to inform the plaintiff of his rights, failure to petition the Court for Interrogatories, Return of Custody,etc. - in essence, just failed to perform his/her duties in a professional and ethical manner and, in doing so, conspired with the JCDHR to kidnap the plaintiff's children Under Color of Law;

9.   That these Defendants, through their unconstrained misuse of the Administrative, Executive and Judicial "positions" they embody, directly resulted in malicious fraud, intrinsic fraud, embezzlement and kidnaping.

WHEREFORE, the plaintiff respectfully requests that this Honorable Court to grant a Temporary Restraining Order against the Defendants to prevent any further irreparable harm and suffering of the father and his children. Furthermore, the father would request any other, further and/or different relief in which he may be entitled, and has not herein requested.

A proposed Order of this motion is attached.

Respectfully submitted on this 13th day of November 2006.

Karl R. Lentz
710 Augusta Farms Road
Waynesboro, VA 22980
678.665.0593

710 Augusta Farms
Waynesboro, VA 22980
1.678.665.0593
kldirectv@yahoo.com
garnergirls@optonline.net
6 November 2006

RE: DUE PROCESS VIOLATIONS

To whom it may concern;

We are aware that your organization rarely takes on individual cases, however, we believe that this case is not only of public interest, but crucial to the sanctity of FAMILY and of our rights as AMERICAN CITIZENS.

Please find attached two separate motions, from two different court-appointed attorney's admitting that we have been denied our due process rights for five years at the hands of the Jefferson County Family Court and the Jefferson County Department of Social Services in Alabama which has resulted in our three children being taken into custody *at birth*.

The State Prosecutor, at the urging of the JCDHR, initiated and pursued a Termination of Parental Rights trial for four years because we filed a complaint in the State Headquarters in Montgomery against the caseworker, Lisa Brown, for attempting to coerce an intern to embellish our son's, KPL, medical condition to gain additional federal funding: he is a child with Down Syndrome. Ms. Brown also withheld visits with our son for TWO AND A HALF YEARS in retaliation for filing a complaint with Beth Schaeffer, DHR in Montgomery . You will also find attached the six criteria to initiate a TPR trial, none of which could remotely be applied to our case and was finally dismissed in Aug 2006, however, the JCDHR still refuses to return our children.
We have never been told of the "charges" against ; had access to the "evidence" the Department of Social Services is handing to the Judge behind closed doors - or in open court; never had the opportunity to present evidence and/or testimony in our behalf; hearings/ trials were held without our presence - without counsel to represent us; refusal of the JCDHR to allow us - or our attorney's  - a copy of hearings/trials; and that the JCDHR is in contempt of court for refusing to provide us the case files and information contained therein in direct defiance of a court order granting us a copy of these files in April 2006.

To further punish us, the JCDHR  has limited our visitations to once a month - and the children appear sporadically; the JCDHR absolutely refuses to allow us to baptize the children - stating that they were in "good Baptist homes" - we are Roman Catholic; allowed the foster care providers to change our daughter's names; failed to allow us to participate - or inform us- in medical decisions and/or procedures; allowed the foster care providers of our son to starve him - he weighed 22 pounds for three years and permitting a diet of "cheese doodles and pepsi because he is too retarded to eat".

There exists serious due process/civil rights violations occurring in Alabama and, after five years,  we have exhausted every administrative avenue and beseech your help to protect our rights and our family.

We sincerely hope that you can appreciate the substantial impact this has on families in the lower socio-economic strata of this society.  I come from a decent, hard-working family and did not truly understand how an Agency, acting maliciously under the color of law, can sidestep the Law, falsify court reports and have undue influence over the Court and completely strip us of our constitutional rights and *our children*.

Thank you for your time and attention to this family. We truly appreciate the opportunity to present our case to you.

Please contact us if you need any further clarification or information.


Sincerely,            Karl and Mary Lentz

## IN THE FAMILY COURT OF JEFFERSON COUNTY, ALABAMA

IN THE MATTER OF:       )

      )      **CASE NUMBERS:**

KOLLETTE SHAY LENTZ    )      JU 2002 53701

KOLE MANGINA         )      JU 2001 51832

KAMERYN LENTZ        )      JU 2004 50504

### MOTION FOR IMMEDIATE HEARING FOR CUSTODY TO FATHER

Comes Now, the Father, Carl Lentz, by and through his attorney of record, W. Alan Summers, Jr., and moves this Honorable Court for an order granting unto him custody of the above stated children, for the following reasons:

1. That Dependency of Kole Mangina was found on March 12, 2002 and of Kolette Lentz and Kameryn Lentz on April 24, 2004;

2. That at the March 12, 2002 hearing, the father was not represented by an attorney, nor was he afforded the right to a court appointed attorney, there was no trial in order for the court to accept testimony and/or evidence and no transcript or recording of any proceeding of said hearing;

3. That at the April 24, 2004 hearing, the father was present and was represented by counsel, but was denied the right to a trial for the taking of testimony and the admittance of evidence. There is no transcript or recording to any proceeding on this date. Furthermore, an order was entered against the wishes of the father and his attorney, in which neither signed nor agreed to any of the contents of said order;

4. That the father has never been allowed to defend any allegation listed in the Dependent Petitions, made the basis of the above styled cases;

5. That the Jefferson County Department of Human Resources is in violation of the RC Consent Decree, in that they have failed to exhaust any and all of its administrative policies and procedures in efforts to rehabilitate this father and his children;

6. That the father of said above named children was served with Petitions to Terminate his parental rights of Kole Mangina on August 4, 2003 and of Kolette Lentz and Kameryn Lentz on November 8, 2004. That on August 14, 2006, some one year and nine months plus later, said Petition to Terminate Parental Rights of the father was finally set for trial, giving the father his first opportunity to defend himself of the allegations and present testimony, but was learned that DHR had made a request to dismiss the petitions due to the paternal grandmothers years of involvement with the case, a favorable homestudy, and her desire to have custody of the children;

10/10/2006 23:12   2058560852   SUMMERS&STARR&SUMMERS   PAGE   03/05

7.   Furthermore, a Motion to Dismiss was filed in the above stated cases on August 14, 2006, based on the activity as described in Paragraph 6 herein above, and after consideration, this Honorable Court "Granted" said motion on August 16, 2006, dismissing any further action of this court. Said motion is attached as "Exhibit A";

8.   That since the dismissal of said case, DHR has failed and/or refused to return physical custody of said children to the father;

9.   That due to the constant delays, the inability of the father to have his day in court, and the poor administration of the case, the father has suffered irreparable harm in that his family has been estranged one from the other causing them not only the lose of their physical bond between this family but also any mental and/or emotional bond and clearly violates any policy and procedures in which Jefferson County Department of Human Resources and this court is reasonably expected to perform.

Wherefore, Premises Considered, the father moves this Honorable Court for an order returning immediate custody of the said minor children to the father for reasons as stated above. Furthermore, the father would request any other, further and/or different relief in which he may be entitled, and has not herein requested.

Respectfully submitted this the 3rd day of October, 2006.

W. Alan Summers
Attorney for the Father
1275 Center Point Parkway
Ste. 100
Birmingham, Alabama 35215
853-3911

IN THE FAMILY COURT OF JEFFERSON COUNTY, ALABAMA

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | CASE NUMBERS: |
| KOLLETTE SHAY LENTZ | ) | JU 2002-53701 |
| KOLE MANGINA | ) | JU 2001-51832 |
| KAMERYN LENTZ | ) | JU 2004-50504 |

## MOTION TO SET ASIDE ORDER OR MOTION FOR RELIEF FROM JUDGEMENT AND MOTION FOR IMMEDIATE HEARING

Comes Now, the Mother, Mary Mangina Lentz, by and through her attorney of record, Mary Kay Laumer, and moves this Honorable Court for an order pursuant to Alabama Rules of Civil Procedure 60(b) setting aside the orders of March 12, 2002 and April 24, 2004 and granting this motion. As grounds the following is set forth:

1. That the above cases of dependency are pending in the Family Court of Jefferson County;

2. That dependency of Kole Mangina was found on March 12, 2002 and dependency of Kolette Lentz and Kameryn Lentz was found on April 24, 2004;

3. That at the March 12, 2002 hearing the Mother was not represented by an attorney, nor was she offered the right to court appointed counsel;

4. That there was no hearing or trial for the court to accept testimony and/or evidence and no transcript or recording of any proceeding;

5. That the Alabama Legislature has extended the right to counsel to parents in dependency proceedings. See 12-15-63(b), Ala. Code 1975 (a copy of which is attached hereto as Exhibit A);

6. That the Mother was never informed of her right to counsel in the Dependency proceeding nor did she knowingly and voluntarily waive her right to counsel under applicable Alabama law; and,

7. That the actions of the Court violate the Mother's Rights under the U.S. Constitution, the Alabama Constitution and state and federal law.

WHEREFORE, PREMISES CONSIDERED, the Mother moves this Honorable Court for an immediate hearing and for an order granting this motion. Further, the Mother would request any other, further, and/or different relief in which she may be entitled, and has not herein

specifically requested.

Respectfully submitted this 9th day of October, 2006.

MARY KAY LAUMER (LAU 004)
Attorney for the Mother
P.O. Box 59292
Birmingham, AL 35259
Telephone: (205) 879-0088

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing motion has been served upon all counsel of record by U.S. Mail properly addressed on this the 9th day of October, 2006.

W. Alan Summers, Esquire
Attorney for the Father
1275 Center Point Parkway
Ste. 100
Birmingham, AL 35215

Celia Nadler, Esquire
GAL
120 2nd Court North
Birmingham, AL 35204

John Schlenker, Esquire
DHR Legal Attorney
PO Box 13248
Birmingham, AL 35202

OF COUNSEL

# Grounds for Termination of Parental Rights

| State | TPR Citation | Filing Required | Exceptions | Grounds Added |
|-------|--------------|-----------------|------------|---------------|
| **ALABAMA** | (26-18-5, 26-18-7): | See below:<br>1. murder of another child of parent<br>2. voluntary manslaughter of another child of parent<br>3. aided, abetted, conspired or solicited to commit murder or voluntary manslaughter<br>4. voluntary manslaughter of another child of parent<br>5. aided, abetted, conspired or solicited to commit murder or voluntary manslaughter<br>6. felony assault resulting in serious injury to child or another child of parent | No other provisions | No other provisions |

1 AUG 2001
MARY DENTAL
RECORD

Dr. Grady Swicord
707 21st Street South
Birmingham, AL 35233

Office Phone: 205-251-8128

Mary Mangina
3123 C Lancaster Ct
Birmingham, AL 35209

Account history for 07-25-01 to 10-24-03, printed on 10-24-03

| Date | Patient | Description | Amount | Balance |
|------|---------|-------------|--------|---------|
| | | Balance as of 07-25-01 | 0.00 | 0.00 |
| | | Periapical single, first | 14.00 | 14.00 |
| 07-25-01 | Mary | Root canal, bicuspid (#12) | 438.00 | 452.00 |
| 07-25-01 | Mary | Cash payment: thank you! | -142.00 | 310.00 |
| 07-25-01 | Account | Core Buildup, Inc, Pins (#12) | 144.00 | 454.00 |
| 08-01-01 | Mary | Cash payment: thank you! | -310.00 | 144.00 |
| 08-01-01 | Account | Mail stmt prepared | 0.00 | 144.00 |
| 08-11-01 | Account | Mail stmt prepared | 0.00 | 144.00 |
| 10-04-01 | Account | Mail stmt prepared | 0.00 | 144.00 |
| 10-17-01 | Account | Mail stmt prepared | 0.00 | 144.00 |
| 10-25-01 | Account | To Linda Cole's Collect. | -144.00 | 0.00 |
| 11-20-01 | Account | Ending balance | | 0.00 |
| 10-24-03 | | | | |

| Patient | Charges | Ins Pmts | Patient Pmts | Net Adj |
|---------|---------|----------|--------------|---------|
| Mary | 596.00 | 0.00 | 0.00 | 0.00 |
| Account | 0.00 | 0.00 | -452.00 | -144.00 |
| Totals | 596.00 | 0.00 | -452.00 | -144.00 |



FALSE ALLEGATION
OF KARL KNOCKING
OUT MARY'S
MOLAR. DHR knew
it was a false
statement, but
reported it to the
Court as the gospel truth

EXHIB



I

*21 NOV 2001*

## COURT REPORT
## Judicial Review
### The Honorable Judge Bahakel
### November 21, 2001 @ 9:00 AM



*cross reference to 14 Aug 2001*

Re: Kole Mangina
 Brittany Anderson

**DOB:** 08-02-2001
 12-01-1995

**JU#:** 2001-51832
 2001 – 51747

**DHR #:** 393.657

**Custody Status:** Temporary - State

**Parents:** Mary Mangina
 Kole Lentz (alleged father to Kole Mangina)
 Scott Anderson – Brittany Anderson

*Karl + Mary arrived at 8:30am at courthouse. Building was closed due to Thanksgiving Holiday. Security Guard gave them access to the building b/c they received summons to appear. Noone was there. Karl + Mary went to Montgomery to complain to Beth Schaeffer*

**Basis for Petition:**
Kole Mangina is at high risk of abuse/neglect due to 1.) Disclosure to U.A.B. social worker, by the mother, Mary Mangina that the alleged father, Kole Lentz is physically and mentally abusive to her. 2.) Questionable reliability of mother to provide care for infant due to history of alcoholism, mental illness, and depression. 3.) The child was diagnosed with Down's Syndrome, and parents had a strong negative reaction to the diagnosis.

**Current Information:**
Kole Mangina remains in the foster home of Mrs. Robin Parsons. Kole is doing well and the Parsons are very attached to him. Kole continues to go for his doctors' appointments approximately every two weeks at the Primary Care Clinic. Kole received his first of six Synagis shots on November 13, 2001.

Brittany Anderson remains in the custody of her maternal grandmother, Margaret Mangina, and is doing very well with her. Brittany is in kinderga̱──
Elementary School.

Mary Mangina has been court ordered to submit to a psychologic
the required recommendations. A psychological evaluation has b
Mangina and Kole Lentz on December 5th, with Dr. Patrick Dunr
was ordered to submit to a substance abuse assessment and follov
recommendations. The recommendations from the assessment we
for outpatient therapy at DHR, to attend weekly AA meetings, to
sever ties with drinkers and drug abusers, to verbalize a commitm
abstinence, and to secure employment. Mary Mangina has met w
for the assessment, but has not followed the recommendations se
Mary Mangina and Kole Lentz have completed parenting classes

**EXHIBIT**

**2**

3 DEC 2001

| Sample JU Form (back) | 04/2001 |

## ORDER OF ADJUDICATION OF
## DEPENDENCY/DISPOSITION/MODIFICATION

[d]  That reasonable efforts are not required to be made because:
   [ ]  the parental rights of a [ ]mother [ ]father to a sibling have been involuntarily terminated: _____
   [ ]  this court has determined that the [ ]mother [ ]father has subjected the child to an aggravated circumstance, specifically_____
   [ ]  this court has determined that the [ ]mother [ ]father committed [ ]murder pursuant to { 13A-6-2, Ala. Code 1975 or [ ]manslaughter pursuant to { 13A-6-3, Ala. Code 1975 of _____ , another child of such parent, as shown in Case No._____ ;
   [ ]  this court has determined that the [ ]mother [ ]father aided or abetted, attempted, conspired, or solicited to commit [ ]murder or [ ]manslaughter pursuant to { 13A-4-___, Ala. Code 1975, of _____ , another child of such parent, as shown in Case No._____ .
   [ ]  this court has determined that the [ ]mother [ ]father committed Assault [ ]1st pursuant to { 13A-6-22, Ala. Code 1975 [ ]2nd pursuant to { 13A-6-23, Ala. Code 1975, which result or_____ , another chi

A permanency hearing is scheduled to take place at_____

It is hereby ORDERED, ADJUDGED, and DECREED as follows:

( )  Dismissed on ( ) Motion of Petitioner ( ) Lack of Prosecution ( ) Failure of proof

( )  Petition sustained ( ). Adjudicated Dependent.
( )  Custody transferred to ( )  *remains with*  JCDHR  _____ County Department of Human Reso

( )  Discretion in planning and placement ( )  Placement with _____

( )  DHR to supervise for _____  ( ) Other _____

Case to be set: ( ) Review  3·12·02 @ 8:30  ( ) Permanency Hearing _____
( ) To Terminate On _____  ( ) Motion  ( ) Termina
Court Costs: ( ) Waived  ( ) Taxed to _____  ( ) Prepaid  ( ) L
Attorney Fees        Amount

_____  _____  taxed to _____  ( ) Recoupment by _____  ( ) Waived ( ) Relieved
_____  _____  taxed to _____  ( ) Recoupment by _____  ( ) Waived ( ) Relieved
_____  _____  taxed to _____  ( ) Recoupment by _____  ( ) Waived ( ) Relieved

The parties are hereby notified of their right to file a written notice of appeal within fourteen (14) days of this order being stamped filed in the clerk's office
( ) see page 2 for additional terms, conditions, and/or findings..

DONE and ORDERED  12/3/01  (date)        _____  JUVENILE COURT JUDGE

Exhibit

3

All prior orders remain in effect Nicole Lentz agrees to submit to Paternity testing to be paid for by JCDHR. "Motherless test" child support relieved to next hearing

12/3/01 AW

*(handwritten left margin, rotated)* did not indicate that 3-12-02 'review' was a DEPENDENCY HEARING

*(handwritten bottom)* no one ever gave Dad This or he would not have this to spend $2,900 to get it.

*VISITS*  *ILLEGAL TO STOP THE VISITS.*  12 March 2002

STATE OF ALABAMA

IN THE MATTER OF

Brittany ANDERSON
Kole Mangins

EXHIBIT 4

**ORDER**

\* \* \* \* \* \* \*

IN THE DISTRICT COURT OF
JEFFERSON COUNTY, ALABAMA
JUVENILE DIVISION
CASE NO.
Ju 2001 51747-AS
2001 51832-AS

FAILURE TO COMPLY WITH THIS ORDER CAN BE GROUNDS FOR THE COURT TO HOLD THE NON-COMPLIER IN CONTEMPT OF COURT.

ly notified of all their relevant, procedural, substantive, and n and the date and time of the NEXT COURT DATE.

:cess to the child(ren) during any and all reasonable times.

N HEARING ( ✓ ) DISPOSITIONAL HEARING ( ) PUBLIC LAW 96-272/ 105-89.

The above-named child(ren)  ( ✓ ) present  ( ) not present as said presence was waived by the Guardian ad Litem.

Also present are:

( ✓ ) Parent /Guardian/Custodian  Mary Mangins  ~~ATTORNEY~~: Scott Anderson (on birth certificate) for Brittany
( ✓ ) Parent /Guardian/Custodian  Kole Lentz  ~~ATTORNEY~~: for Kole (alledged)
( ✓ ) DHR Worker  Lisa Brown  ATTORNEY: Sandra L Johnson DHR
( ✓ ) GUARDIAN AD LITEM  Sandi Gregory  ( ) C.A.S.A.
( ✓ ) OTHER  Brittany's GM / Custodian  Margaret Mangins
Prospective pat C.P. for Kole  Pat Musso

**ADJUDICATION**

(X) The Parties stipulate to the admission of the Court Report filed by DHR and C.A.S.A. (when applicable) with any noted amendments.
( ) The Court notes the previous Order duly entered herein finding the above-named child(ren) to be DEPENDENT on _____.
( ) The parties stipulate to the following: _____

_____
_____
_____

( ) _____ ADMIT(S) the allegations in the Petition(s).
( ) Based on the Admission of Dependency, the Court finds the above-named child(ren) to be DEPENDENT AND IN NEED OF CARE AND SUPERVISION pursuant to Code of Alabama Section 12-15-1 (10).
(X) WHEREFORE, the Court from clear and convincing evidence and having considered all relevant and material evidence presented FINDS the above-named child(ren) to be DEPENDENT AND IN NEED OF CARE AND SUPERVISION pursuant to Code of Alabama Section 12-15-1 (10).

*24 NOV 2003*

# IN THE FAMILY COURT OF JEFFERSON COUNTY, ALABAMA

IN THE MATTER OF:       )
                        )

KOLE MANGINA,        ) CASE NO.  JU 2001-51832
                        )

    A Child.           )
                        )

**FILED IN OFFICE**
FAMILY COURT
NOV 2 4 2003

CLERK _____ S J

## MOTION TO CONTINUE

**COMES NOW** the Jefferson County Department of Human Resources (hereinafter "DHR"), by and through its attorney, Sandra L. Johnson, and moves this Honorable Court to continue the above-styled cause, and for grounds therefor would show the following:

*cross-reference order 8 DEC 2003*

1. That a termination trial is set for December 08, 2003. *but it took place anyway*

2. DHR moves for a continuance as the Department expects to file a TPR on the sibling.

3. It is in all parties best interest to have all issues before the Court at one hearing.

4. The GAL and the putative father agree to the continuance. *Karl told Brian he wanted the tri to take place ASAP*

5. At this time DHR does not know the whereabouts of the mother who is pro se in this matter.

6. Changing the date of the said case will r any outcome on the case.

# EXHIBIT

# 5

2 DEC 2003

710 Augusta Farms Road
Waynesboro, VA 22980
540-256-2395
December 2, 2003

Judge Storm
Jefferson County
Family Court
1321 5th Avenue, South
Birmingham, AL 35202

Dear Judge Storm,

My husband and I were looking forward to being in your Court Room on December 8,
2003. The issue in question is that of our grandchildren, Kole and Kolette Lentz.
However, it has come to my attention today that this date has been postponed, as DHR,
after all this time, is still not prepared to attend court.

I cannot tell you how disappointed we are that this has occurred as we were truly looking
forward to bringing the children home for Christmas. We have been trying, for what
seems a very long time, to be reunited with our grandchildren.

We are certainly willing to do whatever it takes to make this a reality. I would like to
request temporary custody until a decision can be made so that Kole and Kolette can live
together as brother and sister as soon as possible.

If there is any way you can help us or if there is anything we can do please let us know.

Thank you.

Sincerely,

*Patricia Russo*

Patricia Russo

**EXHIBIT**

**6**

ross-reference 24 NOV 2003   outright lie   8 DEC 2003
blatant collusion

PO

**EXHIBIT 7**

**ORDER**

Form C-18J Sp. 3/87

CASE NUMBER

JU es   01 51 832 01
ID   53702
YR   NUMBER

IN THE ___**FAMILY**___ COURT OF ___**JEFFERSON**___ COUNTY

Plaintiff _____ vs Defendant _____

In The Matter Of: Kole Mangina
(Juvenile Case)

CHARGE ___Dependency___   DATE OF HEARING ( 12/8/03 )

**\*\*NOTICE\*\***

[ ] ANY PARTY TO PROCEEDINGS HEARD BY A REFEREE NOT SATISFIED WITH THE FINAL DISPOSITION AS NOTED BELOW HAS THE RIGHT TO A REHEARING BEFORE THE JUDGE OF THIS COURT IF A WRITTEN REQUEST IS FILED WITH THE CLERK OF THIS COURT WITHIN FOURTEEN (14) DAYS OF THIS NOTICE.

[✓] ANY PARTY TO PROCEEDINGS HEARD BY A JUDGE MAY APPEAL THIS ORDER TO THE APPROPRIATE APPELLATE COURT BY FILING WRITTEN NOTICE OF APPEAL WITHIN FOURTEEN (14) DAYS WITH THE CLERK OF THIS COURT AND CLERK OF THE APPROPRIATE APPELLATE COURT.

Sandra L. Johnson rep. Lisa Brown - DHR; Sandi Gregory - GAL; Brian Huff rep. Karl Lentz - alleged presumed father; Karl Lentz, alleged father - not present; Mary Mangina - mother - not present.

Cause came on for TPR trial. DHR's Motion to Continue is granted. Custody of child shall remain with JCDHR. Counsel for Karl Lentz's motion for visitation between Karl Lentz and child is hereby denied as Mr. Lentz is not present this date. All prior consistent orders shall remain in full force & effect.

The court concurs with DHR's case plan of adoption. DHR has made reasonable efforts to reunify family which are detailed in the Court Report dated 12/8/03. Said efforts have failed.

The Court's previous order for DNA testing is hereby amended to reflect that the test shall proceed as a Motherless Test.

Kay Laumer is hereby reappointed to represent the Mother in this matter.

Case is reset for TPR trial on March 26, 2004 at 8:30 a.m.

FILED IN OFFICE
FAMILY COURT
DEC 11 2003
CLERK SJ

Dated for the test
1-26-04

Certified As A True Copy

Karl told by Brian Huff that Dec 8 hearing was rescheduled HOWEVER Brian Huff showed up, as did DHR, GAL.

Date _____

Signature of Clerk/Register

Signature of Judge/Referee

cross reference
21 NOV 2003
2 DEC 2003

COURT RECORD (White), DEFENDANT (Green), PLAINTIFF (Pink), DEFENDANT (Goldenrod)   FAMILY COURT — 41

19 DEC 2003

**THE UNIVERSITY OF ALABAMA AT BIRMINGHAM**

*Department of Genetics*

19 Dec 03

DEC 2 9 2003

DEC 2 9 2003

Jefferson County Family Court
Birmingham Division
120 Second Court North
Birmingham, AL 35204

JU 2001-51832

| | | Lab No. | Race | Sample Date |
|---|---|---|---|---|
| | | | W | |
| | | 50115-03 | | 14 Nov 03 |
| | | 50115-01 | W | 08 Aug 03 |

Mother
Child                Kole Mangina
Alleged Father       Carl Lentz
Case Number          03-07247

| System | Mother | Child | Alleged Father | Paternity Index |
|---|---|---|---|---|
| D8S1179 D8 | ? | 12 | 11, 12 | 3.57 |
| D21S11 D21 | ? | 29 | 29 | 4.68 |
| D7S820 D7 | ? | 9, 10 | 9 | 2.84 |
| HUMCSF1R CSF1R | ? | 10, 12 | 10, 12 | 1.80 |
| D3S1358 D3 | ? | 17, 19 | 16, 17 | 1.38 |
| HUMTHO1 TH | ? | 9, 9.3 | 9.3 | 1.72 |
| D13S317 D13 | ? | 8, 9 | 9, 12 | 3.25 |
| D16S539 D16 | ? | 11, 13 | 13 | 2.99 |
| D2S1338 D2 | ? | 20 | 18, 20 | 3.42 |
| D19S433 D19 | ? | 14 | 14, 15.2 | 1.47 |
| HUMVWFA VWFA31 | ? | 16, 19 | 16, 19 | 4.09 |
| HUMTPOX TPOX | ? | 9, 11 | 8, 9 | 2.16 |
| D18S51 D18 | ? | 12, 18 | 17, 18 | 3.25 |
| D5S818 D5 | ? | 11, 12 | 11 | 1.28 |
| HUMFGA FGA | ? | 21, 22 | 21, 22 | 2.96 |

Exclusion: No

Cumulative Probability of Paternity: 99.99%

**EXHIBIT 8**

Cumulative Paternity Index: 1,110,291 to 1

Carl Lentz can not be excluded as the father of Kole Mangina.  This conclusion is

**Medical Genomics Laboratory**
424 Kaul Human Genetics Building
720 20th Street South
205.934.7107
Fax 205.996.2929

Mailing Address:
KAUL 424
1530 3RD AVE S
BIRMINGHAM AL 35294-0024

**Pat Russo**

| | |
|---|---|
| **From:** | Kimberly Mashego [kmashego@dhr.state.al.us] |
| **Sent:** | Friday, December 19, 2003 4:04 PM |
| **To:** | Pat Russo |
| **Cc:** | Beasley, Terry     JEFF DHR; Felton, Tenesha M.     JEFF DHR; Brown, Lisa     JEFF<br>DHR; Schaffer, Beth     PERS DHR; Glasco, Iris     JEFF DHR |
| **Subject:** | Telephone Conference |

On 12/4/03 Terry Beasley, Tenesha Felton and myself returned a phone call
to you regarding some concerns you wanted to discuss involving your
grandchildren. During this call, you voiced concern that the court hearing
had been continued and would be set for a later date and you also requested
the status of paternity testing for Kole and Kolette. You also spoke of
expecting to have your grandchildren in your custody by the Christmas
Holoidays and you requested the date of the next ISP.

We explained to you that court had indeed been rescheduled and would be
reset. At the time of our conversation we did not have another court date.
As of today we still do not have another court date. Paternity testing is
still pending for Kole and Kolette. Mr. Lentz will need to complete
complete paternity testing for Kolette. We discussed that Lisa was in the
process of scheduling an ISP, but was having problems contacting Mr. Lentz
and Ms. Mangina as they have left the state again. You stated that you
have contact with your son and the next time you spoke with him, you would
ask him to contact Lisa. As of this date, Lisa has not received a call
from Mr. Lentz or Ms. Mangina. In the interest of moving ahead with
planning for Kole and Kolette, Lisa has scheduled the ISP date for Tuesday,
1/13/03 at 1:00 P.M.

During a previous conversation, you stated that you wanted to be involved
in this ISP via conference call. If your preference has changed, please
notify Lisa Brown as soon as possible. Ms. Brown will also be contacting
you prior to the ISP to answer any remaining questions you may have.
Hopefully, this will prepare you to participate in planning for Kole and
Kolette.

If you have additional questions, please feel free to contact Lisa Bown at
205-918-5294. If you are unable to reach Ms. Brown, please contact Tenesha
Felton at 205-918-5208. You may also contact me at 205-918-5332 or Terry
Beasley, Program Manager at 205-918-5136.

Thank you,

Kim Mashego

# EXHIBIT

# 9



THE UNIVERSITY OF
ALABAMA AT BIRMINGHAM

*Department of Genetics*

October 28, 2004

**M E M O R A N D U M**

TO:  Whom it may concern

FROM: R. Michael Settine

RE: Paternity Evaluations for Carl Lentz and Kole Mangina, a minor.

This is to certify that the above-named individuals, Carl Lentz and Kole
Mangina, a minor, appeared at this facility on August 8, 2003 and
November 14, 2003 respectively and provided specimens for the purpose
of evaluating the possible paternity of Carl Lentz with respect to the minor
child, Kole Mangina.  Said evaluation was performed and a report was
released on December 19, 2003 to the Family Court of Jefferson County,
Birmingham Division.

I hope this information is useful to you.  Should you have any questions,
please feel free to contact me at 205-934-7107.

Thank you.

R. Michael Settine, Clinical Management Officer
UAB Medical Genomics Laboratory

**EXHIBIT**

**10**

*cross-reference*
*14 Dec 2003*
*Kim Mashego email*

*a year AFTER results*
*(12-19-03)*
*in - Mashego again requests*
*paternity verification*

es Laboratory
424 Kaul Human Genetics Building
720 20th Street South
205.934.7107
Fax 205.996.2929

Mailing Address:
KAUL 424
1530 3RD AVE S
BIRMINGHAM AL 35294-0024

11 DEC 2003

**EXHIBIT 11**

## IN THE FAMILY COURT OF JEFFERSON COUNTY, ALABAMA

| | | |
|---|---|---|
| In the Matter of: | ) | CASE NO. |
| COLE MANGINA | ) | JU 01-51832 |
| In the Matter of: | ) | |
| COLLETTE SHAY LENTZ | ) | JU 02-53702 |

FILED IN OFFICE
FAMILY COURT
DEC 1 1 2003
CLERK

### MOTION TO SET ASIDE

**COMES NOW** the presumed father in the above referenced matters by and through his attorney of record and moves this Honorable Court to set aside its Order dated December 8, 2003 and as grounds therefore said presumed father states as follows:

1.    That these matters are set before the Honorable Sandra Storm for Termination of Parental Rights proceedings.

2.    That on December 8, 2003 these matters came before the Honorable Sandra Storm on dependency reviews.

3.    That there was no testimony taken at said dependency review.

4.    That as part of this Court's Order it indicates that "the Court concurs with DHR's case plan for adoption. DHR has made reasonable efforts to reunify the family which are detailed in the court report dated December 8, 2003. Said efforts have failed."

5.    That the Court's concurrence with DHR's case plan of adoption is premature in that this Honorable Court has heard no testimony regarding the suitability of the parents to care for the minor children. Further, this Court has not yet considered any relative resources available for placement of the minor children.

**WHEREFORE, PREMISES CONSIDERED,** the attorney for the presumed father respectfully requests that this Honorable Court set this matter for hearing and following same

Hearings were being held w/o knowledge of Karl or Mary

set 1/12/04 @ 8:30

cross-reference
21 NOV 2003
14 Aug 2001

*[handwritten top:] Exhibit 118b    HE ADMITTED    Brian admits here that there was indeed ① a trial ② a court order as a result of 8 DEC 2003 trial even though he repeatedly denied there was a hearing trial*

that an Order be entered setting aside this Court's Order of December 8, 2003.

BOYD, FERNAMBUCQ & VINCENT, P. C.

BY: _____

J. Brian Huff
Attorney for Moveant
2801 University Boulevard, Suite 302
Birmingham, Alabama 35233
(205) 930-9000

### CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing Motion upon the Hon. Sandy Gregory, Legal Aid Society, 120 2nd Court North, Birmingham, AL 35204; and Sandy Johnson, 11 West Oxmoor Road, Suite 600, Birmingham, AL 35209; and Hon. Kay Laumer, P. O. Box 59292, Birmingham, AL 35259, by placing a copy of same in the U. S. mail, properly addressed and postage prepaid, this the _12_ day of _December_, 2003.

_____

J. Brian Huff

*[handwritten:] Granted upon argument of counsel and that part of this court's order of 12-8-03 finding that this court agrees with a case plan of adoption is hereby set aside.*

*[handwritten circled:] Jot 3-04 2' @ 8:30*

*[handwritten:] 1-13-04*

*[handwritten:] Brian convinced Judge Stein to set aside the 12/8 Court order b/c ① it is ILLEGAL to deny visitation ② Brian knew we had proof that we aggressively sought info re 12/8 hearing ③ set aside adoption, but kept case for Russo 12/8 letter*

# CERTIFICATE OF VITAL RECORD

VERIFY PRESENCE OF WATERMARK    HOLD TO LIGHT TO VIEW

## COMMONWEALTH OF VIRGINIA
### DEPARTMENT OF HEALTH – DIVISION OF VITAL RECORDS

### CERTIFICATE OF LIVE BIRTH

**STATE FILE NUMBER:** 145-02-070935

**NAME OF REGISTRANT:** KOLETTE SHAY LENTZ

**DATE OF BIRTH:** SEPTEMBER 28, 2002    **SEX:** FEMALE

**PLACE OF BIRTH:** AUGUSTA COUNTY, VIRGINIA

**MAIDEN NAME OF MOTHER:** MARY KAYE MANGINA

**AGE OF MOTHER:** 37

**MOTHER'S PLACE OF BIRTH:** ALABAMA

**NAME OF FATHER:** KARL RUDOLPH LENTZ

**AGE OF FATHER:** 38

**FATHER'S PLACE OF BIRTH:** NEW YORK

**DATE RECORD FILED:** OCTOBER 8, 2002



This is to certify that this is a true and correct reproduction or abstract of the official record filed with the Virginia Department Of Health, Richmond, Virginia.

DATE ISSUED    **February 25, 2003**

*Deborah Little-Bowser*
Deborah Little-Bowser, State Registrar

Do not accept unless on security paper with seal of Vital Statistics clearly impressed. Section 32.1-272, Code of Virginia, as amended.

VS 15B

**VOID WITHOUT WATERMARK OR IF ALTERED OR ERASED**

marys_drivers_licsence (2549x903x16M jpeg)









2 November 2006

re: Kole, Kolette and Kameryn Lentz

Dear Christa,

It appears that while your agency is telling us that you are "looking into it" and have had some unproductive "dialogue" with the JCDHR, the illegal actions and civil rights violations against this Family continue.

We grow weary of being patronized, that our children have SUFFERED, and continue to suffer, at the hands of the JCDHR and the JC Family Court - that your agency, which appears to be founded on the presumption that you will protect children and uphold the RC CONSENT DECREE and the guidelines set forth in the ALABAMA ADMINSTRATIVE CODE BOOK has FAILED.

That you cannot stop the "system of care" from abusing these children - and their inherent civil rights -

to know their parents, their extended families, - not to be WITHHELD FOR TWO AND A HALF YEARS in retaliation of a disgruntled case worker....

to be brought up in the Roman Catholic Faith of their family - not to be told not to worry about their "souls" that they are in a good BAPTIST home....

to maintain their birth names, - to PROHIBIT THE FOSTER CARE PROVIDERS from actively and aggressively ALIENATING the children from THEIR PARENTS...to PREVENT the foster care providers for causing MORE emotional trauma..

to have proper nutrition - to PREVENT the foster care parents from STARVING my son, to enforce a proper diet - not just "cheese doodles and pespi" because he is "too retarded to eat"......to PROTECT them from MALNUTRITION to justify additional federal funding, to PREVENT them from EATING POISON BERRIES - which are causing PHYSICAL HARM.....

If it is not within the parameters of your agency to assist these children, please submit it in writing as to the reasons why.

You are also aware that at this time we do NOT have attorneys - BECAUSE OUR COURT-APPOINTED ATTORNEYS' HAVE ADMITTED TO COLLUSION AND BLATANT CIVIL RIGHTS VIOLATIONS.

This is an open and shut case, however, we understand that state-sanctioned kidnaping is a billion dollar industry in Alabama and that so many state employees and court officers are implicated seriously inhibits our ability to procure competent legal counsel.

You can choose to ignore the cries of this family for their children or you can step up and PROTECT them.

Sincerely,

Karl and Mary Lentz

November 13, 2006

Re: 2:06V942 - MEF

RECEIVED

2006 NOV 13 P 4:43

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

Honorable Judge Fuller
Honorable Magistrate Coody

I, we, my family believe by reading your response to our TRO or/and Lawsuit we are asking you to hear our Case. No sirs we are not. Our Rights Inherent, Civil, Common-law, basically any right ever devised by a society has been Maliciously violated. All we seek is to recieve remedy of (1) The federal gov't's observance of that our due process rights have been "non-existing". And you seem to believe it would take a long time to hear this Case we would only be needing to Call one witness. My Attorney Alan Summers Jr. who is now a Family Court Judge in Jefferson County to swear, (like he already has in his letter/motion) that he as a Attorney

Knowing full well he was not providing
me a defense by either (a) incapable for
lack of training (which I seriously doubt.
I believe he will make many fine decisions on
the bench.) (b) he was pressured not to (which
is what my previous attorney now head JUDGE in
Brian Huff
Jefferson County told me, he was forced not to
Defend me.) The only difference between these two
attornies one confessed orally to me, the other
attorney I well two attornies now put it in writing
That we, my family was Denied Due Process which
led to "techinical" color of law" Kidnapping.
    You may read these "60-70" something papers, lawsuit
me and my sister wrote/typed with no experance.
    I figure if I hand write this letter you will
be able to tell that we are "people" not a
coparation or a business. we aren't perfect but
There is no reason for this treatment

we have recieved from Jefferson County
(Especially to the mother, hear her story you will all cry)

we hope these children are retuened to the

mother as soon as possible (all my attornies f

judges know this is what I seek, they even laugh

knowing just how wrong I have been done at times

by thier mother, but I keep reminding them

until she has broken a law, what right do I or

anybody have to enter into "her" jurisdication

between her and God and interfer with her

Inherent Rights. If I and the mother (mary)

Decide not to live together with the children, we

will settle that issue in divorce court, not here

in 11th circut court - Please Read Allan Summers

Jrs. motion/confession and Kaye Laumers (mother attorney)

and you will see, honestly you dont need to

read any futher , my God bless this court
                         and All involved in this
                      Lawsuit, yes DHR Too...

11-13-06

        Thank You      Karl Rudolph Lentz